**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

<table>
<tr><td>

FLORIDA IMMIGRANT COALITION, *et al.*,

           *Plaintiffs*,

      v.

JAMES UTHMEIER, in his official capacity as Attorney General for the State of Florida, *et al.*,

           *Defendants*.

</td><td>

No. 1:25-cv-21524-KMW

</td></tr>
</table>

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

"From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). Even in the immigration context, the Supreme Court has recognized that "the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (cleaned up). As a result, states are not without "power to deter the influx of persons entering the United States against federal law," *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982), just as was true at the Founding, *Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102, 132–133 (1837). Rather, states retain inherent sovereign authority to protect their citizens by aiding the enforcement of federal immigration law. So when "the Federal Government . . . prescribe[s] what it believes to be appropriate standards for the treatment of [aliens], the States may, of course, follow the federal direction." *Plyler*, 457 U.S. at 219 n.19.

Florida did nothing more in enacting SB 4-C. To aid the United States in curbing illegal immigration (and to quell the rush of fentanyl trafficking and gang violence that accompanies it), SB 4-C criminalizes the entry into Florida of those who have illegally entered the United States by evading federal inspection. Fla. Stat. §§ 811.102, 811.103. That law tracks federal law to a tee. *See* 8 U.S.C. §§ 1325(a), 1326(a)(2). It also retains common federal-law defenses and says nothing of who should be admitted or removed from the country. Just as Justice Scalia observed, Florida "has moved to protect its sovereignty—not in contradiction of federal law, but in complete compliance with it." *Arizona*, 567 U.S. at 437 (Scalia, J., concurring in part, dissenting in part). "If securing its territory in this fashion is not within the power of [Florida], we should cease referring to it as a sovereign State." *Id.*

Plaintiffs have not shown otherwise. To begin with, they lack standing and a cause of action to enforce federal immigration law. On the merits, they are wrong that Florida's law is preempted or violates the Dormant Commerce Clause. Federal immigration law supplants neither the State's power to assist federal immigration enforcement nor "the defining characteristic of [its] sovereignty: the power to exclude from the sovereign's territory people who have no right to be there." *Id.* at 417. Nor does excluding illegal aliens implicate the Dormant Commerce Clause, for that act has nothing to do with state economic protectionism against sister states.

To top it off, Plaintiffs bring "the most difficult challenge to mount," *United States v. Salerno*, 481 U.S. 739, 745 (1987)—a facial challenge. That choice requires the Plaintiffs to "establish that no set of circumstances exists under which the Act would be valid." *Id.* Plaintiffs cannot meet that "heavy burden." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 200 (2008).

The Court should deny injunctive relief.

## STATEMENT OF THE CASE

### I.   THE CRISIS AT THE SOUTHERN BORDER

Both President Trump and President Biden agree, the situation at America's border with Mexico is nothing short of a national "crisis."[1] Border Patrol consistently encounters around 2 million illegal immigrants a year who evade authorities at the border, and those are merely the individuals Border Patrol apprehended.[2] In fiscal year 2024 alone, Border Patrol seized enough fentanyl to kill every single American several times over—27,000 pounds.[3] The epidemic of illegal immigration reverberates throughout the Nation, including in Florida. Those illegal immigrants create a cost of nearly $182.1 billion nationwide, including healthcare, education, and other social

---

[1]  The White House, *Fact Sheet: President Donald J. Trump Declares a National Emergency at the Southern Border* (Jan. 22, 2025), https://tinyurl.com/yr3j33he; The White House, *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024), https://tinyurl.com/33znys4z.

[2] U.S Customs and Border Patrol, *Southwest Land Border Encounters* (last visited Apr. 15, 2025), https://tinyurl.com/mwnx26f8.

[3] Dep't of Homeland Security, *Fact Sheet: DHS Shows Results in the Fight to Dismantle Cartels and Stop Fentanyl from Entering the U.S.* (July 31, 2024), https://tinyurl.com/bf65z7n2; *see also* DEA, *Facts About Fentanyl* (last visited Apr. 15, 2025), https://tinyurl.com/mte3r9px (explaining that 2 milligrams of fentanyl is a fatal dose for an average American); Wikipedia, *Pound (mass)* (last visited Apr. 15, 2025), https://tinyurl.com/4xc4ykc7 (there are .45359237 kilogram, or 453,592.37 milligrams, in one pound of fentanyl).

safety nets.[4] Florida itself saw record levels of illegal immigration in 2024.[5] That population strains the State fiscally to the tune of over $8 billion, leading to Florida spending $4 billion more on education and $1.6 million more on criminal law enforcement, each Floridian fronting an estimated bill of $5,000 on those effects.[6] The costs for Floridians are more than simply economic, it also cost them their lives—the flooding of fentanyl into the State, again largely fueled by the border crisis, killed 5,083 Floridians in 2022, the second-highest of any state in the Nation.[7] Yet again, that deadly potion led the State to spend more dollars and cents, as Florida led the nation with 2,089 fentanyl-seizure operations in 2023.[8]

## II.    SB 4-C

In 2025, the Florida Legislature passed SB 4-C. That law created two new crimes. The first provision (the entry provision) bars "unauthorized alien[s]" "18 years of age or older" from "knowingly enter[ing] or attempt[ing] to enter this state after entering the United States by eluding or avoiding examination or inspection by immigration officers." Fla. Stat. § 811.102(1). That conforms to federal law, which criminalizes entry by evading inspection. 8 U.S.C. § 1325(a). Florida law defines an "unauthorized alien" as "a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act." Fla. Stat. § 908.111(1)(d); *see id.* (Florida law "shall be interpreted consistently with any applicable federal statutes, rules, or regulations."). SB 4-C provides that entry is not a crime if "[t]he Federal Government has granted the unauthorized alien lawful presence in the United States or discretionary relief that authorizes the unauthorized alien to remain in the United States temporarily or permanently," or an "unauthorized alien's entry into the United States did not constitute a violation" of federal law. Fla. Stat.

