**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-21524-CV-WILLIAMS**

FLORIDA IMMIGRANT COALITION, *et al.*,

      Plaintiffs,

v.

JAMES UTHMEIER, *et al.*,

      Defendants.

_____/

## <u>OMNIBUS ORDER</u>

**THIS MATTER** is before the Court on Plaintiffs' Motion for a Preliminary Injunction (DE 4) and Plaintiffs' Motion for Class Certification (DE 5). Both Motions are fully briefed.[1] On April 18, 2025 and April 29, 2025, the Parties presented oral argument on the Motions before the Court (the "***Hearings***"). (DE 48; DE 66.) For the reasons set forth below, the Motion for Preliminary Injunction (DE 4) is **GRANTED** and the Motion for Class Certification (DE 5) is **GRANTED IN PART AND DENIED IN PART**..

### I.  BACKGROUND

On February 13, 2025, Florida Senate Bill 4-C ("***S.B. 4-C***" or the "***Statute***") went into effect. (DE 1 ¶ 40.) S.B. 4-C creates two new state law offenses: "Illegal entry by adult unauthorized alien[2] into this state" and "Illegal reentry of an adult unauthorized

---

[1] Defendants filed responses in opposition to both Motions (DE 40; DE 44), and Plaintiffs replied (DE 45; DE 46).

[2] The various statutes and cases discussed within this Order use a variety of terms, in additional to "alien," to describe a noncitizen or foreign national in the United States. *See* United States Citizenship and Immigration Services, Glossary (last visited Apr. 27, 2025) (defining an "Alien" as "[a]ny person not a citizen or national of the United States" as defined under federal law), https://www.uscis.gov/tools/glossary. For clarity and

alien." Fla. Stat. §§ 811.102–.103. Section 811.102(1) prohibits any "unauthorized alien who is 18 years of age or older"[3] from "knowingly enter[ing] or attempt[ing] to enter" Florida "after entering the United States by eluding or avoiding examination or inspection by immigration officers" ("*illegal entry*"). A first conviction for illegal entry is a first-degree misdemeanor, requiring a mandatory minimum sentence of nine months' imprisonment, while subsequent convictions are felonies with escalating mandatory minimum sentences. Fla. Stat. § 811.102(1)–(3). Under subsection 811.103(1), an adult "unauthorized alien" commits a third-degree felony, if they "enter[], attempt[] to enter, or [are] at any time found in" Florida after "having been denied admission, excluded, deported, or removed or having departed the United States during the time an order of exclusion, deportation, or removal is outstanding" ("*illegal reentry*"). Fla. Stat. § 811.103(1). Importantly, the scheme requires courts to presume that "no conditions of release can reasonably assure the presence" of any individual arrested under either provision and to order their detention without bond pending disposition of the case. Fla. Stat. §§ 811.102(5), 811.103(4).

On April 2, 2025, Plaintiffs filed a Class Action Complaint (DE 1) ("*Complaint*"), seeking injunctive relief barring enforcement of S.B. 4-C by state and local officials and a declaration that the law violates the United States Constitution's Supremacy and Commerce Clauses. (DE 1 at 17.) Plaintiffs include individuals V.V. and Y.M. (collectively

---

consistency, when not quoting a source, the Court will use the phrase "noncitizen" throughout this Order.

[3] An "unauthorized alien" is defined as anyone unlawfully present in the United States under the Immigration and Nationality Act and any other applicable federal law. Fla. Stat. § 811.101(2) (referencing Fla. Stat. § 908.111).

"**Individual Plaintiffs**"), who allege they are at risk of arrest and prosecution under the Statute, and two grassroots membership organizations, Farmworker Association of Florida, Inc. ("**FWAF**") and Florida Immigrant Coalition ("**FLIC**") (collectively "**Organizational Plaintiffs**"), which support members who are similarly at risk. (*Id.* ¶¶ 8, 11–24, 26–28.) On the same day, Plaintiffs sought class certification and a Temporary Restraining Order ("**TRO**") pausing enforcement of S.B. 4-C pending the Court's consideration of their request for a preliminary injunction. (DE 4; DE 5.) On April 4, 2025, the Court entered a TRO "prohibiting Defendants and their officers, agents, employees, attorneys, and any person who are in active concert or participation with them from enforcing" S.B. 4-C for fourteen days. (DE 28 at 14.) Then, on April 18, 2025, the Court held a Hearing on whether to convert the TRO into a preliminary injunction. (DE 48.) At the conclusion of the Hearing, the Court set an additional Hearing for April 29, 2025 and extended the TRO until that time. The Court reconvened on April 29, 2025, to address the scope of injunctive relief. (DE 66.) Neither Party introduced evidence, so the Court relies on the Parties' written briefs, supplemented by their oral arguments at the Hearings.

## II.   LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure authorizes courts to grant a preliminary injunction before final judgment in limited circumstances. The purpose of this injunctive relief is to "preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005) (citation omitted). To merit a preliminary injunction, Plaintiffs must show:

> (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other

litigant; and (4) that the preliminary injunction would not be averse to the public interest.

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015) (quoting *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263 (11th Cir. 2014)). Plaintiffs "bear[] the burden of persuasion to clearly establish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotations omitted).

A district court "may provisionally certify a class for purposes of a preliminary injunction." *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 870 (S.D. Cal. 2019) (citing *Meyer v. Portfolio Recovery Assoc., LLC,* 707 F.3d 1036, 1043 (9th Cir. 2012)); *see also Kaiser v. Cnty. of Sacramento*, 780 F. Supp. 1309, 1312 (E.D. Cal. 1991) ("The court has provisionally certified the class . . . pending modification or decertification should it become clear that the class is not maintainable. . . . Accordingly, the court may continue to grant injunctive relief on a class-wide basis."). However, Plaintiffs have the burden of "meeting the threshold requirements" for class certification. *Id.*

Rule 23(a) provides that a class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). "These four prerequisites of Rule 23(a) are commonly referred to as 'numerosity, commonality, typicality, and adequacy of representation.'" *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003). Further, the class action must fall into one of categories enumerated in Rule 23(b). Fed. R. Civ. P. 23(b). Plaintiffs seek class

certification under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

As the Parties seeking class certification, Plaintiffs have "the burden of proof," to show that the requirements of Rule 23 are "'in fact' satisfied." *Brown v. Electrolux Home Prods., Inc.*, 817 F. 3d 1225, 1233 (11th Cir. 2016) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Still, when determining whether the requirements for class certification are met, the Court "should not consider the merits of [Plaintiffs'] claim[s]" except to the extent "necessary to determine whether the requirements of Rule 23 will be satisfied." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009) (citations omitted).

## III.   DISCUSSION

The Court begins by addressing whether Plaintiffs have standing to seek their requested relief. *See Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1311 (11th Cir. 2024) (noting that "standing is a threshold jurisdictional question" and without establishing standing a "district court [is] not empowered to reach any merits question"). Then, the Court will discuss the merits of the Motions. Finally, the Court will address the scope of injunctive relief.

### A.  Plaintiffs have standing to bring this action.

Plaintiffs who invoke "the jurisdiction of a federal court bear[] the burden to show '(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a

likelihood that the injury will be redressed by a favorable decision.'" *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting *Granite State Outdoor Advert., Inc. v. City of Clearwater*, 351 F.3d 1112, 1116 (11th Cir. 2003)).

Plaintiffs must "support each element of standing with the manner and degree of evidence required at the successive stages of the litigation. At the preliminary injunction stage, then, the plaintiff must make a clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citations and quotations omitted).[4] "The Supreme Court has been clear that standing in no way depends on the merits of the plaintiff's claim . . . [s]o [courts] generally assess plaintiffs' standing assum[ing] that on the merits the plaintiffs would be successful in their claims." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1211 (11th Cir. 2025) (citations and quotations omitted).

Defendants argue that all Plaintiffs lack standing. However, "[w]here only injunctive relief is sought, only one plaintiff with standing is required." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018); *see also Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1317 (11th Cir. 2021); *Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003). Nonetheless, the Court analyzes standing for each individual and organizational Plaintiff and finds that all have standing.

### 1. *Individual Plaintiffs*

---

[4] The Court notes that, in *Murthy*, the Supreme Court's analysis reflected the fact that the parties had taken discovery. *Murthy*, 603 U.S. at 58 ("Where, as here, the parties have taken discovery, the plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence."). Here, no discovery has been conducted. *See also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) ("The type of evidence that must be presented to make this showing depends on the necessity and status of discovery in the case.").

"Injury in fact reflects the statutory requirement that a person be adversely affected or aggrieved, and it serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1340 (11th Cir. 2014) (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)). An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). Defendants argue that Individual Plaintiffs have failed to offer concrete plans to exit or enter Florida and therefore fail to establish an injury. Defendants also argue that Individual Plaintiffs have no legally protected interest in the conduct they seek to vindicate. The Court addresses each point in turn.

   *a.  Concrete Injury*

   V.V. is a FWAF member who was previously deported and last reentered the United States without inspection in 2014. (DE 1 ¶ 16.) She now lives in Immokalee, Florida with her husband and her four U.S. citizen children. (*Id.*) Plaintiff Y.M. is a FLIC member living in Florida, who entered the United States without inspection more than twenty years ago. (*Id.* ¶¶ 26–27.) Y.M. leaves Florida twice a year with her minor U.S. citizen son who has a disability. (*Id.* ¶¶ 26, 28.) Individual Plaintiffs argue that they are at imminent risk of arrest and detention as they are subject to prosecution and imprisonment under S.B. 4-C. (*Id.* ¶ 59.) It is irrelevant that they have not yet been arrested or prosecuted: "When an individual is subject to [the threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "When the harm alleged is prospective, as it [is] here, a plaintiff can satisfy the injury-in-fact requirement by showing imminent harm. While the threatened future injury cannot be merely hypothetical or conjectural, probabilistic harm is enough." *Arcia*, 772 F.3d at 1341 (citations omitted).