---

[4] House Republican Policy Committee, *Real Life Impacts of the Border Crisis* 2 (2024), https://tinyurl.com/ycx6wkv8.

[5] Anthony Talcott, *Florida sees record-high illegal immigration. Here's how it affects your wallet*, ClickOrlando (Aug. 20, 2024), https://tinyurl.com/3y5bpvxa.

[6] Federation for American Immigration Reform, *The Fiscal Burden of Illegal Immigration on Florida* (2023) https://tinyurl.com/2p9h7f8v.

[7] USA Facts, *Are fentanyl overdose deaths rising in the US?* (last updated Sept. 27, 2023), https://tinyurl.com/mvus7kff.

[8] Office of the Attorney General James Uthmeier, *VIDEO: AG Moody and FDLE Announce Third Straight Decrease in Statewide Drug Deaths, As Florida Leads Nation in Fentanyl Seizures* (July 9, 2024), https://tinyurl.com/yc7edrft.

§ 811.102(4)(a), (c). Further respecting federal law, state officers must notify federal authorities that they have arrested these unlawfully present aliens. Fla. Stat. § 811.102(7)(a).

The second provision (the reentry provision) criminalizes the entry or presence of "unauthorized alien[s]" "18 years of age or older" where the federal government has "denied admission, excluded, deported, or removed" the alien or where the alien "departed the United States during the time an order of exclusion, deportation, or removal is outstanding." Fla. Stat. § 811.103(1). Again, this provision follows federal law—which criminalizes the reentry or presence of aliens that the federal government excluded, deported, or removed or who have an ongoing order of exclusion, deportation, or removal against them. 8 U.S.C. § 1326(a). And Florida provides that an alien's entry or presence does not violate the reentry provision when the alien has express permission to enter from the United States Attorney General or "was not required to obtain such advance consent" under federal law. Fla. Stat. § 811.103(1)(a), (b).

## III.   FACTUAL BACKGROUND

Plaintiffs are two anonymous individuals and two organizations. DE1 ¶¶ 8–29. Plaintiffs YM and VV both allege to have "entered the United States without inspection" some years ago and currently reside in Florida. DE4-5 ¶¶ 2, 5; DE4-4 ¶¶ 2, 5–6. YM has "applied for a U visa," but the federal government has not yet resolved her application. DE4-5 ¶ 6. VV has reentered the United States after deportation, and she has not sought "to adjust [her] status" since. DE4-4 ¶¶ 6– 7. Both Plaintiffs allege some vague desire to leave Florida and return: YM "generally leave[s] Florida for family vacation approximately twice a year" and "plan[s] to continue this travel going forward," DE4-5 ¶ 7, and VV "traveled to New Jersey during harvesting season to pick blueberries, and" she wants "to do so again during the next season," DE4-4 ¶ 8.

Plaintiffs Florida Immigrant Coalition (FIC) and the Farmworker Association are nonprofit organizations headquartered in Florida. DE1 ¶¶ 8, 17. FIC has individual and organizational members (including the Farmworker Association and YM). DE4-3 ¶¶ 15, 18. The Farmworker Association has individual members, including YM. DE4-2 ¶ 21. It also has a member, WA, who is not a plaintiff but who claims to have "entered the United States without inspection," and "generally travels outside of Florida on occasion for holidays." DE4-2 ¶ 20.

Plaintiffs sued Florida's Attorney General, the statewide prosecutor, and Florida's 20 state attorneys to enjoin any enforcement of SB 4-C. DE1. They also seek to certify a class to enjoin all of SB 4-C's applications. DE5. The class would reach anyone who "avoid[ed] examination or

inspection by immigration officials" and "who may now or in the future enter or attempt to enter the state of Florida," and those who may want to be in Florida "after the person has been denied admission to or excluded, deported, or removed from the United States." DE1 ¶ 61.

Plaintiffs allege that SB 4-C is preempted by federal law and violates the Dormant Commerce Clause. DE1 ¶ 68–77. They moved for a temporary restraining order and a preliminary injunction, DE4, and the Court granted the restraining order, DE28.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, plaintiffs must show that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury absent the injunction; (3) their threatened injury outweighs the harm the injunction may cause to Defendants; and (4) the injunction would not be adverse to the public interest. *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).

## ARGUMENT

## I.   THE PLAINTIFFS LACK STANDING TO ATTACK SB 4-C.

To have standing under Article III, plaintiffs must show injury in fact, traceability, and redressability. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). The injury must be "concrete and particularized" and "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). For there to be traceability and redressability to a particular defendant, a plaintiff "must show, at the very least, that the [specific] official has the authority to enforce the particular provision that he has challenged." *Support Working Animals v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). And even after showing Article III standing, an organization must also show third-party standing if they raise the legal rights of others, which "allows a narrow class of litigants to assert the legal rights of others." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 n.5 (2024). Plaintiffs have cleared none of those hurdles.

### A.   The unnamed, individual Plaintiffs lack standing.

Both individual Plaintiffs lack standing. So does WA who, though not a Plaintiff, is a member of the Farmworker Association by which the organizations hope to establish standing. DE4-2 ¶ 20 (the Farmworker Association's declaration relying on injuries to WA); DE4-3 ¶ 18 (FIC's declaration relying on the Farmworker Association to establish its standing).

To start, a plaintiff lacks injury if he fails to allege that he is presently engaging, or will imminently engage, in conduct that violates the challenged statute. *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428–29 (11th Cir. 1998); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). None of the individuals identified by Plaintiffs meets that bar. WA, YM, and VV offer "merely speculative" travel wishes without any "concrete plans" to exit or enter Florida. *Lujan*, 504 U.S. at 561, 564; *see also* DE4-2 ¶ 20 (WA alleging that "[s]he generally travels outside of Florida on occasion for holidays, including Christmas and spring break, and then returns to Florida"); DE4-5 ¶ 7 (YM alleging that she "generally leave[s] Florida for family vacation approximately twice a year," and, at some unspecified future time, "plan[s] to continue this travel"); DE4-4 ¶ 8 (VV alleging that she "frequently travel[s] outside of Florida for work," "ha[s] traveled to New Jersey during harvesting season to pick blueberries," and "intend[s] to do so again during the next season" without giving any more details). And Plaintiffs offer nowhere near enough facts to show that the individuals they identify fall outside of SB 4-C's statutory defenses. DE4-2 ¶ 20 (providing only that WA "entered the United States without inspection in 2003," and saying nothing about her status with the federal government). They have thus failed to show that they are engaging, or will soon engage, in conducted proscribed by SB 4-C.