Plaintiff V.V., whose prospective prosecution would fall under S.B. 4-C's illegal reentry provision, need not allege any travel plans. Under that provision, V.V. is subject to arrest, detention, and prosecution if she "is at any time found in this state." Fla. Stat. § 811.103(1). Therefore, her affidavit attesting to her prior deportation, reentry without inspection, and current residence in Florida, is sufficient to demonstrate a concrete injury. Plaintiff Y.M. has attested that she leaves the state twice a year and intends to continue doing so. Defendants characterize this testimony as the type of "'some day' intentions" disavowed by the Supreme Court in *Lujan*. However, in *Lujan*, the plaintiffs—who alleged their injury was based on their hope to one day return to Sri Lanka to view endangered species—testified that they "had no current plans" to return, saying, "[n]ot next year, I will say. In the future." *Lujan*, 504 U.S. at 564. Those allegations are in stark contrast to Y.M.'s testimony that she intends to travel in and out of state multiple times this year.[5] *See also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) ("Immediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months.").

---

[5] It is worth noting that nothing in standing jurisprudence "requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List*, 573 U.S. at 163.

Other courts have found that a plaintiff has "suffered an injury in fact [when] she's established 'a realistic danger of sustaining direct injury' from 'the statute's operation or enforcement.'" *Farmworker Ass'n of Fla., Inc.*, 734 F. Supp. 3d at 1321 (quoting *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1257 (11th Cir. 2012) ("**GLAHR**")). Law enforcement agencies in Florida have already made numerous arrests pursuant to S.B. 4-C—both before and after the Court's entry of the TRO in this matter— which the Court finds evinces a realistic probability that Individual Plaintiffs could be subject to arrest and prosecution under S.B. 4-C.

### b. *Legally Protected Interest*

Defendants' argument that Plaintiffs have no legally protected interest is based on a misinterpretation of the right Plaintiffs seek to vindicate. Rather than seeking to drive without licenses, work without legal authorization, or seek to obtain transportation in violation of federal and state law, as Defendants contend, Plaintiffs simply wish not to be arrested and prosecuted under a law that violates constitutional principles of federalism. Numerous other federal courts have recognized this right as a legally protected interest. *See GLAHR*, 691 F.3d 1257–62; *Farmworker Ass'n of Fla.*, 734 F. Supp. 3d at 1321–29; *see also Polelle*, 131 F.4th at 1212 ("[P]laintiffs allege a legally protected interest when they meet the 'low bar' of pointing to some arguable or colorable federal or constitutional interest.").

### 2.  *Organizational Plaintiffs*

"An organization can establish Article III standing either 'through its members [or] . . . through its own injury in fact.'" *City of S. Mia. v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023) (quoting *Ga. Ass'n of Latino Elected Offs., v. Gwinnett Cnty. Bd. of Registration*

& *Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022)). As an initial matter, it is necessary to clarify Plaintiffs' theory of standing: FWAF does not assert organizational standing based on diversion of resources and neither FWAF nor FLIC seek to assert the rights of third parties. Accordingly, to the extent Defendants' briefing covers such arguments, they will not be addressed.

"To establish associational standing, an organization must prove that its members 'would otherwise have standing to sue in their own right.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (citations omitted). When analyzing associational standing, "plaintiff-organizations [are required] to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). V.V. is a member of both FWAF and FLIC, and Y.M. is a member of FLIC. (DE 4-3 ¶¶ 15, 19.) As discussed, *supra*, Individual Plaintiffs have standing to sue in their own right. Furthermore, both organizations allege that they have members—beyond Individual Plaintiffs—who would suffer harm if S.B. 4-C is not enjoined. Accordingly, the Court finds that the organizational plaintiffs have standing under the theory of associational standing.[6]

### 3. *Traceability & Redressability*

"The latter two requirements [of standing]—traceability and redressability—often travel together, and where, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting

---

[6] Because the Court finds the Organizational Plaintiffs each have associational standing, it does not need to reach Plaintiffs' arguments that FLIC also has standing under a diversion of resources theory.

enforcement would be effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). Put another way, "[w]hen traceability and redressability are at stake, the key questions are who caused the injury and how it can be remedied." *City of S. Mia.*, 65 F.4th at 640.

To determine redressability, the Court focuses "on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis in original). Defendants argue that Plaintiffs lack standing to sue all state attorneys but raise no arguments related to standing as to the Attorney General or Statewide Prosecutor. The Court, in its prior order, found Plaintiffs had standing to sue all Defendants. In this order, the Court only addresses traceability and redressability as to the state attorneys.

The injuries facing Plaintiffs are arrest and prosecution under S.B. 4-C. State attorneys are state officials charged with "prosecut[ing] or defend[ing] on behalf of the state *all* suits, applications, or motions, civil or criminal, in which the state is a party[.]"[7] Fla. Stat. § 27.02 (emphasis added). State attorneys are tasked with prosecuting violations of S.B. 4-C and Defendants do not dispute this delegation of responsibility. Instead, they argue that V.V. only has standing against the state attorney who could prosecute her in the city she resides in, and that Y.M. would only have standing against the state attorney assigned to the jurisdiction where she will reenter the state. These geographic strictures fail for several reasons. First, V.V. would be subject to prosecution anywhere and "any time" she is "found [within the] state." Fla. Stat. § 811.103(1). Second, because V.V. is a farmworker, she travels around the state and out of state for such work.

---

[7] There are certain exceptions to this duty, none of which are relevant here.

(DE 4-4 ¶ 8.) Y.M. does the same for personal travel. (DE 4-5 ¶ 7.) Neither must detail their precise paths of travel through each state attorney's jurisdiction to support standing. *See Drewniak v. U.S. Customs and Border Prot.*, 554 F. Supp. 3d 348, 363–64 (D.N.H. 2021) (Plaintiffs' allegation that he would continue using a main intrastate highway to travel between two areas in New Hampshire created a sufficient risk of being stopped at a random CBP checkpoint for Article III standing, despite Plaintiff not alleging a precise route or timing of travel); *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") (internal quotations omitted). Defendants' arguments assume a rigidity of travel that does not comport with the pleadings, case authority, or the realities of modern movement.

Because the state attorneys' authority to prosecute violations of S.B. 4-C would cause Plaintiffs' injuries, enjoining them from doing so will directly redress those injuries. Put another way, Plaintiffs' requested relief—an order declaring the entry and reentry provisions of S.B. 4-C to be unlawful and enjoining the state attorneys from prosecuting people under those provisions—will directly resolve Plaintiffs' reasonable fear that the challenged law will be enforced against them or their members by those Defendants. Given that Plaintiffs have standing, the Court will address the remainder of the factors governing their request for a preliminary injunction.[8]

---

[8] Defendants advance a final threshold argument, namely that Plaintiffs lack a "cause of action" for their suit because the Supremacy Clause does not provide one and the Immigration and Nationality Act (INA) displaces equitable relief through its own detailed

**B. Plaintiffs have met the criteria for issuance of a preliminary injunction.**

As stated above, to succeed on a motion for preliminary injunction Plaintiffs must show: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Gissendaner*, 779 F.3d at 1280 (citation omitted). The Court addresses each requirement in turn.

### 1. *Likelihood of success on the merits*

Plaintiffs argue S.B. 4-C violates the Supremacy Clause by creating a statutory scheme in an area exclusively reserved for the federal government that conflicts with

---

remedial scheme. (DE 40 at 8–11) (relying on *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–29 (2015)). First, Plaintiffs have never advanced the theory that their suit is pursuant to a "cause of action" granted by the Supremacy Clause—instead, they are invoking the Court's equitable jurisdiction pursuant to *Ex parte Young*. *See Armstong,* 575 U.S. at 325, 326 (reiterating the well-accepted principles that the Supremacy Clause "certainly does not create a cause of action" but that, "as [the Supreme Court] has long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted") (citing *Ex parte Young*, 209 U.S. 123, 155–156 (1908)).

Second, just days ago, Judge Ruiz squarely rejected Defendants' argument that the INA displaces equitable relief in a thorough, well-reasoned analysis in a case involving a preemption challenge to enforcement of another state immigration scheme. *Farmworker Ass'n of Fla., Inc. v. Uthmeier*, No. 23-CV-22655 (S.D. Fla. Apr. 17, 2025), DE 137 at 5–14. The Court will not rehash all the issues with Defendants' position in the same depth here. In short, however, the fact that the INA delegates general "administration and enforcement" to the Secretary of Homeland Security, *see* 8 U.S.C. § 1103(a)(1), and prosecution of federal entry and reentry offenses to United States attorneys, *see* 8 U.S.C. § 1329, in no way demonstrates a Congressional intent to displace equitable relief when a party does not seek to *enforce* the INA, but seeks to avoid prosecution under a state law preempted by the INA. *See Farmworker Ass'n of Fla., Inc.*, No. 23-CV-22655, DE 137 at 10–11 (concluding the INA does not contain a "sole remedy," foreclosing equitable relief). Therefore, Plaintiffs' ability to invoke equitable jurisdiction under *Ex Parte Young* remains intact.

existing federal immigration law and its enforcement. (DE 4 at 5); *see* U.S. Const. art. VI (making federal law the "supreme Law of the Land"). In other words, they argue that S.B. 4-C is "field preempted" and "conflict preempted" by federal immigration law governing entry, reentry, and continued presence of noncitizens. (*Id.* at 6, 11.) Plaintiffs further contend that S.B. 4-C runs afoul of the Commerce Clause's implicit limitation on states' power to restrict the interstate movement of people. (*Id.* at 14); *see* U.S. Const. art. I, § 8, cl. 3 (giving Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"). For the reasons set forth below, the Court agrees that, at this early stage, Plaintiffs have shown they are likely to succeed on the merits.