Next, a plaintiff lacks injury if he has no "legally protected interest" in the conduct he seeks to vindicate. *Lujan*, 504 U.S. at 560. A plaintiff who complains "that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) (finding that asylum-seekers did not have standing to assert a right to cross the border illegally). Here, each individual seeks to vindicate their ability to engage in unrelated illegal conduct: whether it be continuing to drive without a license, their inability to continue working without legal authorization, or their ability to obtain transportation in violation of federal and state law. DE4-4 ¶¶ 8–9 (VV seeks to work without authorization); DE4-5 ¶ 7 (YM seeks to travel out of state at an unspecified time); DE4-2 ¶ 20 (WA seeks to travel out of state at some unspecified future time). But this conduct violates laws that Plaintiffs do not challenge, so it is not legally protected. Fla. Stat. § 322.03 (making driving without a license a crime); 8 U.S.C. § 1324a(a) (making working without authorization unlawful); Fla. Stat. § 448.095 (similar); 8 U.S.C. § 1324(a)(1)(A) (barring knowing or reckless transportation of aliens); Fla. Stat. § 787.07 (similar).

Finally, Plaintiffs at least lack standing to sue *all* of the state attorneys, given that only the state attorneys where their offenses were committed could prosecute them. *See* Fla. Stat. § 910.03; *see also Support Working Animals*, 8 F.4th at 1201 (traceability and redressability requires a showing that the "official [sued] has the authority to enforce the particular provision that he has challenged"). Nor does it matter that Plaintiffs seek to represent a statewide class. As will be explained in the Defendants' response to class certification, any class action would exclude relief against additional state attorneys. *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("A named plaintiff in a class action who cannot establish the requisite case or controversy between himself and the defendants simply cannot seek relief for anyone—not for himself, and not for any other member of the class."); *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("[P]laintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek[.]"). As for VV, the only state attorney who could prosecute her in Immokalee, Florida, for her presence there is Amira Fox. As for YM, her failure to allege any concrete plans about her travel makes it impossible to know where she would "enter" Florida, so it is unclear which state attorney would have jurisdiction to prosecute her.

**B.    The organizational Plaintiffs lack standing.**

An organization may show standing through either associational standing (injury to its members) or organizational standing (injury to itself). *See City of South Miami v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023). Neither works for FIC or the Farmworker Association.

As for associational standing, FIC and the Farmworker Association cannot show that any of "its members would otherwise have standing to sue in their own right." *Jacobson*, 974 F.3d at 1249 (quotations omitted). None of the individuals identified—YM, VV, or WA—have standing for the reasons outlined above. And while FIC claims that the Farmworker Association is a member with its own standing, the Farmworker Association itself has not shown associational standing—the only members it has identified are WA and VV, who lack standing—and as explained next, the Farmworker Association has not shown organizational standing.

Nor can the Farmworker Association rely on organizational standing through a diversion of resources theory. The Farmworker Association does not even allege that it would have to divert resources. FIC, who claims that the Farmworker Association is one of its members, DE4-3 ¶ 18, says that its organizational members "that serve immigrants" will be forced "to divert significant

resources from existing programs." DE4-3 ¶ 20. But it does not even allege that the Farmworker Association will, and the Farmworker Association's declaration never alleges diversion. DE4-2.

Even if it did, FIC does not explain how SB 4-C "forc[es] [the Farmworker Association] to divert resources to counteract" illegal acts. *Browning*, 522 F.3d at 1165 (emphasis added). It simply concludes that SB 4-C will cause it "to divert significant resources from existing programs," DE4-3 ¶ 20, without providing any details on how SB 4-C will cause diversion, *see City of South Miami*, 65 F.4th at 639 (an organization cannot "spend its way into standing").

Nor has the Farmworker Association shown, as it must, that any injury is "closely connected to the diversion." *Id.* at 638–39. The Association must show "what harm [it] is seeking to counteract and how its diversion of resources is aimed" at preventing that harm. *Cousins v. Sch. Bd. of Orange Cnty.*, No. 6:22-cv-1312, 2023 WL 5836463, *6 (M.D. Fla. Aug. 16, 2023) (Berger, J.). But it identifies no steps that it is taking to counteract SB 4-C, nor how those steps ameliorate any alleged harms. *See id.* (noting that the plaintiff failed "to show any logical connection between" the diversion of resources and "combating the alleged injuries").

## C.    The organizational Plaintiffs lack third-party standing.

Article III aside, the organizational Plaintiffs have also not established third-party standing to assert the rights of illegal aliens. To do so, they must at least identify a "hindrance" that those aliens face in "protect[ing] [their] own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). But this very case proves there is no hindrance, as two individual plaintiffs have sued. DE4-4 ¶ 5; DE4-5 ¶ 5. So third-party standing is unwarranted. *See Kowalski*, 543 U.S. at 133–34.

## II.    PLAINTIFFS LACK A CAUSE OF ACTION TO ENFORCE FEDERAL IMMIGRATION LAW.

1. Next up, Plaintiffs have failed to identify an express, implied, or equitable "cause of action" to enforce the federal Immigration and Nationality Act (INA). *Davis v. Passman*, 442 U.S. 228, 239 (1979). The Supremacy Clause certainly does not provide one, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), and the INA itself says nothing about any private party suing to enforce that Act, *see* 8 U.S.C. §§ 1324, 1329 (vesting enforcement in the U.S. Attorney to "prosecute every suit," whether "civil [or] criminal," "brought by the United States . . . under the provisions of this subchapter"). This express public-enforcement mechanism shuts the door on any implication that the INA empowers private parties to sue. *See In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc); *see also Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162

(D.C. Cir. 1999) (stating that Section 1329 "mak[es] clear that district court jurisdiction founded on the immigration statute is confined to actions brought by the government").