    *a. Supremacy Clause*

When analyzing whether a state law is preempted by a federal scheme, "the purpose of Congress is the ultimate touchstone." *Marrache v. Bacardi U.S.A., Inc.,* 17 F.4th 1084, 1094 (11th Cir. 2021) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). Congressional intent to preempt state law is most readily discernable when it is "explicitly stated in the [federal] statute's language." *Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516 (1992) (describing express preemption); *see also Marrache*, 17 F.4th at 1094 (describing an "express statement on preemption" as preferable).[9] However, state law can also be "impliedly preempted" by federal law in cases of conflict preemption and field preemption. *Marrache*, 17 F.4th at 1094.

Conflict preemption occurs "where it is impossible for a private party to comply with both state and federal laws . . . [or] the challenged state law stands as an obstacle to the

---

[9] Plaintiffs do not argue any such explicit statutory language is present here.

accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 520 U.S. 363, 373–74 (2000) (internal citation and quotations omitted). A state law is field preempted when it regulates conduct "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (holding the field of noncitizen registration is field preempted). "The categories of preemption are not rigidly distinct . . . [and] field pre-emption may be understood as a species of conflict pre-emption." *Nat'l Ass'n of State Utility Consumer Advocs. v. Fed. Commc'n Comm'n*, 457 F.3d 1238, 1252 (11th Cir. 2006) (quoting *Crosby*, 530 U.S. at 372 n.6). Of course, the Court will not assume Congress intended to supersede the historic police powers of the States "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Marrache*, 17 F.4th at 1095 (quoting *Nat'l Ass'n of State Util. Consumer Advocs.*, 457 F.3d at 1252). However, both the nature of the subject matter and the extensive scheme of regulation authored by Congress over decades support the Court's analysis set out below.

     i.  <u>Field Preemption</u>

Courts may infer an intent to displace state law from a "framework of regulation so pervasive that Congress left no room for the States to supplement it, or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (alterations accepted and internal quotations omitted).

"For nearly 150 years, the Supreme Court [and other federal courts have] held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024). Most recently, courts established that federal law preempts any state scheme in the fields of noncitizen registration and the transport and movement of noncitizens, both closely related to illegal entry and reentry. In fact, in those cases, courts grouped federal entry and reentry provisions together with the other fields as part of "the larger context of federal statutes criminalizing the acts undertaken by aliens and those who assist them in coming to, or remaining within, the United States." *GLAHR*, 691 F.3d at 1264; *Arizona*, 567 U.S. at 395–96 (describing the INAs "extensive and complex" scheme as not just covering noncitizen registration, but also "who may not be admitted to the United States," "[u]nlawful entry and unlawful reentry into the country," and "which aliens may be removed from the United States") (citing 8 U.S.C. §§ 1325, 1326, the federal entry and reentry provisions S.B. 4-C is modeled after).

First, in *Arizona*, the Supreme Court held that the field of noncitizen registration was fully occupied by the comprehensive immigration scheme created in 1952 by the Immigration and Nationality Act ("***INA***"), 8 U.S.C. § 1101, *et seq*. 567 U.S. at 401–02; se*e also Patel v. Garland*, 596 U.S. 328, 331 (2022) ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States. When noncitizens violate those rules, Congress has provided procedures for their removal."). The Supreme Court found that the noncitizen registration provisions within this scheme "provide a full set of standards . . . including the punishment for noncompliance. It was designed as a 'harmonious whole.'" *Id.* at 401 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)).

Further, the Court noted the importance to U.S. foreign relations of having "a single sovereign responsible for maintaining a comprehensive and unified system" to track noncitizens. *Id.* at 401–02. "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* at 395; *see also Hines*, 312 U.S. at 64 ("One of the most important and delicate of all international relationships, recognized immemorially as a responsibility of government, has to do with the protection of the just rights of a country's own nationals when those nationals are in another country.").

The Eleventh, Ninth, and Fourth Circuits found these principles apply with equal force to the federal government's regulation of noncitizen transport and movement. *See, e.g.*, *GLAHR*, 691 F.3d at 1263–64 (holding the "INA provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens," preempting a Georgia state law regulating the same conduct); *United States v. Alabama*, 691 F.3d 1269, 1287 (11th Cir. 2012) (agreeing with *GLAHR* and holding Alabama's similar law was field preempted); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1026 (9th Cir. 2013) (same for Arizona law); *United States v. South Carolina*, 720 F.3d 518, 530–32 (4th Cir. 2013) (same for South Carolina law). The INA creates prohibitions for offenses relating to noncitizen transport and movement, specifies criminal and civil penalties, and delegates enforcement of the provisions to United States attorneys. *GLAHR*, 691 F.3d at 1263–64 (citing 8 U.S.C. §§ 1324, 1329). "Like the federal registration scheme addressed in *Arizona*, [this is] a 'full set of standards' to govern the unlawful transport and movement of aliens." *Id.* at 1264 (quoting *Arizona*, 567 U.S. at

401). Further, restricting the movement of noncitizens into and within the United States by criminalizing those who transport, conceal, or encourage their movement impacts "the status, safety, and security of [foreign] nationals in the United States" such that foreign countries "must be able to confer and communicate on this subject with one national sovereign, not the 50 separate states." *Whiting*, 723 F.3d at 1023–24.

Federal regulation of entry and reentry share both traits—comprehensiveness and impact on sensitive foreign relations interests—with that of noncitizen registration and noncitizen transportation and movement. The INA defines and prohibits illegal entry and reentry and creates specific civil and criminal penalties for violations. 8 U.S.C. §§ 1325 (entry), 1326 (reentry). The reentry provision in particular recognizes the need for nuanced immigration decisions. For instance, it provides differing penalties for those reentering without prior convictions and those reentering after "commission of three or more misdemeanors" involving specified offenses or "an aggravated felony," those reentering after being excluded from the United States after committing terrorist activities, and those reentering after being removed prior to completion of a prison sentence. 8 U.S.C. § 1326(b)(1)–(4), (c). And like the provisions regarding noncitizen transportation addressed in *GLAHR*, the INA "confin[es] the prosecution of [illegal entry and reentry] to federal court" and "limit[s] the power to pursue those cases to the appropriate United States Attorney." *GLAHR*, 691 F.3d at 1265; *see* 8 U.S.C. § 1329. Together, these provisions provide "a full set of standards governing [entry and reentry], including the punishment for noncompliance" and methods of enforcement. *Arizona*, 567 U.S. at 401. They were "designed as a harmonious whole . . . reflecting a Congressional decision to foreclose any state regulation in the area." *Id*.

Second, the criminalization of unauthorized noncitizen entry and reentry into the United States impacts "the status, safety, and security" of foreign nationals in an even more direct way than the regulation of noncitizen transport. *Arizona*, 567 U.S. at 395. "[T]he protection of the just rights of a country's own nationals when those nationals are in another country" is "one of the most important and delicate of all international relationships." *Arizona*, 567 U.S. at 395 (quoting *Hines,* 312 U.S. at 64). Therefore, the federal government has a strong foreign relations interest in being the sole entity setting policy for the treatment of foreign nationals coming across the U.S. border and moving throughout the country. *Texas,* 97 F.4th at 283–84 ("Field preemption of the entry . . . of noncitizens is indicated by the breadth of the United States' power 'to control and conduct relations with foreign nations,' and the reasons for the existence of that power.") (quoting *Arizona*, 567 U.S. at 395).

Defendants resist the great weight of this authority by positing hollow distinctions between the INA provisions involving the noncitizen registration and transportation and movement fields, and the illegal entry and reentry field. (DE 40 at 14–16.) First, Defendants argue "the INA's entry and reentry crimes are far less detailed than those for alien registration." (*Id.* at 14.) But apart from citing the few statutory provisions that govern each, Defendants provide no support for this claim. (*Id.*)

Next, Defendants argue that the unique federal interests at stake in the noncitizen registration field analyzed in *Arizona*—maintaining reciprocal expectations for the treatment of foreign nationals in other countries—is not implicated by restrictions on noncitizen movement into and throughout the U.S. (*Id.* at 15.) According to Defendants, noncitizen registration impacts "perfectly law-abiding" noncitizens, while entry crimes

"inherently affect only non-law-abiding [noncitizens]," so have a "more muted impact on 'amity and commerce' between nations." (*Id.*) (quoting *Hines,* 312 U.S. at 64–66).

Notably, the *Arizona* Court did not make this strained differentiation. Rather, it spoke broadly about the interest that foreign governments have in the "status, safety, and security of their nationals" abroad, and the corollary need for federal governance of immigration and noncitizen status to prevent States from "tak[ing] action that would undermine foreign relations[.]" *Arizona*, 567 U.S. at 395. This makes sense, given that the noncitizen registration provision at issue in *Arizona* expressly exempted persons lawfully present in the United States. Ariz. Stat. § 13-1509(F). And even if it did not, those who would be subject to *Arizona*'s noncitizen registration provision would also be in violation of the federal noncitizen registration provision, *see* 8 U.S.C. § 1304(e), just as those who would be in violation of S.B. 4-C are also in violation of the federal entry or reentry law. Therefore, there is no difference between the "law-abiding" status of individuals subject to the two laws, nor between the strength of the federal governments' interests in managing treatment of foreign nationals across the two contexts.[10]

---

[10] Defendants also attempt to undermine the precedential value of *GLAHR* and *Alabama*, saying "transport and harboring are special because, as [the GLAHR court] noted, Congress had specifically limited state participation in those crimes to arrest under federal law." (DE 40 at 15) (citing *GLAHR*, 691 F.3d at 1266 (citing 8 U.S.C. § 1324(c)). Yet, the fact that the INA allows state officials to make arrests for transport and harboring crimes but not for entry and reentry crimes undercuts Defendants' position. Congress knew how to carve out a role for states to play in immigration enforcement and chose to exclude state law enforcement entirely from enforcement of federal entry and reentry provisions. *See United States v. Pate*, 84 F.4th 1196, 1202 (11th Cir. 2023) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations omitted). This is additional evidence of congressional intent to foreclose state participation in the field.