Plaintiffs thus invoke an equitable cause of action, DE1 at 13–14, which fails because "Congress [has] displace[d] . . . equitable relief." *Armstrong*, 575 U.S. at 329. When the "fairest reading" of a statute shows that Congress intended to preclude private enforcement, parties "cannot, by invoking [courts'] equitable powers, circumvent" that statutory limit. *Id.* at 328–29.[9]

So it is here. Congress established a reticulated enforcement scheme for use by particular federal officers. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) (where Congress created a "detailed remedial scheme," federal courts "should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*"). The INA charges the Secretary of Homeland Security "with the administration and enforcement" of the INA unless another part "relate[s] to the powers, functions, and duties conferred upon" other Executive Branch officers. 8 U.S.C. § 1103(a)(1). Some examples of carveouts are the federal bars on illegal entry and reentry, which, as just noted, provide for enforcement by particular federal officers— criminal and civil suits by a U.S. Attorney. 8 U.S.C. § 1329; *see also* 8 U.S.C. §§ 1324, 1326, 1330 (providing that "fine[s], penalt[ies] or expenses imposed or incurred" under several sections of Subchapter II may be "recovered by civil suit, in the name of the United States"). Because federal law "expressly confers enforcement authority on the Secretary" and other federal officers, it "preclud[es] enforcement by" private plaintiffs. *Corey v. Rockdale Cnty.*, No. 1:22-cv-3918, 2023 WL 6242669, at *5 (N.D. Ga. Aug. 28, 2023); *see also Armstrong*, 575 U.S. at 328 ("express provision" for government enforcement "suggests that Congress intended to preclude" private enforcement).[10]

---

[9] In *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, the Eleventh Circuit understood the Supremacy Clause to supply a cause of action to enforce the INA, *see* 691 F.3d 1250, 1261 (11th Cir. 2012), but that analysis has been abrogated by *Armstrong*, 575 U.S. at 324–25 ("It is equally apparent that the Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action." (citation omitted)).

[10] Congress also provided for limited private enforcement of the INA through the Racketeering Influence and Corrupt Organizations (RICO) Act, under which a private party may sue to recover damages for transportation and harboring offenses under the INA. 18 U.S.C. §§ 1961(1)(F), 1962, 1964(c). "Congress's decision to create a limited private cause of action" only further solidifies "that the omission of a general private right of action in the [INA] should . . . be understood as intentional." *Coal. for Competitive Elec., Dynegy, Inc. v. Zibelman*, 272 F.Supp.3d 554, 565 (S.D.N.Y. 2017) (quotation omitted).

That statutory bar is even clearer given the background principles of criminal and immigration law, where private rights and interests are at their nadir. *See Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 261 & n.8 (2011) (providing that *Ex parte Young* claims "cannot occur unless the" plaintiff "has been given a federal right of" his or her "own to vindicate . . . under the . . . statute"). Criminal prosecution is a "core executive power." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 219 (2020). "No case during the last generation creates a private right of action to enforce a statute cast in the form of a criminal prohibition[.]" *Isr. Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.*, 16 F.3d 198, 200–01 (7th Cir. 1994).

Private enforcement of criminal laws is particularly inappropriate. The INA, like other criminal statutes, vests enforcement in federal authorities whom Congress trusted to exercise that discretion "through a system of centralized enforcement." *Smith v. Hickenlooper*, 164 F. Supp. 3d 1286, 1292–93 (D. Colo. 2016); *see also, e.g.*, *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 902–05 (10th Cir. 2017) (rejecting a preemption challenge to Colorado's marijuana laws because Congress displaced private enforcement of the Controlled Substances Act). That is even more so when Plaintiffs' whole theory of preemption is that immigration regulation "is exclusively a federal power." DE4 at 8 (emphasis omitted). Though they are wrong that states are entirely excluded from regulating in or near this realm, the "one voice" they propose to elevate would in any event not be theirs to control. *See Arizona*, 567 U.S. at 409–10. Congress exercised its "broad discretion" and "power over the manner of the[] implementation" of the INA by "leav[ing] the enforcement of federal law to federal actors." *Armstrong*, 575 U.S. at 325–26.

Nor does the INA even grant Plaintiffs privately enforceable, "personal rights." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002). When suing in equity, the plaintiff must come armed with a federal law endowing it with privately enforceable rights. *See Safe Sts. All.*, 859 F.3d at 899–904. To do so, Plaintiffs must show that the statute is intended to bestow a personal right "in clear and unambiguous terms." *Gonzaga*, 536 U.S. at 290. The only right they identify is the right to not be regulated because of field and conflict preemption, but that is insufficient to establish a cause of action. The statute must do more than "focus on the person[s] regulated," *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001); "its text must be phrased in terms of the persons benefited." *Gonzaga*, 536 U.S. at 284. Any implicit preemption is merely an effort to "maintain[] uniformity in the administration of the federal regulatory [scheme]," not to grant private rights. *Golden State*

*Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110–12 (1989). Nothing in the INA establishes such a right. If anything, it restricts Plaintiffs' rights by criminalizing their conduct.

2. At the very least, the organizational Plaintiffs cannot sue in equity here. Whether the organizational Plaintiffs may sue in equity depends on whether granting them relief aligns with the relief "traditionally accorded by courts of equity" at the Founding. *Grupo Mexicano de Desarrollo S.A., v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999). It does not.