Accordingly, courts across the country have unanimously held that nearly identical state illegal entry and reentry laws recently enacted are likely preempted by federal immigration law governing noncitizen entry. *See e.g., United States v. Iowa*, 126 F.4th 1334, 1346 (8th Cir. 2025) (affirming preliminary injunction against Iowa's illegal entry and reentry law, after holding the law conflicts "with federal law because it creates a parallel scheme of enforcement for immigration law"), *vacated as moot*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Texas*, 97 F.4th at 287–88 (holding Texas had not shown its illegal entry scheme was not both field and conflict preempted by federal law); *United States v. Oklahoma*, 739 F. Supp. 3d 985, 999 (W.D. Okla. 2024) ("[T]here is strong support for the conclusion that Congress has legislated so comprehensively in the field of noncitizen entry and reentry that it left no room for supplementary state legislation.") (internal quotations omitted), *appeal filed*, No. 24-6144 (10th Cir. 2024); Memorandum Decision and Order, *Idaho Org. of Res. Councils Inc. v. Labrador*, No. 25-cv-00178 (D. Idaho Apr. 29, 2025) (issuing preliminary injunction prohibiting enforcement of a similar Idaho law), ECF No. 84.[11]

Provisions within S.B. 4-C that define illegal entry and reentry through reference to federal law,[12] or create affirmative defenses where the federal government has given

---

[11] Defendants studiously ignore the precedential impact of these cases in their briefing. And when the Court asked for clarification on how these cases, and *Texas*, 97 F.4th 268, in particular, impact their position, Defendants conceded, "I suppose that we just disagree with the Fifth Circuit." (DE 50 at 46.) Defendants' disagreement with existing precedent is a hallmark of their argument. *See* (DE 40 at 16 n.12) (arguing, "[t]o the extent [*GLAHR*] and *Alabama* are not distinguishable from this case . . . those cases should be overturned by the Eleventh Circuit.").

[12] *See* Fla. Stat. § 811.101(2) (referencing Fla. Stat. § 908.111).

an individual reprieve from deportation or removal,[13] do not save the statute from constitutional infirmity. "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401; *see also Texas*, 97 F.4th at 286 (dismissing Texas's argument that illegal reentry provisions which "mirror" the federal equivalent are permissible as "ignor[ing] the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself.") (internal quotations omitted).[14] Therefore, S.B. 4-C is likely field preempted by federal entry and reentry laws.

ii.   Conflict Preemption

"[S]tate laws are [also] preempted when they conflict with federal law." *Arizona*, 567 U.S. at 399. This includes when compliance with both laws is a "physical impossibility[,]" but also when a challenged law simply impedes "the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (first quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963) and then quoting *Hines*, 312 U.S. at 62). For example, even when Arizona imposed a state law penalty for conduct already proscribed by the federal government—willful failure to complete or carry an "alien registration" card—the Supreme Court concluded that "[permitting] the State to impose

---

[13] *See* Fla. Stat. § 811.102(4).

[14] Potentially aware of the issues with characterizing S.B. 4-C as a complement to federal entry and reentry laws, Defendants later switch course and argue that S.B. 4-C "does not directly operate in the field of entry, admission, and removal of noncitizens" because it "primarily regulates entry into Florida—not entry into the country." (DE 40 at 15.) But in this way, S.B. 4-C is no different than the state analogues in *Arizona, GLAHR,* and other similar cases. Glossing onto a federal crime the requirement that the prohibited conduct take place within a given state does not remove the problematic convergence between the schemes.

its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." *Arizona*, 567 U.S. at 402. The state could prosecute violations even when federal officials determined they would "frustrate federal policies." *Id.*; *see also* *GLAHR*, 691 F.3d at 1265 ("By confining the prosecution of federal immigration crimes to federal court, Congress limited the power to pursue those cases to the appropriate United States Attorney."). Further, inconsistencies between penalties under the state and federal schemes create an actual conflict. *Arizona*, 567 U.S. at 402–03 (state laws precluding a sentence of probation conflicted with federal laws allowing probation for the same conduct).

S.B. 4-C appears to suffer from the same debilities as the noncitizen registration law struck down in *Arizona*. First, it gives state officials authority to prosecute illegal entry or reentry in cases where federal actors may choose not to. Even if federal and state officials choose to commence parallel dual prosecutions under both laws, S.B. 4-C's mandatory detention provision limits federal law enforcement discretion to recommend pre-trial release and obstructs federal courts' ability to conduct proceedings requiring defendants' presence. Relatedly, state officials are free to prosecute a charge under S.B. 4-C even while a federal immigration proceeding is underway, which may determine that the defendant may remain lawfully present under federal law. *See Texas*, 97 F.4th at 279 (noting as problematic the possibility that under Texas' illegal entry laws, a defendant could be removed through the state proceeding "before federal proceedings that would permit her to remain in the United States lawfully have been initiated or concluded"). Finally, S.B. 4-C requires mandatory prison sentences for state law violations where the INA allows for a fine or probation for the equivalent federal crime. *Compare* Fla. Stat. §

811.102(1) (mandating a minimum of a nine-month prison sentence for a first illegal entry conviction), *with* 8 U.S.C. § 1325(a) (authorizing a maximum prison sentence of six months but not mandating any incarceration upon a first improper entry).

Rather than address any of these conflicts, Defendants invoke the general principle that "nothing about the 'overlap' in federal and state criminal law demands preemption." (DE 40 at 17) (citing *Kansas v.* Garcia, 589 U.S. 191, 212 (2020)).[15] It is of course true that any overlap between federal and state laws does not create a *per se* conflict. But S.B. 4-C does not just share some overlapping features with federal entry and reentry laws—it creates an entirely separate enforcement scheme for essentially the same conduct regulated by the federal government. The Fifth Circuit in *Texas* considered and rejected these exact overlap arguments,[16] concluding, when "two separate remedies are brought to bear on the same activity," "conflict is imminent." *Texas*, 97 F.4th at 289; *see also* Brief for Appellants at 25–27, *Texas*, 97 F.4th 268 (No. 24-50149), 2024 WL 1220010 (citing *Garcia* to make the same conflict preemption arguments Defendants

---

[15] *Garcia* involved a claim that Kansas' general fraud statute is preempted by provisions of the federal Immigration Reform and Control Act of 1986 ("**IRCA**"), which (1) require employees to provide certain personal information to employers on an I-9 form used verify the employees' work authorization, and (2) prohibit the use of the information contained in the form for most purposes aside from work authorization verification. *Id.* at 195–96, 200 (quoting 8 U.S.C. § 1324a(b)(5)). Respondents were convicted under the Kansas statute after providing the same false information on certain tax-withholding forms, which they provided on their I-9 forms. *Id.* at 198–99. The Court concluded that "the mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption." *Id.* at 212. The incidental overlap between the general fraud statute at issue in *Garcia* and the IRCA is simply not comparable to the complete overlap between the conduct prohibited by S.B. 4-C and federal entry and reentry provisions.

[16] Once again, Defendants do not engage in any meaningful discussion of that case. *See supra* n.8. Rather, they cite the dissent as a guide for this Court's determination. (DE 40 at 11, 19.)

make here). Because S.B. 4-C imposes a different pretrial detention and penalty scheme and shifts enforcement discretion to state officers for essentially the same conduct proscribed by federal law, S.B. 4-C is likely conflict preempted.

      *b. Commerce Clause*

Plaintiffs also argue S.B. 4-C violates the Commerce Clause, which gives Congress power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl 3; *see* (DE 4 at 14). That power "encompasses the movement in interstate commerce of persons as well as commodities." *United States v. Guest*, 383 U.S. 745, 758–59 (1966); *see also Edwards v. California*, 314 U.S. 160, 172 (1941) ("[I]t is settled beyond question that the transportation of persons is 'commerce,' within the meaning of" the Commerce Clause.). Implicit in congressional power to regulate interstate commerce is an "implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1243 (11th Cir. 2012). When a scheme "directly regulates or discriminates against interstate commerce" it will generally be "struck down . . . without further inquiry." *Bainbridge v. Turner*, 311 F.3d 1104, 1109 (11th Cir. 2002).[17]

Plaintiffs assert that S.B. 4-C facially discriminates against interstate commerce by criminalizing entry across Florida's border only by certain noncitizens. (DE 4 at 14–15.) Although the Court has determined that a preliminary injunction is appropriate based on

---

[17] A law may be excepted from this nearly per se rule if it is shown to "advance a local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (quoting *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988)). But given that S.B. 4-C basically duplicates existing federal law, it is unlikely Florida can make a showing that its state law version is necessary in this context.

Plaintiffs' preemption argument, it should be noted that courts have determined similar statutes violate the dormant commerce clause on this basis. *See, e.g.*, *Edwards,* 314 U.S. at 174, 177 (striking down California's ban on transportation of indigent nonresidents into the state because it had the "plain and sole function" of restricting interstate commerce); *United States v. Texas*, 719 F. Supp. 3d 640, 679 (W.D. Tex. 2024) (holding "[o]n its face, [Texas' illegal entry law] discriminates against foreign commerce," so violates the dormant commerce clause).[18] Therefore, at this juncture, the Court finds that Plaintiffs' Commerce Clause analysis also supports their request for a preliminary injunction.