As Judge Oldham recently observed, the *Ex parte Young* action is available only to private plaintiffs "to preemptively assert 'in equity . . . a defense that would otherwise have been available in the State's enforcement proceedings at law.'" *United States v. Texas*, 97 F.4th 268, 310 (5th Cir. 2024) (Oldham, J. dissenting) (quoting *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 619–20 (2012) (Roberts, C.J., dissenting, joined by Scalia, Thomas, and Alito, JJ.)). *Ex parte Young* traces its roots to "anti-suit injunctions," which "[a]s classically understood," "permit potential defendants in legal actions to raise in equity a defense available at law." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). That makes sense in terms of Founding-era equitable principles—a court in equity would not act unless there was "no adequate remedy at law," and that occurred when an individual had a legal defense, "enforcement actions [we]re imminent[,] . . . and the moving party lack[ed] the realistic option of violating the law once and raising its federal defenses." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Even if the INA did not displace private enforcement, *Ex parte Young* at most protects an individual who claims that "federal law immunizes him from state regulation." *Armstrong*, 575 U.S. at 326. In other words, it protects only those who are "direct targets of regulation." Caleb Nelson, *"Standing" and Remedial Rights in Administrative Law*, 105 Va. L. Rev. 703, 715 (2019). That is not to say that these preemption claims cannot be raised, as individual Plaintiffs may do so as a defense to a state enforcement proceeding. But the organizational Plaintiffs may not.

FIC and the Farmworker Association are not such plaintiffs. They do not preemptively raise federal preemption as "a defense that would otherwise have been available in the State's enforcement proceedings at law," *Whole Women's Health v. Jackson*, 595 U.S. 30, 53 (2021) (Thomas, J., concurring in part and dissenting in part), or otherwise seek immunity from state regulation, because they are not regulated by SB 4-C. Their claims should be rejected.

11

III.   **SB 4-C IS NOT PREEMPTED BY FEDERAL IMMIGRATION LAW.**

Plaintiffs assert that SB 4-C is preempted on its face. *See* DE4 at 8–10; DE5 at 2. The scope of that challenge reflects their deliberately broad request to enjoin enforcing SB 4-C against anyone who "may now or in the future" violate the entry or reentry provisions. DE5 at 2. That ambitious choice requires them to show "that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. In other words, if even one application of SB 4-C is not preempted, Plaintiffs lose. *See id.* That high standard flows from the "disfavored" nature of such broad relief. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

Plaintiffs attempt to meet that exacting burden through the doctrines of field preemption and conflict preemption stemming from federal immigration law. They have not come close.

A.     **Plaintiffs have not shown that SB 4-C is field preempted in all applications.**

Field preemption occurs only in the "rare case[]" where state law "fall[s] into a field that is implicitly reserved exclusively for federal regulation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). To establish that SB 4-C is field preempted, Plaintiffs must first identify a field that federal law has fully occupied. *Id.* Then Plaintiffs must show that SB 4-C operates within that field in all its applications. *See Salerno*, 481 U.S. at 745. They have failed at both steps.

1. To establish that a field is preempted, Plaintiffs must show that the "clear and manifest purpose of Congress" was a "complete ouster of state power" in that area. *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). That "can be inferred from a framework of regulation so pervasive . . . that Congress left no room for the States to supplement it" or a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Because field preemption is strong medicine, the field must be narrowly defined. *See Hillsborough Cnty. v. Automated Med. Lab'ys*, Inc., 471 U.S. 707, 718 (1985). And even in the arena of immigration, "courts should assume that" Congress has "not superseded" the "historic police powers of the States." *Arizona*, 567 U.S. at 400.

Against that backdrop, Plaintiffs suggest that the Constitution and the INA each preempt the field of "entry, movement, and residence of aliens within the United States." DE4 at 8–9. Neither of those sources, however, supports their sweeping vision of field preemption.

Start with the Constitution. No text in the Constitution, nor any discussion from the Framing, clearly expresses an intent that only federal law may govern the "entry, movement, and residence of aliens." Plaintiffs at best ask the Court to surmise that intent from the penumbras and

12

emanations of the federal government's "power to establish a uniform Rule of Naturalization, its power to regulate Commerce with foreign Nations, and its broad authority over foreign affairs." DE4 at 7 n.1 (citation omitted). That is nowhere near clear enough to establish preemption.

And the Framers would never have agreed to that power grab. Far from evincing an exclusive federal authority over alien rights, early practice was to leave alien rights entirely to the states. *See* Allison Brownell Tirres, *Ownership Without Citizenship: The Creation of Noncitizen Property Rights*, 19 Mich. J. Race & L. 1, 20 (2013) (describing early practice; "the federal government's control over naturalization did not translate into control over most other alien rights, which remained the province of the states"). The text and debates over the first Naturalization Act revealed a sharp distinction between immigration and naturalization—Congress claimed exclusive authority to regulate naturalization, but it shared with the states the power to determine what rights flowed to immigrants before naturalization. *See id.* at 15–20; *see also* 1 Annals of Cong. 1162 (1790) (Representative Seney explaining that, "We can go no further than to prescribe the rule by which it can be determined who are, and who are not citizens; but we cannot say they shall be entitled to privileges in the different States"). Had the Framers thought the Constitution entrusted all immigration matters exclusively to the federal government, "[t]he delegates . . . would have rushed to the exits." *Arizona*, 567 U.S. at 436 (Scalia, J., concurring in part, dissenting in part).

Even more, Plaintiffs' all-consuming view of federal immigration power flouts a century of post-Framing history. Congress left the states with "exclusive" authority to regulate aliens for the first 100 years of the Nation, including alien travel into their sovereign lands. *Id.* at 417–21; *see* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1846–59 (1993).[11] For instance, Jefferson wrote in condemnation of the Alien and Sedition Acts "that alien friends are under the jurisdiction and protection of the laws of the state wherein they are [and] that no power over them has been delegated to the United States, nor prohibited to the individual states, distinct from their power over citizens." Kentucky Resolutions of

---

[11] Even before the Founding, Massachusetts, Pennsylvania, South Carolina, and Virginia prohibited the importation of persons who had ever been convicted of crime. Act of Feb. 14, 1789, ch. 61, § 7, 1789 Mass. Acts 98, 100-01; Act of Mar. 27, 1789, ch. 463, 1788-89 Pa. Acts 692; Act of Nov. 4, 1788, No. 1542, 1788 S.C. Acts 5; Act of Nov. 13, 1788, ch. 12, 1788 Va. Acts 9. After the Founding, Maine, Maryland, New Jersey, New York, and Rhode Island followed suit. *See, e.g.*, Act of Feb. 24, 1821, ch. 22, § 6, 1821 Me. Laws 90, 91-92; Act of Jan. 6, 1810, ch. 138, § 7(3), 1809-10 Md. Laws; Act of Jan. 28, 1797, ch. 611, § 3, 1797 N.J. Acts 131; Act of Apr. 25, 1833, ch. 230, 1833 N.Y. Laws 313; Act of 1798, § 17, 1798 R.I. Laws 348, 358.