### 2. *Irreparable injury*

Plaintiffs argue that, absent an immediate pause to enforcement of S.B. 4-C, they will suffer irreparable harm by being placed at risk of arrest, prosecution, and detention under an unconstitutional state statute. (DE 4 at 17.[19]) In their Supplemental Response, Plaintiffs note several reports documenting recent arrests pursuant to S.B. 4-C. (DE 23

---

[18] At the April 18, 2025 Hearing, Defendants cited the district court opinion in *United States v. Arizona* as counter-authority. *United States v. Arizona*, 703 F. Supp. 2d 980 (D. Ariz. 2010), *aff'd*, 641 F.3d 339 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012), *and aff'd in part, rev'd in part*, 689 F.3d 1132 (9th Cir. 2012). (DE 50 at 50.) There, the district court judge preliminarily enjoined several Arizona immigration provisions after finding they were preempted by federal law. The appeal of the court's order eventually led to the Supreme Court decision *Arizona,* 567 U.S. 387. While the court granted the injunction on preemption grounds, it rejected the United States' argument that Arizona's noncitizen transport prohibition likely violated the dormant commerce clause. *Id.* at 1002–04. However, the court based that decision on its determination that the Arizona law "does not restrict or limit which aliens can enter Arizona." *Id.* at 1003. S.B. 4-C contains explicit language as to which noncitizens may enter Florida. Additionally, neither the Ninth Circuit nor Supreme Court discussed the commerce clause issue in their decisions. Consequently, the district court's analysis in *Arizona* is both inapplicable and unpersuasive here.

[19] The Court uses CM/ECF page numbering, which appears in the top right corner of all filings.

at 2.) One news source quotes the Brevard County Sheriff Wayne Ivey stating his office was "seeing cases like this six to seven times a week." Space Coast Daily, First Arrest Made Under Florida's New Immigration Law Happens in Brevard County (Mar. 13, 2025), https://perma.cc/D3DQ-UNKA. And, as noted during the Hearing on April 18, 2025, more than a dozen persons in Leon County, including a United States citizen, have been arrested even after the Court entered the TRO enjoining enforcement of S.B. 4-C. (DE 50 at 12.) As discussed, *supra,* Individual Plaintiffs' declarations confirm they are at risk of arrest and prosecution given ongoing enforcement of the S.B. 4-C. Likewise, Organizational Plaintiffs' declarations support the conclusion that a subset of their members may be susceptible to the law's enforcement. (DE 4-2 at 3–4; DE 4-3 at 3–4) (attesting to the many FWAF and FLIC members without documentation who entered or reentered without inspection and regularly travel between Florida and other states). Because "Plaintiffs are under the threat of state prosecution for crimes that conflict with federal law," a preliminary injunction is necessary to mitigate the risk of irreparable harm from S.B. 4-C. *GLAHR*, 691 F.3d at 1269.

### 3. *Balance of equities and public interest*

For similar reasons, the balance of equities and the public interest favor granting a preliminary injunction. "These two factors merge when, as here, the government is the opposing party." *Farmworker Ass'n of Fla.,* 734 F. Supp. 3d at 1342. The harm to Defendants from briefly suspending enforcement of S.B. 4-C is minimal, especially given that similar federal provisions already exist and may be enforced against appropriate

persons in Florida.[20] More importantly, the Court has already determined Plaintiffs are likely to succeed on the merits, and Defendants have "no legitimate interest in enforcing an unconstitutional law." *Honefund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024) (internal quotations omitted).

### C. Provisional class certification is appropriate.

Plaintiffs ask the Court to issue provisional class certification "for the purpose of issuing a temporary restraining order or preliminary injunction," and then "consider any outstanding questions before proceeding to full class certification." (DE 5 at 2.) Plaintiffs propose the following two classes, which draw from the language of S.B. 4-C's two offense provisions to capture anyone "potentially subject" to their enforcement:

> [A]ny person not a citizen or national of the United States who may now or in the future enter or attempt to enter the state of Florida after entering the United States by eluding or avoiding examination or inspection by immigration officers [("***Proposed Entry Class***")].

> [A]ny person not a citizen or national of the United States who may enter, attempt to enter, or be found in the state of Florida after the person has been denied admission to or excluded, deported, or removed from the United States; or has departed from the United States while an order of exclusion, deportation, or removal was outstanding [("***Proposed Reentry Class***")].

(*Id.* at 2.) Plaintiffs propose that Individual Plaintiffs Y.M. and V.V. and Organizational Plaintiffs FLIC and FWAF be the class representatives. (*Id.* at 5–6.)

---

[20] State and local law enforcement agencies may also enter into written agreements, called 287(g) agreements, giving officers within those agencies power to enforce federal immigration law. 8 U.S.C. § 1357. Florida entities account for nearly 50% of all 287(g) agreements nationwide. United States Immigration and Customs Enforcement, Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act (last visited Apr. 27, 2025) (providing database listing 208 out of 455 active 287(g) agreements as being with Florida agencies), https://www.ice.gov/identify-and-arrest/287g.

Plaintiffs have the burden of showing these class definitions meet the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). Fed. R. Civ. P. 23(a). Plaintiffs must also show that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345–46 (2011) (quoting Rule 23(b)(2)).

### 1. Numerosity

Numerosity requires that the classes be "so numerous that joinder of all members is impracticable" Fed. R. Civ P. 23(a)(1). Generally, "a class size of more than forty is adequate." *Ibrahim v. Acosta*, 326 F.R.D. 696, 699 (S.D. Fla. 2018) (citing *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489–90 (S.D. Fla. 2003)).

The most recently released United States Department of Homeland estimate is that there are around 10,990,000 unauthorized immigrants in the United States, including 9,760,000 who are eighteen years of age or older. Bryan Baker & Robert Warren, Off. of Homeland Sec. Stat., U.S. Dep't of Homeland Sec., Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018-January 2022 (2024), https://perma.cc/ABZ6-Q3R7.[21] Around 590,000 of those unauthorized immigrants reside in Florida. *Id.* at 17. Those people have various inter-state travel habits, and many have no doubt been removed, deported, or left while such orders were outstanding. Given

---

[21] The Court may take judicial notice of government agency reports. *See Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) (taking judicial notice of a Florida Department of Corrections annual statistics report); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports."); *Flathead-Lolo-Bitterroot Citizen Tas Force v. Montana*, 98 F. 4th 1180, 1189 (9th Cir. 2024) (noting that "the Federal Rules of Evidence do not strictly apply in the preliminary injunction context").

these statistics, by any accounting, the number of people who fit into Plaintiffs' proposed classes far exceeds the required number of more than forty.

### 2. Commonality and Typicality

Commonality is met when there are "questions of law or fact common to the class[es.]" Fed R. Civ P. (23)(a)(2). "Commonality requires the [P]laintiff[s] to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law . . . . Their claims must depend on a common contention—for example, [in a Title VII context,] the discriminatory bias on the part of the same supervisor." *Duke*, 564 U.S. at 350.

Meanwhile, typicality ensures "the claims or defenses of the representative parties are typical of the claims or defenses of the class[es.]" Fed. R. Civ P. (23)(a)(3). The inquiry "turns on 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named class plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1231 (S.D. Fla. 2020) (quoting *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012)). This nexus exists when "claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Id.* (quoting *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 686 (S.D. Fla. 2004)).

> [T]he commonality and typicality requirements . . . tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Dukes*, 564 U.S. at 349 n.5 (internal quotations omitted).

Here, members of the proposed classes plainly advance the same contention. All members of the Proposed Entry Class will make the same facial constitutional challenges to S.B. 4-C's entry provision, and the members of the Proposed Reentry Class will engage in the same challenge for the Statute's reentry provision. Therefore, the "class-wide proceeding [will] generate common answers apt to drive the resolution of the litigation." *Id.* at 350. It follows that typicality is also met, as the class representatives challenge the same provisions of S.B. 4-C on the same legal grounds and seek the same relief as the unnamed class members.

Defendants argue commonality is defeated because the Court "would need to answer a myriad of questions" related to individuals' travel habits, ages, and immigration statutes to determine whether a given person is within one of the classes. (DE 44 at 8.) But this misapprehends the inquiry. "[F]or purposes of [commonality], even a single common question will do[.]" *Dukes*, 564 U.S. at 359 (internal quotations omitted and alterations accepted). In this case, the common questions are core to resolving Plaintiffs' claims and providing effective relief: whether the entry and reentry provisions violate the Supremacy Clause or Commerce Clause.

Defendants repackage this same argument to challenge the proposed classes' typicality. (DE 44 at 9) (arguing Plaintiffs do not meet typicality "when so many class members 'may' 'potentially' qualify for one or more of the numerous affirmative defenses the statute makes available to them"). This again misunderstands the purpose of the requirement. Typicality ensures that the interests of representatives are "so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n.5. Despite the potential for some class members to

invoke an affirmative defense during a prosecution under S.B. 4-C inapplicable to others, they are all subject to arrest and detention under the law. Thus, the type and source of their injuries are shared. So are their claims and requested relief. *See Gayle*, 614 F. Supp. 3d at 1231 (individuals confined across three detention centers under similar conditions exposing them to illness meet typicality, despite individual differences in the detention facility and personal risk factors). Therefore, commonality and typicality are met.

### 3. *Adequacy of representation*

The class must also be structured such that named Plaintiffs "fairly and adequately protect the interests of the class". Fed. R. Civ. P. 23(a)(4). Adequacy of representation depends on "(1) whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and . . . (2) whether plaintiffs have interests antagonistic to those of the rest of the class." *Cheney,* 213 F.R.D. at 495 (internal quotations omitted). Defendants do not contest that these requirements are met.

Plaintiffs' counsel includes a large team of attorneys who have significant experience litigating class actions, immigration cases, and cases seeking injunctive relief, including from laws similar to S.B. 4-C. (DE 5-1.) Counsel has confirmed no conflicts of interest exist and that they pledge to devote the resources required to effectively litigate this case. (DE 5 at 13.) Therefore, Plaintiffs' counsel are able to conduct the proposed litigation.