1798, reprinted in J. Powell, *Languages of Power: A Sourcebook of Early American Constitutional History* 131 (1991). Given that history, it is no surprise that the Supreme Court "has never held that every state enactment which in any way deals with aliens" is preempted by the Constitution. *DeCanas*, 424 U.S. at 355. The "historic police powers of the States" remain even in its immigration cases. *Arizona*, 567 U.S. at 400. Indeed, except for the blip of the Alien Act of 1798, Congress did not enact any immigration statutes until the late 1800s. *Arizona*, 567 U.S. at 421 (Scalia, J., concurring in part, dissenting in part).

Plaintiffs have not clearly shown that the INA preempts their chosen field either. They claim that the "comprehensive" nature of the INA and amorphous federal interests gleaned from its text establish Congress's intent to control entirely the movement of aliens. DE4 at 8–9. But the only evidence Plaintiffs cite for that premise is the INA's "criminaliz[ation of alien] entry and re-entry between ports of entry" and the transportation and harbor of those aliens. *Id.* That Congress has criminalized conduct, however, far from shows that it also foreclosed state laws on the subject. *See Garcia*, 589 U.S. at 212 ("Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap[.]"). Such a view would unwind countless overlapping state crimes, from manufacture and sale of narcotics, to racketeering and conspiracies, to fraud and murder. Nor is there anything inherently different about criminal laws targeted at illegal aliens. *See DeCanas*, 424 U.S. at 357 (requiring "a demonstration that complete ouster of state power . . . was the clear and manifest purpose of Congress" to field preempt state laws related to illegal immigrants). To the contrary, when the federal government has "prescribed what it believes to be appropriate standards for the treatment of [certain aliens], the States may, of course, follow the federal direction." *Plyler*, 457 U.S. at 219 n.19.

Plaintiffs also contend that the INA's alien-entry framework is even "more" comprehensive than its framework for alien registration, the sole field that the Supreme Court has held preempted by the INA. DE4 at 8–9 (citing *Arizona*, 567 U.S. at 400–03). Hardly. The INA's entry and reentry crimes are far less detailed than those for alien registration, which detail extensively what, when, how, and with whom aliens are to register. *Compare* 8 U.S.C. §§ 1325, 1326, *with* 8 U.S.C. §§ 1301–1306. And it provides that those provisions are to be enforced by the "person[s] authorized under regulations issued by the Attorney General to register aliens." 8 U.S.C. § 1304(c). The Court has consistently declined to extend *Arizona*, *see Garcia*, 589 U.S. at 210, and nothing in the alien-entry scheme warrants doing so here.

In any event, it would not matter even if the criminal alien-entry aspect of the INA were more comprehensive than the alien-registration aspect. Preemption may not be "inferred merely from the comprehensive character" of federal law. *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973). Rather, in *Arizona*, the Court relied on both the statute's comprehensiveness and the unique federal interests involved in alien registration. *Arizona*, 567 U.S. at 400–03. Plaintiffs do not identify any similarly unique federal interests in alien movement about the states, nor do the ones identified in *Arizona* translate to this context. There, registration of "perfectly law-abiding" aliens created expectations about the "protection of the just rights of a country's own nationals when those nationals are in another country." *Hines v. Davidowitz*, 312 U.S. 52, 64–66 (1941). Those expectations stemmed from "obligations" under treaties and the "customs defining with more or less certainty the duties owing by all nations to alien residents." *Id.* at 65. That does not apply to entry crimes, which inherently affect only *non-law-abiding* aliens, and thus have a more muted impact on "amity and commerce" between nations. *Id.* at 64–65.

In a final effort, Plaintiffs ask this Court to extend *Georgia Latino* and *Alabama*. DE4 at 9–10. There, the Eleventh Circuit held that the INA preempted the field of "prohibitions on the transportation, harboring, and inducement of unlawfully present aliens." *Georgia Latino*, 691 F.3d at 1266; *see also United States v. Alabama*, 691 F.3d 1269, 1287 (11th Cir. 2012). But transport and harboring are special because, as *Georgia Latino* noted, Congress had specifically limited state participation in those crimes to arrest under federal law. *Georgia Latino*, 691 F.3d at 1264 (citing 8 U.S.C. § 1324(c)).

2. Even if there were some field preemption beyond *Arizona*, SB 4-C is still not preempted. It is not enough that a state law touches on a preempted field, because laws with only "some indirect effect" on that field "[are] not pre-empted." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 308 (1988). Florida's law does not directly operate in the field of "entry, admission, and removal of noncitizens," DE4 at 7, in a way that would meet the facial challenge standard. *See Salerno*, 481 U.S. at 745. Through SB 4-C, Florida primarily regulates entry into Florida—not entry into the country. Nor does it regulate admission or the discretionary process of removal—it does not determine who is to be admitted or who will be removed from the country, decisions left to the federal government. SB 4-C faithfully respects federal-law defenses when federal law authorizes the alien to "remain in the United States temporarily or permanently." Fla. Stat. § 810.102(4)(a). And where an alien travels by themselves into Florida, it does not implicate the separate field of

"prohibitions on the transportation, harboring, and inducement of unlawfully present aliens," *Georgia Latino*, 691 F.3d at 1266, because someone *other than the alien* must provide that transportation, harboring, or inducement.[12] In that case, Florida's law would have, at most, "some indirect effect" on that field insufficient for facial preemption. *Schneidewind*, 485 U.S. at 308.