Likewise, the named Plaintiffs' interests are aligned with the class members' for the same reasons outlined in the Court's typicality discussion. The class members are those subject to enforcement of S.B. 4-C by virtue of being noncitizens who entered or reentered the United States without inspection with plans to enter or reenter Florida, or

are present in Florida after reentering the United States. The named Plaintiffs each fall into one of these categories. *See* (DE 4-4 at 1; DE 4-5 at 2–3) (declarations of V.V. and Y.M.). Therefore, Rule 23(a)(4)'s adequacy of representation requirement is also met.

### 4. Rule 23(b)(2)

Defendants also do not contest that this case fits within the Rule 23(b)(2) category. Rule 23(b)(2) "has been liberally applied in the area of civil rights." *Braggs v. Dunn*, 317 F.R.D. 634, 667 (N.D. Ala. 2016). Indeed, "some courts have gone so far as to say that the rule's requirements are 'almost automatically satisfied in actions primarily seeking injunctive relief.'" *Id.* (quoting *Baby Neal v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994). "The critical inquiry is whether the class members have suffered a common injury that may properly be addressed by class-wide injunctive or equitable relief." *Ibrahim* , 326 F.R.D. at 701 (S.D. Fla. 2018) (citing *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)); *see also Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'").

The proposed class members all face the common risk of being subject to enforcement of S.B. 4-C, a law Plaintiffs claim is unconstitutional. *See Susan B. Anthony List*, 573 U.S. at 161 (holding the threat of prosecution pursuant to an unconstitutional statute was an injury-in-fact). That injury would be addressed for all members of each class through a class-wide injunction preventing enforcement of the law's entry and reentry provisions. And Plaintiffs' facial constitutional challenge to both provisions of S.B.

4-C would result in class-wide injunctions if meritorious. Consequently, this case fits squarely into the category described in Rule 23(b)(2).

### 5. Defendants' other objections

Defendants' other objections to Plaintiffs' proposed classes revolve around the stated concern that the proposed classes are "amorphous and imprecise." (DE 44 at 6–7) (arguing the classes are not "adequately defined and clearly ascertainable" because they include anyone "who '*may* enter, attempt to enter, or be found in the State," do not define "a 'particular time period' during which harms will occur," and do not distinguish between people who "may have different immigration histories, which may qualify them for affirmative defenses under S.B. 4-C and eliminate the possibility of injury in fact." (emphasis added) (quoting *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 301 (S.D. Ala. 2006); *see also* (*id.* at 7*)* (describing Plaintiffs' classes as "overbroad" because they include individuals who are merely "potentially subject to [S.B.] 4-C" so do not "match [Plaintiffs'] claim that Florida is harming the smaller group of individuals who are actually subject to" the law) (internal quotations omitted).

Defendants misperceive what is required in a case like this for classes to be deemed ascertainable. Defendants cite cases in which plaintiffs sought class certification to obtain class-wide damages for past harms. *See, e.g., Cherry v. Dometic Corp.*, 986 F.3d 1296, 1300 (11th Cir. 2021) (requesting class certification under Rule 23(b)(3) to seek damages); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019); (same); *Fisher*, 238 F.R.D. at 277, 296 (same). But classes constructed to seek prospective class-wide injunctive relief are inherently different from those formed to seek backward-looking damages. *Shelton v. Bledsoe*, 775 F.3d 554, 560 (3d Cir. 2015)

("Though classes certified under Rule 23(b)(3) and Rule 23(b)(2) all proceed as 'class actions,' the two subsections actually create two remarkably different litigation devices."). "Because the focus in a [Rule 23](b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a [Rule 23](b)(2) action than in a [Rule 23](b)(3) action." *Id.* at 561 (citing *Dukes*, 564 U.S. at 362–63). In fact, courts within the Eleventh Circuit have expressed "serious reason to doubt that the judicially created ascertainability requirement applies to Rule 23(b)(2) classes." *Braggs*, 317 F.R.D. at 671.[22] In this case, where Plaintiffs allege class members face risks of future harm, Defendants' claim that the class definitions must "specify a particular group harmed during a particular time period via a particular manner," is untenable. *Fisher*, 238 F.R.D. at 301; *see also Shook v. El Paso Cnty*, 386 F.3d 963, 972 (10th Cir. 2004) ("[W]hile the lack of identifiability is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule 23(b)(2). . . . In fact, many courts have found Rule 23(b)(2) well suited for cases where the composition of a class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring a suit on behalf of a shifting prison population.") (citations omitted).

---

[22] The Eleventh Circuit has described classes generally as needing to be "adequately defined and clearly ascertainable," but has not had occasion to analyze in-depth how ascertainability differs between class actions under 23(b)(3) and 23(b)(2). *Cherry*, 986 F.3d at 1302 (internal quotations omitted); *AA Suncoast Chiropractic Clinic, P.A. v. Progressive American Insurance Company*, 938 F.3d 1170, 1174 (11th Cir. 2019) (relying on a 23(b)(3) case when articulating the rule that "[e]very class must be 'adequately defined and clearly ascertainable.'") (quoting *Little v. T-Mobile USA, Inc.,* 691 F.3d 1302, 1304 (11th Cir. 2012)).

Nevertheless, class definitions must not be so broad that "many or most of the putative class members" will not be able to show that they have Article III standing if it comes time for the Court to grant relief. *Cordoba*, 942 F.3d at 1273 (while it is not necessary for unnamed class members to "prove their standing before a class could be certified," the likelihood that putative class members have standing "is assuredly a relevant factor that a district court must consider when deciding whether and how to certify a class"). It is "well-established that the [C]ourt may, in its discretion, modify the definition of the proposed class to provide the necessary precision or to correct other deficiencies." *Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254, 267 (E.D.N.Y. 2016) (alterations accepted and internal quotations omitted). Plaintiffs' proposed class definitions contain two deficiencies that increase the likelihood of there being class members who cannot show imminent risk of enforcement under S.B. 4-C: (1) Plaintiffs neglect to require that class members are eighteen years or older, an element of S.B. 4-C's entry and reentry offenses, and (2) Plaintiffs include those who merely "may" enter, attempt to enter, or be found in the state of Florida. Correcting for these two deficiencies will ensure that an individual will qualify as a class member as soon as they meet the elements of either S.B. 4-C offense, and so are at concrete and imminent risk of enforcement. *Shook*, 386 F.3d at 972 (recognizing the fluidity of class membership as a feature in Rule 23(b)(2) cases); *Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 264 (D.N.H. 2013) ("[W]here certification of a (b)(2) injunctive class is sought, actual membership of the class need not be precisely delimited because notice to the members is not required.") (quotations omitted and alterations accepted). Therefore, the Court will provisionally certify two classes, defined as follows:

Any person eighteen years of age or older, who is not a citizen or national of the United States who enters or attempts to enter the state of Florida after entering the United States by eluding or avoiding examination or inspection by immigration officers ("**Entry Class**").

Any person eighteen years of age or older, who is not a citizen or national of the United States who enters, attempts to enter, or is in the state of Florida after the person has been denied admission to or excluded, deported, or removed from the United States; or has departed from the United States while an order of exclusion, deportation, or removal was outstanding ("**Reentry Class**").

### D. Scope of the Injunction

Having established that a preliminary injunction is warranted, the Court addresses the scope of the injunction. Following the Court's entry of a TRO, local law enforcement agencies continued to make arrests for purported violations of S.B. 4-C. *See, e.g.*, (DE 57-6). Defendants argue that law enforcement agencies, who are not named defendants in this action, are not bound by the Court's orders. For the reasons set forth below, the Court finds that local law enforcement agencies[23] are bound by the Court's Order and cannot make arrests pursuant to S.B. 4-C unless the Court enters a future order dissolving the injunction or a higher reviewing court modifies or overrules this Order.

Federal Rule of Civil Procedure 65 provides that a Court's injunctive power binds the parties; the parties' officers, agent, servants, employees, and attorneys; and other persons who are in active concert or participation with the parties or their officers, agents, servants, employees, and/or attorneys. Fed. R. Civ. P. 65(d)(2).

---

[23] To avoid any confusion, the Court clarifies that local law enforcement agencies, as used in this section, refers to statewide law enforcement agencies such as Florida Highway Patrol and Florida Department of Law Enforcement, along with any other municipal or county law enforcement agencies throughout the state of Florida who present cases to the named state attorneys and the Attorney General for prosecution.

This [rule] is derived from the common[-]law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.

*Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945). It is undisputed that law enforcement agencies are not named parties in this action. Defendants argue that Florida's law enforcement officers are not: (1) Defendants' officers, agents, servants, employees, or attorneys; or (2) invariably in active concert or participation with Defendants. The Court addresses each argument in turn.

### 1. Agents and Servants

"Rule 65(d) 'cannot be read to restrict the inherent power of a court to protect its ability to render a binding judgment.'" *USA v. Robinson*, 83 F.4th 868, 878–79 (11th Cir. 2023) (quoting *U.S. v. Hall*, 472 F.2d 261, 267 (5th Cir. 1972)). "An injunction is not a game of whack-a-mole where the Court must repeatedly issue new injunctions to address the Defendants' post-injunction craftiness." *Id.* at 885. As both Parties agree, the agent or servant inquiry turns on whether the bound Party controls the other. *See* (DE 56 at 6) ("To fall within the common-law definition of all the categories listed in Rule 65(d)(2), law-enforcement officers must be subject to Defendants' control and wield authority to act on Defendants' behalf."); (DE 57 at 13) (citing *Regal Knitwear Co.*, 324 U.S. at 14 (injunction binds "those . . . subject to [Defendants'] control").

Defendants argue that they are unable to exercise control over law enforcement officials because "Plaintiffs have identified no legal authority empowering Defendants to discipline law-enforcement officers in a managerial capacity"; "law-enforcement offices do not receive their funding from Defendants' coffers"; and "many law-enforcement

officials are either directly elected by local constituencies" or "appointed by local governments." (DE 56 at 7−8.)