 **B.** **Plaintiffs have not shown that SB 4-C is conflict preempted in all applications.**

 Plaintiffs have also not surmounted the "high threshold" for conflict preemption. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2012) (plurality opinion). Plaintiffs argue that SB 4-C impermissibly regulates immigration, creates immigration classifications, and interferes with federal enforcement discretion. None of that is true.

 1. Florida has not acted "unilaterally to regulate immigration without any input from the Federal Government" to "achieve its own immigration policy," contrary to *Arizona*. DE4 at 11 (quoting *Arizona*, 567 U.S. at 408). This part of *Arizona* dealt with Arizona's Section 6, which made it a state crime for an alien to be removable. *Arizona*, 567 U.S. at 408. But the Court stressed that federal law does not make it "a crime for a removable alien to remain present in the United States" and that "the removal process is entrusted to the discretion of the Federal Government." *Id.* at 408–09; *see also INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038 (1984). The process of removal thus entails unique discretionary calls by the Attorney General of whether, even if a person is technically removable, "it is appropriate to allow a foreign national to continue living in the United States." *Arizona*, 567 U.S. at 409. Those discretionary calls also implicated unique foreign-affairs interests like those in alien-registration. *Id.*

 By contrast, Florida's SB 4-C mirrors federal *criminal* law and does not regulate removal. Federal law criminalizes the unlawful entry of aliens by evading inspection, 8 U.S.C. § 1325(a), and Florida regulates a subset of that criminal activity: entry into Florida after evading inspection, Fla. Stat. § 811.102(1). Federal law also criminalizes the unlawful reentry while an order of deportation, exclusion, or removal is pending. 8 U.S.C. § 1326(a). Florida, yet again, regulates only a subset of that activity: the entry into Florida after the same type of federally criminalized reentry. Fla. Stat. § 811.103(1). SB 4-C thus creates a parallel crime based on the unique harms to Floridians, causing no conflict.

---

 [12] To the extent *Georgia Latino* and *Alabama* are not distinguishable from this case, Defendants preserve for appeal that those cases should be overturned by the Eleventh Circuit.

2. Next, Plaintiffs argue that SB 4-C conflicts with federal law because it does not define "lawful presence" and thus creates an immigration classification. *See* DE4 at 13–14 (claiming that this term has "no general meaning in immigration law"). But SB 4-C does not deviate from federal law, and instead hinges on federal law. Even though the statute does not define what it means to be lawfully or unlawfully present, the statute "borrows from federal standards to verify lawful presence." *Estrada v. Becker*, 917 F.3d 1298, 1304 (11th Cir. 2019). As this Court noted in its TRO opinion, DE28 at 1 n.2, Florida law makes clear that the lawfulness of an alien's presence is determined "according to the terms of the federal Immigration and Nationality Act," and "shall be interpreted consistently with any applicable federal statutes, rules, or regulations," Fla. Stat. § 908.111(1)(d); *see also* Fla. Stat. § 811.101(2). Florida law also exempts individuals where the federal government has granted the "alien lawful presence . . . or discretionary relief that authorizes the unauthorized alien to remain in the United States temporarily or permanently," which is a commonsense way of saying that federal authorities have let an alien stay in the United States. Fla. Stat. § 811.102(4)(a). That does not turn on "state-created criteria," but rather "looks to federal standards to verify lawful presence." *Estrada*, 917 F.3d at 1304 (quotations omitted).

3. Finally, Plaintiffs argue that enforcement of SB 4-C conflicts with the prosecutorial discretion entrusted to federal agents over immigration crimes. DE4 at 12; *see also* DE28 at 10. But prosecutorial discretion inheres in every criminal law, so that argument would unabashedly apply to every federal crime. Yet nothing about the "overlap" in federal and state criminal law demands preemption. *Garcia*, 589 U.S. at 212. And "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Id.* Preemption arises from "'the Laws of the United States,'" not federal officers' "criminal law enforcement priorities." *Id.*

Nor do *Georgia Latino* and *Alabama* solve this case. Those cases dealt with "transportation, harboring, and inducement of unlawfully present aliens" by other individuals—and the Eleventh Circuit was concerned with the idea that state enforcement of overlapping crimes would "threaten the uniform application of the INA," and potentially implicate foreign-policy interests unmoored from the text and structure of the INA. *Ga. Latino All. for Hum. Rights v. Governor of Ga.*, 691 F.3d 1250, 1266 (11th Cir. 2012); *see also* DE4 at 12 (pointing to vague "foreign-policy objectives" of the INA). That reasoning is inconsistent with *Garcia* and need not be further extended. 589 U.S. at 212 ("Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap."); *see also id.* at 202 (stating that

"brooding federal interest or appealing to a judicial policy preference" cannot establish preemption (quotations omitted)). Plaintiffs fail to show conflict preemption.

## IV.  SB 4-C DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE.

Plaintiffs next allege that SB 4-C violates the Dormant Commerce Clause. The Dormant Commerce Clause, at its "very core," is concerned with preventing economic discrimination between states. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quotations omitted). It promotes interstate comity by preventing "state laws driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (quotations omitted). Courts thus look to whether a law "purposely discriminate[s] against out-of-state economic interests." *Id.* at 371; *see also Or. Waste Sys., Inc. v. Dep't of Envt't Quality of State of Or.*, 511 U.S. 93, 99 (1994) (discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter"). In doing so, courts are careful to chart the narrow course between "rebuff[ing] attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce . . . [and] generally supporting their right to impose even burdensome regulations in the interest of local health and safety." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949). Occasionally, courts look to an even "more ambitious theor[y]," *Ross*, 598 U.S. at 371, that "the burden imposed on interstate commerce" is "clearly excessive in relation to the putative local benefits," *id.* at 377 (quotations omitted). Yet that disfavored theory is merely another way of applying the Dormant Commerce Clause's core theory by "smok[ing] out a hidden protectionism." *Id.* at 379 (quotations omitted).