In responding to these assertions, Plaintiffs submitted copies of letters sent by Defendant Attorney General Uthmeier ("**AG Uthmeier**") to the Mayor of Orlando and the City Council of Fort Meyers pursuant to his authority under Florida Statute 908.107, threatening removal of those officials from their offices based on his perception that they had failed to use their best efforts to support the enforcement of federal immigration law.[24] (DE 57-3; DE 57-4.) Furthermore, the Court is aware of multiple posts on AG Uthmeier's social media, directing state law enforcement agencies, like Florida Highway Patrol ("**FHP**"), Florida Fish and Wildlife Commission ("**FWC**"), and Florida Department of Law Enforcement ("**FDLE**") to act. For instance, on March 27, 2025, AG Uthmeier tweeted from his official account, "Today, at my direction, FDLE and FWC executed a search warrant at the Gulf World Marine Park in Panama City Beach." @AGJamesUthmeier,

---

[24] In addition to the threat of removal, the statutory section allows AG Uthmeier to "file suit against a local governmental entity or local law enforcement agency" for any violation of state laws mandating cooperation with the federal government in the enforcement of federal immigration law. Fla. Stat. § 908.107(2). A government official's threat to file suit is the "employ[ment of] the coercive apparatus of the government" and "an overt threat of specific punishment." *See Kando v. City of Long Beach*, No. 21-56199, 2023 WL 3092304 at *1 (9th Cir. Apr. 26, 2023) (discussing the coercive impact of a government official's threat to file suit in the context of a first-amendment retaliation claim). Certainly, AG Uthmeier's power to file suit is, practically speaking, a form of control over local law enforcement. The Defendants rely on the court's analysis in *Jacobson* to rebut the claim of control. (DE 56 at 8.) In *Jacobson*, the Eleventh Circuit concluded that the Secretary of State's ("**Secretary**") power to bring suits to enforce the performance of any duties of a county supervisor of elections was insufficient to show the Secretary of State's traceability for standing purposes to a law implemented by those supervisors. *974 F.3d* at 1253–54. First, the court was engaged in a standing analysis, not an inquiry under Rule 65(d)(2). Second, in *Jacobson*, the record showed that the power to file suit was "the *only* means of control the Secretary has over the Supervisors." *Id.* at 1253. The Court notes AG Uthmeier's power to file suit as just one of several means of control of law enforcement agencies that he enjoys.

Twitter (Mar. 27, 2025, 4:29 p.m.), https://perma.cc/HAJ8-MMU2. The next day, he announced, "At my direction, the [FHP] and [FDLE] will monitor the planned 'TeslaTakedown' events across Florida tomorrow. . . . If these protests, turn violent, we will do what's necessary to restore order and hold offenders accountable." @AGJamesUthmeier, Twitter (Mar. 28, 2025, 5:49 p.m.), https://perma.cc/YSV7-LU44.[25] Those statements by the party Defendant support a conclusion that he exerts a measure of control over state and local law enforcement agencies' criminal enforcement efforts, including those related to immigration.[26]

AG Uthmeier's asserted control over state law enforcement agencies is grounded in his constitutional and statutory authority over those agencies. The Attorney General is the "chief state legal officer" and a member of the Governor's three-member Cabinet. Fla. Const. art. IV. § 4. As a member of the Cabinet, AG Uthmeier is one of the heads of FDLE

---

[25] Pursuant to this Court's Order (DE 49), on April 18, 2025, AG Uthmeier sent a letter to the law enforcement community notifying "that all Florida law enforcement agencies at present must refrain from enforcing" S.B. 4-C. (DE 57-2 at 2.). He continued, "Please instruct your officers and agents to comply with [the Court's] directives." (*Id.* at 3.) Then, on his own initiative, on April 23, 2025, AG Uthmeier sent a follow-up letter to the law enforcement community reversing his prior directive. (DE 57-1.) It said, "I cannot prevent you from enforcing §§ 811.102 and 811.103, where there remains no judicial order that properly restrains you from doing so." (*Id.* at 2.) Aside from the clear misstatement that there is "no judicial order" that restrains law enforcement from arresting individuals pursuant to S.B. 4-C, AG Uthmeier's assessment that the order does not "properly" restrain them demonstrates his active effort to counsel law enforcement. As discussed at April 29, 2025 Hearing, this letter will be the subject of a separate proceeding.

[26] The Court takes judicial notice of these communications "to establish that the matters had been publicly asserted" by AG Uthmeier, not for the truth of the matters asserted therein. *Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 329 (S.D.N.Y. 2019); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (judicial notice of documents was appropriate at the Rule 12(b)(6) motion to dismiss stage "to determine what statements they contained . . . not for the truth of the matters asserted.") (cleaned up); *Flathead*, 98 F. 4th at 1189.

and FHP. Fla. Stat. § 20.201 (creating FDLE and making the Governor and Cabinet "head[s] of the department");[27] Fla. Stat. § 20.24 (creating the Department of Highway Safety and Motor Vehicles ("**DHSMV**"), headed by the Governor and Cabinet, and creating FHP as a division of DHSMV).[28] Further, AG Uthmeier is empowered to "give an official opinion and legal advice . . . on any question of law relating to the official duties" of any state or local officer. Fla. Stat. § 16.01(3). "Although an opinion of the Attorney General is not binding on a court, [Florida courts give it] careful consideration and generally [regard it] as highly persuasive." *Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 473 (Fla. 2005).[29]

Based on AG Uthemeier's own statements directing the conduct of law enforcement actors, which appear to be premised on his structural authority over state and local law enforcement agencies, the Court finds that both are bound by the preliminary injunction pursuant to a theory of agency with AG Uthmeier.

---

[27] For example, AG Uthmeier is empowered to directly assign FHP patrol officers to his office for security services. Fla. Stat § 321.04(4).

[28] Defendants' reliance on *Support Working Animals* is misplaced. In that case, the Eleventh Circuit held only that "the Attorney General is not *the* head of FDLE" but is instead "*one of several* heads of the FDLE." *Support Working Animals, Inc.*, 8 F.4th at 1204 (citing Fla. Stat. § 20.201) (emphasis in original). That there are other Florida Cabinet members that may exercise control over the FDLE does not change the Court's analysis.

[29] It should be noted that, though local law enforcement budgets may not be directly under AG Uthmeier's control, his office controls a number of funds from which money may flow to or benefit law enforcement agencies throughout the state. *See e.g.,* (DE 56 at 8 n.5) (describing AG Uthmeier's authority to "give grants to sheriffs" from the Crim Stopper Trust Fund created by Florida Statute § 16.555); Fla. Stat. § 16.54 (establishing the Florida Crime Prevention Training Institute Revolving Trust Fund which funds various crime prevention programs for law enforcement personnel). This access to funding can be construed as another form of control.

### 2. Active Concert or Participation

"[A] district court may bind nonparties 'who are in active concert' with a defendant, Fed. R. Civ. P. 65(d)(2)(C), . . . when a plaintiff validly invokes federal jurisdiction by satisfying the traceability and redressability requirements of standing against a defendant." *Jacobson*, 974 F.3d at 1255. As discussed, *supra*, Plaintiffs have validly invoked the Court's jurisdiction and established standing. Therefore, the only question remaining before the Court is whether local law enforcement departments are in active concert or participation with Defendants.

"Subsection C's active concert or participation criterion is directed to the actuality of concert or participation, without regard to the motives that prompt the concert or participation." *Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 929 (S.D. Cal. 2020). Put another way,

> [t]he phrase 'in active concert or participation' in no respect implies any conspiratorial, devious, or insidious intent or design by [the parties]. The phrase 'in active concert or participation' stands in Rule 65 in the ordinary and usual sense and means a purposeful acting of two or more persons together or toward the same end, a purposeful acting of one in accord with the ends of the other, or the purposeful act or omission of one in a manner or by a means that furthers or advances the other.

*Est. of Kyle Thomas Brennan v. Church of Scientology Flag Serv. Org., Inc.*, No. 809-CV-264-T-23EAJ, 2010 WL 4007591, at *2 (M.D. Fla. Oct. 12, 2010). "An arrest is the initial stage of a criminal prosecution." *Terry v. Ohio*, 392 U.S. 1, 26 (1968). Therefore, when law enforcement agencies conduct arrests pursuant to S.B. 4-C, they do so in order for named Defendants to file and prosecute charges under the Statute. In other words, law enforcement agencies conduct arrests to allow the named Defendants to enforce S.B. 4-C by initiating prosecution. As Defendants acknowledged during oral argument: "There is

clearly a partnership between Florida prosecutors and Florida law enforcement." April 29, 2025 Oral Argument at 33:42, No. 25-cv-21524 (S.D. Fla.). *See Doe v. Harris*, No. C12-5713, 2013 WL 144048, at *12 (N.D. Cal. Jan. 11, 2013) ("Even if the Attorney General does not have absolute control and direction over local law enforcement, it cannot be disputed that, as to the collection of sex offender registration data, local law enforcement at least acts 'in active concert or participation with' the Attorney General, if not as her agent."); *Blackard v. Memphis Area Med Ctr. For Women, Inc.*, 262 F.3d 568, 576 (6th Cir. 2001) ("Plaintiffs' definition of 'in active concert or participation' is overly narrow and does not comport with the law. It is not necessary that the enjoined party control the third party in order for the third party to be bound by the injunction. The third party is bound by an injunction if that party is identified with the named, enjoined party in interest, in 'privity' with it, represented by it **or** subject to its control.") (emphasis in original); *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (scope of district court's preliminary injunction properly included district attorneys tasked with enforcing the law because the suit was a facial challenge to a state criminal statute, and district attorneys prosecute criminal cases on behalf of the state).[30]