Florida's law has nothing to do with economic protectionism or disturbing the "national market for competition." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). It does not target out-of-state economic interests on its face or in its intent, but is designed to deter the influx of illegal aliens into Florida (no matter where they might reside) and prevent the many problems—social, moral, and criminal—that would follow. *See infra* notes 14–15. In that way, Florida's law does not "benefit[]" in-state "economic interests" at the expense of "burden[ing]" "out-of-state economic interests." *Or. Waste Sys.*, 511 U.S. at 99. The unnamed Plaintiffs prove this point: Though they are Florida residents, they are subject to SB 4-C all the same. It also does not matter that SB 4-C might "have the 'practical effect of controlling' extraterritorial behavior." *Ross*, 598 U.S. at 374. Nor do the law's practical effects "disclose purposeful discrimination against out-of-

state businesses" under the Supreme Court's balancing framework. *Id.* at 379. Florida's law involves precisely the type of weighing of "economic costs (to some) against noneconomic benefits (to others)" that the Court disclaimed in *Ross*. *Id.* at 381 (plurality opinion). Florida's SB 4-C was passed "to vindicate a variety of interests, many noneconomic," and "[n]o neutral legal rule guides the way" in evaluating SB 4-C. *Id.*

Plaintiffs cite to *Edwards v. California*, 314 U.S. 160 (1941), to state that any crossing of state borders by individuals is "commerce" that a state is per se prohibited from regulating. DE4 at 16. Even if the transportation of individuals is commerce, it is one that Congress has affirmatively prohibited. 8 U.S.C. § 1325(a) (criminalizing entry into the country by evading inspection); 8 U.S.C. § 1324(a)(1)(A)(ii) (criminalizing the transportation of illegally present aliens anywhere in the country). "[T]here is no basis for concluding that the dormant [] Commerce Clause applies to commerce that violates federal law." *Texas*, 97 F.4th at 332 (Oldham, J., dissenting).

What is more, the law in *Edwards* was clearly protectionist. California banned the knowing transportation of indigent persons into the State based on the theory that "each community should care for its own indigent" and that those indigents would create "problems of . . . finance." 314 U.S. at 165–67. Further, that law barred the transportation of "indigent *non-residents*"—expressly discriminating against out-of-state economic interests. *Id.* at 174 (emphasis added). In that way, the policy of "economic isolation" in *Edwards*—a type of policy "that had plagued relations among the Colonies," *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (quotations omitted)—fits neatly in the "very core" of the Dormant Commerce Clause, *Ross*, 598 U.S. at 369 (quotations omitted). By contrast, states "retain[ ] broad regulatory authority to protect the health and safety of its citizens." *Maine v. Taylor*, 477 U.S. 131, 151 (1986). Florida's law thus looks nothing like the law in *Edwards*.[13]

Finally, even if the law were discriminatory, a state may justify its law by showing that the law "serves legitimate local purposes that could not adequately be served by available

---

[13] In reality, Plaintiffs attempt to fit a right to interstate travel in the Dormant Commerce Clause, though the Supreme Court has recognized such a right in the Privileges and Immunities Clause and the Privileges or Immunities Clause. *See Saenz v. Roe*, 526 U.S. 489, 500–04 & n.13 (1999) (characterizing *Edwards* as vindicating the right to travel under the Privileges and Immunities and Privileges or Immunities Clauses). But those latter clauses provide rights only to "[c]itizens" and Plaintiffs cannot avoid that limitation by artfully pleading a dormant-commerce violation. U.S. Const. art. IV, § 2, cl. 1, amend. XIV, § 1.

19

nondiscriminatory alternatives." *Id.* That is the case here, as SB 4-C serves legitimate local benefits, and there are no less discriminatory alternatives to achieve those ends.

## IV.    THE BALANCE OF THE EQUITIES DO NOT FAVOR AN INJUNCTION.

Nor do the equities favor injunctive relief. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotations omitted). This rule applies with even more force when "a law . . . reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (quotations omitted). Florida's interest in ensuring individuals in its territory are inspected is legitimate. For example, traffickers "successfully smuggl[e] mass quantities of deadly illicit fentanyl past" federal agents,[14] endangering Floridians.[15]

Moreover, Plaintiffs have unclean hands. A preliminary injunction is a form of equitable relief, and "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Plaintiffs seek a preliminary injunction to protect illegal conduct such as driving without a license, working without authorization, and avoiding detection for criminal illegal entry. That they cannot do. *See Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985). To be clear, Defendants do not contend that a person's status as an illegal immigrant always forecloses equitable relief. Here, however, Plaintiffs seek to facilitate unrelated violations of law through this lawsuit, and that is fatal to their request for equitable relief.

## CONCLUSION

The Court should deny injunctive relief.

---

[14] *Subcommittee on Border Security and Enforcement Demands Answers in Phase Two of Mayorkas Investigation*, House Committee on Homeland Security (July 13, 2023), https://tinyurl.com/a2udkxt8.

[15] *AG Moody and Law Enforcement Leaders Sound the Alarm as Deadly Fentanyl Catapults Panhandle Counties to Top Spot for Per Capita Opioid Death Rate in Florida*, Office of Attorney General James Uthmeier (Aug. 2, 2023), https://tinyurl.com/ywf9utmh.

Respectfully submitted on April 15, 2025.

JAMES UTHMEIER
  *Attorney General*

/s/ *Robert S. Schenck*       
JEFFREY P. DESOUSA (FBN 110951)
  *Acting Solicitor General*
NATHAN A. FORRESTER (FBN 1045107)
DAVID M. COSTELLO (FBN 1004952)
  *Chief Deputy Solicitors General*
ROBERT S. SCHENCK (FBN 1044532)
CHRISTINE PRATT (FBN 100351)
  *Assistant Solicitors General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
Facsimile: (850) 410-2672
*jeffrey.desousa@myfloridalegal.com*
*nathan.forrester@myfloridalegal.com*
*david.costello@myfloridalegal.com*
*robert.schenck@myfloridalegal.com*
*christine.pratt@myfloridalegal.com*

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on April 15, 2025, to all counsel of record.

<u>/s/ *Robert S. Schenck*     </u>
Assistant Solicitor General