---

[30] The close partnership between state attorneys and law enforcement agencies in Florida's criminal justice system is mandated by a myriad of state statutory and judicial circuit regulatory law. *See e.g.*, Fla. Sta. § 27.255 (declaring any investigator employed by a state attorney to be a law enforcement officer, with full powers of arrest); Fla. Stat § 985.145(5)–(6) (requiring a state attorney to notify the arresting law enforcement agency when a juvenile is arrested and subsequently referred to mental health services or a diversionary program); Fla. Stat. § 914.25 (2)–(4) (requiring any law enforcement officer who identifies an at-risk victim or witness in a covered criminal case to notify the prosecuting state attorney, requiring the state attorney to notify FDLE if the at-risk person needs to be relocated, and requiring the state attorney and any investigating law enforcement agency to temporarily relocate the individual); Fla. Stat. § 943.1740 (requiring any law enforcement agency's use of force policy to incorporate an independent review of the use of force by the state attorney of that agency's judicial

Defendants argue that the Eleventh Circuit's reasoning in *City of South Miami v. Governor* precludes the Court's order from being binding upon law enforcement. (DE 56 at 8–9.) The Court disagrees. In *City of South Miami*, the Eleventh Circuit made clear that it's holding that plaintiffs did not have standing was based on a lack of evidence developed in that particular record and did not foreclose the possibility that a different record including different evidence could have established that named defendants exerted control over the law enforcement. 65 F.4th at 642 ("The record contains no evidence— none—that Governor DeSantis would use his suspension authority to encourage racial profiling. . . . The organizations' failure to produce any evidence to trace any injury to the governor and attorney general does not foreclose the possibility that these officials could be proper defendants on a different record, as our precedents make clear.") Here, even prior to any formal discovery, there is evidence that AG Uthmeier has used his authority to encourage local law enforcement to continue making arrests under a law the Court has, for the time being, found unconstitutional. *See* (DE 57-1) (letter from AG Uthmeier to the law enforcement community freeing them to make arrests pursuant to S.B. 4-C and

---

circuit); Fla. Stat. § 985.12 (mandating that state attorneys, local law enforcement agencies, and others, collaborate to create juvenile delinquency citation programs in each judicial circuit in Florida); Sixth Jud. Circ. of Fla. L.R. 2021-043 (requiring a local law enforcement agency to forward to the state attorney any affidavit alleging a violation of a protective order); Seventeenth Jud. Circ. of Fla. L.R. 2021-28-UFC (A1) (establishing a juvenile civil citation program whereby local law enforcement agencies in Broward County must forward all qualifying juvenile referral arrest forms to the state attorney and the state attorney must notify the sending law enforcement agency if any additional information is needed to make a prosecution decision).

It is clear from these, along with many other areas of partnership, that local law enforcement agencies act in concert with state attorneys in the operation of the criminal system. The Court acknowledges that the State Attorney Defendants are to this point adhering to the Court's TRO in advising partnering law enforcement officers not to make arrests pursuant to S.B. 4-C.

disavowing the TRO's effect on law enforcement officers). AG Uthmeier's role in providing legal advice to state and local law enforcement officials, see *supra*, creates a stark contrast to the record in *City of South Miami*.

In any event, the separation between local law enforcement and Defendants still does not foreclose local law enforcement from falling within the scope of the Court's Order. "[T]he 'active concert or participation' clause *supposes* legal distinctiveness; if [local law enforcement and Defendants] were the *same* party, the order would be binding directly. The 'active concert or participation' clause is designed to prevent what may well have happened here: the addressee of an injunction, eager to avoid its obligations, persuades a friendly third party to take steps that frustrate the injunction's effectiveness." *Lindland v. U.S. Wrestling Ass'n, Inc.*, 227 F.3d 1000, 1006 (7th Cir. 2000).

Finally,[31] the Court finds that the logical outcome of Defendants' argument raises grave constitutional concerns. "It is basic to [the Supremacy Clause] that all conflicting

---

[31] The Court views the Parties' arguments regarding privity to be tangential to the issue at hand. Privity, at least in the narrow conception Defendants propose, is not necessary where there is no need to adduce a special relationship between persons because the action is against state officials in their official capacities. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.") (citations omitted).

But even if some notion of privity can inform a case like this, Defendants' reliance on *Wilson v. Attaway*, 757 F.2d 1227, 1237 (11th Cir. 1985), and *Hargis v. City of Orlando*, 586 F. App'x 493, 498 (11th Cir. 2014), is misplaced. In those cases, courts held officer-defendants in section 1983 cases claiming false arrest were not collaterally estopped by adverse state criminal court rulings. *Wilson*, 757 F.2d at 1237–38; *Hargis*, 586 F. App'x at 497–98. In that context, the "prosecutors represent the interests of the people of the State . . ., not the interests of the arresting police officer[s]. *Hargis*, 586 F. App'x at 498 (alteration accepted). In this case, Plaintiffs are seeking prospective, forward relief from enforcement of an allegedly unconstitutional law, and law enforcement agencies and state prosecutors have the same interest in enforcing that law. Neither Plaintiffs, Defendants, nor the Court have found any authority applying the construct of privity to

state provisions be without effect." *Maryland v. Louisiana*, 451 U.S. 725, 728 (1981); *see also Irving v. Mazda Motor Corp.*, 136 F.3d 764, 767 (11th Cir. 1998) ("[S]tate law that conflicts with federal law is 'without effect.'") (quoting *Cipollone*, 505 U.S. at 516). And though it is clear Defendants disagree with the Court's analysis, since April 4, 2025, the Court has found that there is a substantial likelihood that S.B. 4-C is unconstitutional. "As a fundamental proposition, orders of the court must be obeyed until reversed by orderly review. . . . If the order appears to be incorrect, the proper course of action lies in review[.]" *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1208 (11th Cir. 1985) (citations omitted); *see also Evans v. Williams*, 206 F.3d 1292, 1299 (D.C. Cir. 2000) ("[A] party faced with an invalid injunction must have the injunction modified or vacated; he cannot simply ignore it."); *Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967) ("[I]f the injunction was erroneous, jurisdiction was not thereby forfeited, that the error was subject to correction only by the ordinary method of appeal, and disobedience to the order constituted contempt.").

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Because arrests are seizures of persons, they must be reasonable under the circumstances." *D.C. v. Wesby*, 583 U.S. 48, 56 (2018). "[T]he 'reasonableness' of an arrest is, in turn, determined by the presence or absence of probable cause for the arrest." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their

---

relationships between law enforcement agencies and state prosecuting entities in cases seeking prospective relief from enforcement of an allegedly unconstitutional state criminal law.

knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Id.* (quoting *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002)). Further, "[i]t is axiomatic that seizures have purposes," and "when those purposes are spent, further seizure is unreasonable." *Williams v. Dart*, 967 F.3d 625, 634 (7th Cir. 2020). "At the time of the founding and still today, the primary purpose of an arrest is to ensure the arrestee appears to answer charges." *Id.* (describing probable cause, which justified an arrest and initial detention, as having been "exhausted" once the purpose for the detention was fulfilled); *Terry*, 392 U.S. at 26 ("An arrest is the initial stage of a criminal prosecution."). To posit, as Defendants do, that law enforcement may arrest individuals for conduct they know has no current legal basis to sustain criminal charges, is to upend Fourth Amendment jurisprudence in its entirety. *Terry*, 392 U.S. at 9 ("No right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

## IV.    CONCLUSION

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Motion for a Preliminary Injunction (DE 4) is **GRANTED**.

2. Plaintiffs' Motion for Provisional Class Certification (DE 5) is **GRANTED IN PART AND DENIED IN PART**.

3. The Court **PROVISIONALLY CERTIFIES** the Entry Class and Reentry Class, as defined, *supra*, for the purpose of issuing the Preliminary Injunction.

4. Plaintiffs' counsel are **APPOINTED** as provisional class counsel.

5. The Court **ENTERS** a Preliminary Injunction prohibiting Defendants and their officers, agents, employees, attorneys, and any persons who are in active concert or participation with them from enforcing S.B. 4-C, codified as Florida Statutes sections 811.102–.103, against any member of the Entry Class or Reentry Class. The preliminary injunction shall include among those "who are in active concert or participation with" Defendants or their officers, agents, employees, or attorneys, and thus prohibited from enforcing S.B. 4-C, the following: any officer or other personnel within any municipal or county police department within Florida, the Florida Department of Law Enforcement, or the Florida Highway Patrol, and any other law enforcement officer with power to enforce S.B. 4-C. (DE 28 at 14); *see also* Fed. R. Civ. P. 65(d)(2)(C) (including "other persons who are in active concert or participation with" the parties or the parties' officers, agents, servants, employees, and attorneys among those bound by any injunction). The preliminary injunction shall also prohibit any person covered by the preliminary injunction from filing or maintaining any charge pursuant to Florida Statute sections 811.102 or 811.103.

6. On or before **May 12, 2025**, Defendant Attorney General Uthmeier shall **SHOW CAUSE** why he should not be held in contempt or sanctioned for violating this Court's TRO (DE 28; DE 49) through sending his April 23, 2025 letter to law enforcement agencies in Florida advising them, in part, that "no lawful, legitimate order currently impedes [their] agencies from continuing to enforce" S.B. 4-C. (DE 57-1 at 2.); *see also supra* pp. 40–41 n.25. Plaintiffs may file a brief detailing their position regarding AG Uthmeier's response to show cause on or before **May 22,**

**2025.** The Parties are **COMPELLED** to attend a **Show Cause Hearing** on **May 29, 2025 at 2:00 p.m.** before the Honorable Kathleen M. Williams in Room 11-3 of the Wilkie D. Ferguson, Jr. United States Courthouse, located at 400 North Miami Avenue in Miami, Florida. Defendants must be prepared to discuss why sanctions should not be imposed for AG Uthmeier's failure to comply with a Court order.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>29th</u> day of April, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE