## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FLORIDA IMMIGRANT COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JAMES UTHMEIER, in his official capacity as Attorney General for the State of Florida, *et al.*, <br><br> *Defendants*. | No. 1:25-cv-21524-KMW |

## DEFENDANT ATTORNEY GENERAL OF FLORIDA'S RESPONSE TO
## ORDER TO SHOW CAUSE

Jesse Panuccio
(Florida Bar No. 31401)
Evan Ezray
(Florida Bar No. 1008228)
Jason Hilborn
(Florida Bar No. 1008829)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
jpannucio@bsfllp.com

*Counsel for the Attorney General of the State
of Florida for the Contempt Proceedings*

This Court ordered the chief legal officer of the State of Florida, Attorney General James Uthmeier, to "show cause why he should not be held in contempt or sanctioned for violating this Court's" temporary restraining order ("TRO").  DE 67 at 48 (citing DE 28, 49).  In the two orders comprising the TRO, the Court enjoined the Attorney General in two respects.  First, the Court ordered him not to enforce sections 811.102 and 811.103, Florida Statutes ("SB 4-C").  *See* DE 28 at 14 ("prohibiting … enforcing SB 4-C"); DE 49 at 1 ("prohibited from enforcing SB 4-C").  The Attorney General has not enforced those laws since the Court entered the TRO.  Second, the Court ordered the Attorney General to "provide actual notice of the TRO" to thousands of non-parties— namely, "any officer or other personnel within any municipal or county police department within Florida, the Florida Department of Law Enforcement, or the Florida Highway Patrol, and any other law enforcement officer with power to enforce SB4-C."  DE 49 at 1–2.  The Attorney General provided such notice.  Having complied with the Court's TRO, there is no basis for contempt or sanctions.

The Court's show-cause order points to the Attorney General's April 23 letter, which the Court describes as "advising [the non-parties], in part, that 'no lawful, legitimate order currently impedes [the non-parties] from continuing to enforce' S.B. 4-C."  DE 67 at 48 (partially quoting DE 57-1).  But the elided quote in the show-cause order does not fairly reflect the April 23 letter in context.  Pursuant to the Court's TRO, the Attorney General had previously sent a letter to all law enforcement in the state—thousands of officers—alerting these non-parties for the first time to their inclusion in the Court's injunctive relief.  In that first letter, the Attorney General noted that he believes the Court erred by including non-parties in its order and that he would be further briefing the issue.  The Attorney General filed that brief on April 23, *see* DE 56, and then sent the April 23 letter updating the thousands of non-party officers who, despite being enjoined through

1

these proceedings, are otherwise not receiving any notice about them.  In that letter, the Attorney General explained "[his] view" of the law "[a]s set forth in the brief [his] office filed" in this Court. DE 57-1.

None of this violated the only two clear commands in the TRO: that the Attorney General (i) shall not enforce SB 4-C, and (ii) shall provide notice of the TRO to thousands of non-party law enforcement officers.  The TRO did not prohibit—much less clearly prohibit—the Attorney General from (i) holding a legal view contrary to the conclusions reached by this Court, (ii) filing a brief explaining his legal position, (iii) notifying others of the filing of that brief, or (iv) publicly explaining the position or reasoning in that brief.  Interpreting the TRO to include such prohibitions, and then basing a contempt finding on that interpretation, would violate the rule that contempt exists only when a party *clearly* violates a *clear* order.  Interpreting an order to prohibit a state attorney general from disagreeing with a federal order—while following it—would also be an extraordinary, first-of-its-kind assertion of federal judicial power, implicating grave constitutional concerns.  *See* U.S. CONST. AMENDS. 1, 10.

## **BACKGROUND**

The named Defendants are the Attorney General of Florida, the statewide prosecutor, and each state judicial circuit's independently elected state attorney.  On April 4, 2025, this Court entered a temporary restraining order "prohibiting Defendants and their officers, agents, employees, attorneys, and any person[s] who are in active concert or participation with them from enforcing" SB 4-C.  DE 28 at 14.  After a hearing on April 18, 2025, the Court issued an order finding that the "TRO shall be interpreted to include," as "prohibited from enforcing SB 4-C," tens of thousands of non-parties—namely, "any officer or other personnel with any municipal or county police department within Florida, the Florida Department of Law Enforcement, or the Florida Highway Patrol, and any other law enforcement officer with power to enforce SB 4-C."  DE 49 at

1.[1]  The April 18 order required Defendants to "provide actual notice of the TRO" to their own

"officers, agents, employees, [and] attorneys," as well as the thousands of non-parties included in

the order.  *Id.* at 2.  The Court also ordered supplemental briefing on "the proper scope of the

TRO/PI."  *Id.*

        Complying with the Court's directive, the Attorney General immediately sent a letter to all

law enforcement agencies in Florida ("April 18 Letter") informing them of the TRO and this

Court's "clarification that law enforcement officers should take no steps to enforce Sections

811.102 and 811.103, including through arrests or detentions."  DE 57-2 at 2.  In that letter, the

Attorney General also explained his position that the TRO "is both wrong on the merits and

overbroad in its scope."  *Id.* at 1.  He noted that his office would "continue to press these scope-

of-relief arguments in the district court and, as appropriate, in the U.S. Court of Appeals for the

Eleventh Circuit."  *Id.*

        On April 23, 2025, the Attorney General filed his supplemental brief, in which he argued

that the Court "lacks equitable authority to enjoin" non-parties to the case and that the TRO is

therefore "overbroad" and may only extend, at most, to non-party law enforcement officers who

"aid and abet" Defendants in violating the injunction.  DE 56 at 2, 15.  That same day, the Attorney

General sent a follow-up letter ("April 23 Letter") updating the law enforcement agencies that his

office had filed the supplemental brief.  DE 57-1.  In that letter, the Attorney General reiterated

that the Court interpreted the TRO to reach "all law enforcement agencies in Florida."  *Id.*  But he

also explained the position "set forth in the brief [his] office filed"—i.e., that enjoining thousands

of non-parties across the state is "wrong" and therefore the order was not "lawful."  The Attorney

---

[1] As of 2024, municipal police departments in Florida employed 20,225 officers, and county sheriffs employed 23,407 officers.  *See* Fla. Dept. of L. Enforcement, Criminal Justice Agency Profile Report, https://www.fdle.state.fl.us/CJSTC/Publications/CJAP/Statewide-Ratios.

General explained that he would "continue to argue that position" in Court.  *Id.*  The Attorney General explained his view that, under state law, *he* (as opposed to the Court) "cannot prevent [other law enforcement agencies] from enforcing §§ 811.102 and 811.103."  *Id.*

On April 29, *after* the Attorney General sent the April 23 Letter, this Court entered an Omnibus Order providing the Court's reasoning for including thousands of non-party municipal and county law enforcement officers within the scope of its injunction.  DE 67 at 37–47.  The Court concluded that these thousands of local officers—though independently elected or appointed—are agents of the Attorney General, and he has "control" and "structural authority" over them, *id.* at 41, because:

- of the possibility of "removal" of state, county, or municipal officers under section 908.107, Florida Statutes (despite the removal authority being vested solely in the Governor), *id.* at 39;

- there are "multiple posts on AG Uthmeier's social media, directing state law enforcement agencies … to act," *id.* at 39–40;

- the Attorney General is one member of the four-member Commission that controls the Florida Department of Law Enforcement and the Florida Highway Patrol by majority vote, *id.* at 40–41; and

- the Attorney General may give "an official opinion and legal advice" that is "not binding" on Florida officials or courts, *id.* at 41.[2]

In that same Omnibus Order, which for the first time explained the Court's theory of the Attorney General's "control" and "authority" over every law enforcement officer in Florida, the Court ordered the Attorney General to "show cause why he should not be held in contempt or sanctioned for violating the TRO (DE 28; DE 49) through sending his April 23, 2025 letter to law enforcement agencies in Florida."  *Id.* at 48.  The Court characterized the April 23 Letter as a "misstatement" and an "active effort to counsel law enforcement."  *Id.* at 40 n.25.

---

[2] The Omnibus Order does not cite any state or federal case reaching this same conclusion regarding the scope of the Florida Attorney General's authority.

## ARGUMENT

A federal district court must exercise its contempt power with extreme caution.  As the Supreme Court has explained:

> [T]he contempt power … is liable to abuse.  Unlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct. Contumacy often strikes at the most vulnerable and human qualities of a judge's temperament, and its fusion of legislative, executive, and judicial powers summons forth ... the prospect of the most tyrannical licentiousness.

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (quotation marks and citations omitted).  Civil contempt is thus a "potent weapon," *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019), and when "it is founded upon a decree too vague to be understood, it can be a deadly one," *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (alteration omitted).

To guard against the risks of judicial overreach, Rule 65 of the Federal Rules of Civil Procedure requires an injunction to "describe in reasonable detail … the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).  "[T]hose enjoined" must "receive explicit notice of precisely what conduct is outlawed" before they can be subject to contempt.  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).  Thus, an "injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law."  *S.E.C. v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) (quoting *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1222–23 (11th Cir. 2000)).  To that end, courts have consistently held that a "person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing."  *S.E.C. v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012) (quoting *Hughey v. JMS Dev. Corp*, 78 F.3d 1523, 1531 (11th Cir. 1996)); *see, e.g., Monsanto Co. v. Haskel Trading,*

*Inc.*, 13 F. Supp.2d 349, 363 (E.D.N.Y. 1998) ("The clarity of the order must be such that it enables the enjoined party 'to ascertain from the four corners of the order precisely what acts are forbidden.'" (quoting *Drywall Tapers & Pointers of Greater N.Y., Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389, 395 (2d Cir. 1989))).

Under that standard, "civil contempt 'should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct.'" *Taggart*, 587 U.S. at 561 (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)). This "rigorous" standard, *see In re Roth*, 935 F.3d 1270, 1278 (11th Cir. 2019), permits civil contempt only if "there is no objectively reasonable basis for concluding that [the defendant's] conduct might be lawful," *Taggart*, 587 U.S. at 561. Or, said differently, civil contempt will not lie when there is "an objectively reasonable basis to believe" that the court's order did not bar the alleged "conduct." *In re Grant-Carmack*, No. 23-11817, 2024 WL 1433714, at *4 (11th Cir. Apr. 3, 2024). Civil contempt is thus "unavailable" and "inappropriate" if there is a "fair ground of doubt as to whether the [court's] order barred [the party's] conduct." *Roth*, 935 F.3d at 1278 (quotation marks omitted); *see also Trade Well Int'l v. United Cent. Bank*, 778 F.3d 620, 626 (7th Cir. 2015) (contempt requires "an unequivocal command which the party in contempt violated" (quoting *Mañez v. Bridgestone Firestone N. Am. Tire, LLC,* 533 F.3d 578, 591 (7th Cir. 2008))). "[A]ny ambiguities or uncertainties in … a court order must be read in a light favorable to the person charged with contempt." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991); *see also Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971) ("[A]mbiguities and omissions in orders redound to the benefit of the person charged with contempt."); *Ga. Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007) (same).

This demanding standard precludes contempt here.  The TRO had one prohibitory element and one mandatory element.  First, it prohibited the Attorney General from enforcing SB 4-C.  DE 28 at 14; DE 49 at 1–2.  He has not enforced SB 4-C since the issuance of the TRO.  DE 71 at 23:11–13.  Second, the TRO required the Attorney General to provide written notice of the TRO to all law enforcement officers in Florida.  DE 49 at 2.  The Attorney General has done so.  DE 57-2.  But nothing in the TRO prohibited—much less clearly prohibited—the Attorney General from holding a legal opinion contrary to the Court's conclusion, filing a brief in favor of his contrary legal conclusion, or alerting others that he holds such a view and filed a brief expressing that view.  And that is all the April 23 Letter represents: the Attorney General's explanation of his contrary view and notice that he filed a brief expressing that view.  To find contempt by reading more into the Court's TRO, or into the April 23 Letter, would violate both the contempt standard and raise serious constitutional questions.[3]

## I.   The April 23 Letter Did Not Violate the Temporary Restraining Order Because It Did Not Enforce SB 4-C.

"In determining whether a particular act falls within the scope of an injunction's prohibition, particular emphasis must be given to the express terms of the order."  *Alley v. U.S. Dep't of Health & Hum. Servs.*, 590 F.3d 1195, 1207 (11th Cir. 2009) (quoting *Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 385, 388 (5th Cir. 1980)).  The TRO's first express requirement was to

---

[3] The Attorney General has appealed the underlying preliminary injunction. DE 68.  If the Attorney General succeeds on appeal, that may independently vitiate any contempt.  *E.g.*, *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1310 (11th Cir. 2008) ("A judgment of civil contempt ... stands or falls with the validity or invalidity of the order."); *McLean v. Cent. States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985) ("[R]eversal of the underlying order ordinarily invalidates any civil contempt sanctions predicated thereon."); *United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1398 (6th Cir. 1991) (considering the propriety of contempt for violating a TRO in an appeal from the preliminary injunction); *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1179 (3d Cir. 1976) (similar).  Accordingly, the Attorney General incorporates his merits arguments here.

prohibit Defendants from enforcing SB 4-C. *See* DE 28 at 14 ("The Court enters a TRO prohibiting Defendants and their officers, agents, employees attorneys, and any person[s] who are in active concern or participation with them from enforcing SB 4-C."); DE 49 at 1 ("The Temporary Restraining Order ('TRO') (DE 28) is extended and shall remain in effect through April 29, 2025 at 5:00 p.m. or until further order of the Court.").  The Attorney General fully complied with that prohibition.  Since the entry of the TRO, he has not enforced SB 4-C, and there is no contrary evidence in the record.

The Court has raised the possibility that the April 23 Letter constituted enforcement because it represents an "active effort to counsel law enforcement" that "the order does not 'properly' restrain them."  DE 67 at 40 n.25.  That suggestion is mistaken for several reasons.

**1.**  The Court's proffered reading of the April 23 Letter relies on one portion of one sentence, rather than reading letter as a whole and in the context of what preceded it: the April 18 Letter and the brief the Attorney General filed earlier on April 23.  In the April 18 Letter, which was ordered by the Court, the Attorney General provided notice to the Florida law enforcement community—the thousands of officers who are not parties and who were enjoined without prior notice—of the existence of the TRO.  Because the Attorney General does not lead or control those agencies, he requested each agency to "[p]lease instruct your officers and agents to comply with Judge William's directives."  DE 57-2 at 2.  And because the April 18 Letter was the first notice these agencies received about the lawsuit—and their addition to it as enjoined entities—the Attorney General also explained his litigating position.  He informed the agencies that he "disagree[s] with this order" because it is "overbroad in its scope," and stated that he will "continue to press these scope-of-relief arguments in the district court."  *Id.* at 1.

As part of the TRO, the Court ordered the Attorney General to file supplemental briefing on "the proper scope of the TRO/PI by April 23, 2023 at 12:00 p.m." DE 49 at 2. The Attorney General timely filed his brief on April 23, arguing that the TRO was "unlawful" and that the Court lacked "equitable authority to enjoin all non-party law enforcement officers with power to enforce SB 4-C." DE 56 at 2, 15 (quotation marks and alteration omitted). But the hundreds of agencies and thousands of officers enjoined by the Court did not receive that filing because, again, they are not parties. So, to keep them informed, the Attorney General sent a follow up letter after he filed his brief on April 23.

In the April 23 Letter, the Attorney General expressly reiterated the Court's conclusion that the TRO "bound" the letter's recipients. DE 57-1. He explained—as he had in the April 18 Letter—that he believed the Court's conclusion as to permissible scope of the TRO was "wrong," and he noted that the April 18 Letter had promised his "office would be arguing as much in short order." *Id.* He then informed the letter's recipients: "Today, my office filed a brief explaining why" the Court's order was impermissible in its scope. The next (and final) four sentences of the letter—which the Court partially quoted in its show-cause order and at a prior hearing, DE 67 at 40 n.25; DE 71 at 23:24–24:6; 25:15–26:1—read as follows:

> That said, I want to make clear what I expressed in my April 18 letter. Judge Williams ordered my office to notify you of the evolving scope of her order, and I did so. But I cannot prevent you from enforcing §§ 811.102 and 811.103, where there remains no judicial order that properly restrains you from doing so. As set forth in the brief my office filed today, it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce Florida's new illegal entry and reentry laws.

DE 57-1.

In the context of the April 18 Letter that preceded it, the paragraph that precedes it, and the very language of the paragraph ("As set forth in the brief my office filed today, it is my view …"), the paragraph cannot be fairly read as the Attorney General "counsel[ing] law enforcement" to

enforce SB 4-C, DE 67 at 40 n.25.  Instead, it is the Attorney General explaining (1) his view that *he* does not have authority under state law to "prevent" independent agencies from taking actions, and (2) that while the TRO prohibits them from enforcing the law, "it is [his] view"—"[a]s set forth in [his] brief"—that the scope of the order is neither "lawful" nor "legitimate."  DE 57-1.  In other words, the last paragraph of the April 23 Letter explains (i) the legal views the Attorney General expressed in his brief, and (ii) the scope of *his* authority, as opposed to *the Court's* authority.  Advising law enforcement in this manner was entirely reasonable given that (i) these non-parties are not receiving any other type of notice from the Court or Plaintiffs as to what is occurring in this case, but are nonetheless now bound by its edicts; (ii) the Attorney General had previously stated another brief would be forthcoming; and (iii) these non-parties might have questions as to the source of the prohibition on their actions (the Court versus the Attorney General).

    **2.**  Nothing in the April 23 Letter comports with the common understanding of "enforce."  That phrase in the TRO "must be read and interpreted objectively."  *United States v. Scruggs*, No. 2:07-cr-325, DE 34 at 22 (N.D. Ala. Feb. 29, 2008).  Indeed, "unbroken lines of authority" caution courts "to read court decrees to mean rather precisely what they say."  *NBA Props., Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (Breyer, J.).  Said otherwise, in "determining whether a party is in contempt of a court order, the order is subject to reasonable interpretation."  *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002).  And in engaging in that reasonable interpretation, courts must "construe any ambiguities or uncertainties ... "in a light favorable to the person charged with contempt."  *Ga. Power Co.*, 484 F.3d at 1291.

    To "enforce" means to "give force or effect to (a law, etc.)."  *Enforce*, Black's Law Dictionary (12th ed. 2024); *see also Enforce*, Webster's Third New International Dictionary (2002

ed.) ("to put into force; to cause to take effect; give effect to esp. with vigor <laws>"); *e.g.*, *Scruggs*, No. 2:07-cr-325, DE 34 at 23 (looking to dictionary to define the scope of an injunction). Enforcement, in other words, "typically involves compulsion or constraint." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). State officials thus "enforce" a law when "they clearly ... assisted or currently assist in giving effect to the contested law." *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024) (quotation marks and alteration omitted). By contrast, state officials do not enforce the law by promulgating it, *see Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020), advocating for it, *see Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1203–04 (11th Cir. 2021), or issuing written opinions on its scope or effect, *see Free Speech Coal., Inc. v. Anderson*, 685 F. Supp. 3d 1299, 1304 (D. Utah 2023).

The common thread running through these decisions is that commenting about a law— even strongly, and even in legally relevant ways—does not enforce the law. For example, in *Southern Pacific Transp. Co. v. Brown*, 651 F.2d 613 (1980), the Ninth Circuit held that the Oregon Attorney General did not "enforce" an Oregon law by "advis[ing] Oregon district attorneys to presume the [law] constitutional"—even if "his opinion might be persuasive"—because the Attorney General had no authority under state law to "compel the district attorneys to prosecute or refrain from doing so." *Id.* at 614–15 (observing district attorneys could "reject[]" the Attorney General's "advice").

Here, then, the April 23 Letter did not enforce SB 4-C. The Attorney General did not direct law enforcement officials to do anything. Nor did he compel law enforcement officials to do anything. *See K.P.*, 627 F.3d at 124. Rather, he explained his "view ... [a]s set forth in the brief [his] office filed." DE 57-1. That is not enforcement. *E.g.*, *United States v. Abbott*, 85 F.4th 328, 335 (5th Cir. 2023) ("public statements" are not enforcement); *Tex. Democratic Party v. Abbott*,

978 F.3d 168, 181 (5th Cir. 2020) (State Attorney General sending a letter to other state officials outlining his view of the law did not "intimate that formal enforcement was on the horizon" (quotation marks and alteration omitted)); *Brown*, 651 F.2d at 615 (no enforcement where State Attorney General's "advice" was not "binding" on district attorneys); *Chrysafis v. James*, 534 F. Supp. 3d 272, 298 (E.D.N.Y. 2021) ("Plaintiffs cite no authority, nor did the Court find any, for the proposition that an official's public statements and guidance to other state officials are sufficient to establish either the official's authority to enforce a law or her willingness to do so.").

Nor can the April 23 Letter be fairly characterized as an instruction to enforce SB 4-C.  To the contrary, the Attorney General made clear in the letter itself that he does not believe he has the power to issue such an instruction to the letter's recipients.  And the letter incorporates a brief, which at length explains the Attorney General's view that he does not control local law enforcement officials.  *See* DE 56 at 6–15; *cf. Warren v. DeSantis*, 90 F.4th 1115, 1130 (11th Cir. 2024) (explaining that typically "elected officials do not exercise a significant degree of control over other elected officials"), *vacated as moot*, 125 F.4th 1361 (11th Cir. 2025); *Chrysafis*, 534 F. Supp. 3d at 298 ("[T]he fact that the Attorney General provided general information to the local law enforcement officers who are directly responsible for complying with the [law] underscores that it is other state and local officials, rather than the Attorney General, who have the particular duty to administer or enforce the [law].").

**3.**  The Court explained that it was "surprised and shocked" by the April 23 Letter.  DE 71 at 23:19–23.  Respectfully, a subjective reaction is irrelevant to the contempt analysis.  The standard for civil contempt is "an objective one."  *Taggart*, 587 U.S. at 561.  All that matters is whether the "conduct complied with the order at issue."  *Doe v. Bush*, 261 F.3d 1037, 1047 (11th Cir. 2001) (quoting *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990));

*Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 795 (5th Cir. 2013) (reversing finding of contempt where defendant's "actions did not violate the injunction as drafted," regardless of any subjective "purpose of the district court's injunction"); *Scruggs*, No. 2:07-cr-325, DE 34 at 24 (declining to impose contempt because defendant did not violate the "express terms of the injunction," even when there was a "cloud of suspicion surrounding" defendant's conduct). Here, the Attorney General complied with the Court's order to cease enforcing SB 4-C. That the Attorney General also expressed his views of the merits of that order—views he has openly expressed in filings before this Court and the Eleventh Circuit—does not violate any objective term of the Court's TRO.

**4.** As noted above, in its **April 29** Omnibus Order, this Court has apparently concluded that the Attorney General of Florida has "control" and "structural authority" over every state, county, and municipal law enforcement agency and officer in Florida. Whatever the merits of that unprecedented holding,[4] it was rendered *after* the April 23 Letter and thus cannot be considered as

---

[4] Nothing in either order comprising the TRO concluded that the Attorney General controls the thousands of independently elected or appointed law enforcement officers across Florida. Indeed, at the time of the April 23 Letter, no Florida or federal court had ever come to such a conclusion. Rather, at the county level, the sheriff is the "chief … law enforcement officer of the county." *Blackburn v. Brorein*, 70 So. 2d 293, 296 (Fla. 1954). The sheriff, thus, has the power to make arrests. *See* Fla. Stat. § 30.15. And he does so without oversight from the Attorney General. *See Hufford v. Rodgers*, 912 F.2d 1338, 1341–42 (11th Cir. 1990) (examining Florida law and discerning "no intent for state officials to control or supervise the sheriff"); *Abusaid v. Hillsborough Cnty. Bd. of Cnty. Com'rs*, 405 F.3d 1298, 1307 (11th Cir. 2005) (recognizing that sheriffs have "great independence in their day-to-day operations" over which "the state has retained no control"). Authority over local law enforcement is "centralized in the county," so that "the people" are "able to place responsibility upon a particular officer"—the sheriff—"for failure of law enforcement." *Szell v. Lamar*, 414 So. 2d 276, 277 (Fla. 5th DCA 1982).

Federal courts had repeatedly recognized the same thing: the Attorney General (at least when the statewide prosecutor lacks jurisdiction) "does not enforce Florida criminal statutes and is not a proper defendant in a challenge to the constitutionality of a criminal statute." Report and Recommendation at *3, *Caban v. Attorney General of the State of Fla.*, No. 23-cv-61316, 2023 WL 12081126 (S.D. Fla. Dec. 14, 2023) (collecting cases). Recognizing as much, the Eleventh Circuit had held that the Attorney General did not "enforce" a related immigration statute because

ground for contempt of the TRO, which included no such reasoning. *See Ga. Power Co.*, 484 F.3d at 1291 ("In determining whether a party is in contempt of a court order, the order ... may not be expanded beyond the meaning of its terms absent notice and an opportunity to be heard." (quoting *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002))).

   **5.** Any doubt on these issues must be resolved against a finding of contempt.

   *First*, the law is clear that "[i]f there is a fair ground of doubt as to the wrongfulness of the defendant's actions said to be in contempt, the District Court should not entertain the civil contempt proceeding or find contempt." *Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*, 803 F.2d 1170, 1173 (Fed. Cir. 1986); *see also Taggert*, 587 U.S. at 557; *Roth*, 935 F.3d at 1278; *Stuart v. Reynolds*, 204 F. 709, 726 (5th Cir. 1913). Here, at a minimum, there is a fair reading of the April 23 Letter that is not contumacious because it does not enforce SB 4-C. That alone is a reason not to find contempt. *See Ga. Power Co.*, 484 F.3d at 1291 (a court may "make a finding of civil contempt—that is, willful disregard of the authority of this Court—only upon a showing that the alleged contempt is *clear and convincing*").

   *Second*, the cited portion of the April 23 Letter, DE 67 at 40 n.25, is based on the Florida Attorney General's understanding of his own role under Florida law. The Attorney General's position, as expressed in the letter, was that the local law enforcement were bound by the Court's TRO, not by him. DE 57-1. Of course, federal courts have the power to interpret state law. *See generally Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). But the Court should still exercise restraint

---

state law did not give the Attorney General authority to "control" law enforcement officials. *City of S. Miami v. Governor*, 65 F.4th 631, 641–42 (11th Cir. 2023).
   The Attorney General, in short, would have had no way to know, when he wrote the April 23 Letter, that his statement that he (as opposed to the Court) could not control local law enforcement was anything but a mine-run recitation of Florida law, as long understood by Florida officials, Florida courts, and federal courts.

when opining on "difficult questions of state law bearing on policy problems of substantial public import." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976).  That should be doubly true in matters of contempt: it is one thing for this federal Court to disagree with the Florida Attorney General about his role under the Florida Constitution; it is quite another to impose contempt based on that disagreement.

*Third*, in analyzing contempt, the Court should not "ignore the fact that a contempt sanction imposed on the Attorney General in his official capacity has greater public importance, with separation of power overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." *In re Attorney Gen. of U. S.*, 596 F.2d 58, 64 (2d Cir. 1979).  An attorney general, after all, is "a public official who exercises powers entrusted to him by both the executive and legislative branches, with obligations to the judicial branch … Courts accordingly owe him respect as an official and, absent an abuse of power or misuse of office, the most careful and reasoned treatment as party or as litigant." *Id.*

*Fourth*, federalism principles counsel against finding the Attorney General in contempt. Though federal courts no doubt possess broad equitable power, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362 (1976).  Federal courts are therefore "always reluctant" to exercise that power to find a "[state] official in contempt," *Newman v. Alabama*, 683 F.2d 1312, 1318 (11th Cir. 1982)—especially when doing so might interfere with the operation of state government. Indeed, "considerations of comity and federalism argue for the federal courts' avoiding whenever possible getting involved in delicate issues concerning the internal structure of state government." *United Beverage Co. of S. Bend, Inc. v. Ind. Alcoholic Beverage Comm'n*, 760 F.2d 155, 160 (7th Cir. 1985).  "As representative of the dominant partner in the necessary interplay between the two

sovereigns, federal courts must be especially sensitive to this balance and assiduous in its preservation." *Duke v. Texas*, 477 F.2d 244, 252 (5th Cir. 1973); *see also Harris v. Samuels*, 440 F.2d 748, 752 (5th Cir. 1971).

*Fifth*, and relatedly, reading the Attorney General's comments as contumacious risks denying an important Florida government official the right to speak for himself. *See Wood v. Georgia*, 370 U.S. 375, 389 (1962) ("Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression."). As a general matter, the government "is entitled to say what it wishes." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). "Indeed, it is not easy to imagine how government could function if it lacked this freedom" to "speak for itself." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) (quotation marks omitted). A federal court reading its TRO so broadly to limit the State Attorney General's ability to communicate with State law enforcement about his view of the law would undermine Florida's government structure, implicating serious First and Tenth Amendment concerns.

*   *   *

To "find that sanctions are appropriate here," this Court "would have to hold that 'there is no objectively reasonable basis for concluding that [the Florida Attorney General's] conduct might be lawful.'" *Roth*, 935 F.3d at 1278 (quoting *Taggart*, 587 U.S. at 557). The Attorney General has consistently abided by the Court's order to cease enforcing Florida Statutes Sections 811.102 and 811.103. Nowhere does the TRO (expressly or impliedly) require the Attorney General to refrain from sharing his views about the order with law enforcement. At a minimum, there is "more than a 'fair ground of doubt' as to whether" the TRO "barred [General Uthmeier's] conduct." *Id.*

## II.    The April 23 Letter Did Not Violate the Temporary Restraining Order Because the Attorney General Provided Actual Notice of the Order to Law Enforcement.

The TRO's second requirement was for the Attorney General to "provide actual notice of the TRO" to local law enforcement.  DE 49 at 2.  The Attorney General did exactly that.  *See* DE 57-2 at 1 (providing notice that "all Florida law enforcement agencies at present must refrain from enforcing Sections 811.102 and 811.103").  And in doing so, he was clear that law enforcement should "instruct your officers and agents to comply with Judge Williams' directives."  *Id.* at 2. Nothing more was required to comply with the TRO.

For three reasons, nothing in the April 23 Letter undid that compliance.  *First*, by April 23 the Attorney General had complied with the TRO.  He was required to provide actual notice.  And he did it.  *See Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) ("A person who attempts with reasonable diligence to comply with a court order should not be held in contempt." (alteration omitted) (quoting *Newman v. Graddick*, 740 F.2d 1513, 1525 (11th Cir. 1984)); *Mercer v. Mitchell*, 908 F.2d 763, 787 n.11 (11th Cir. 1990) (same).

*Second*, nothing in the April 23 Letter revoked the Attorney General's prior notice.  To the contrary, the April 23 Letter reiterates the April 18 Letter.  It says: "all law enforcement agencies in Florida were bound by an *ex parte* temporary restraining order."  DE 57-1.  A fair reading of the April 23 Letter thus cannot be read to undo the notice issued on April 18.

*Third*, the Attorney General's criticism of the TRO did not undermine his notice.  To be sure, the Attorney General firmly disagrees with the TRO.  And the April 23 Letter shares the Attorney General's view that the TRO was not proper.  But the Court required only notice; not notice shorn from critique.[5]

---

[5] When sanctions are premised on the failure to comply with a court order, the sanctions test—whether the court order was violated—mirrors the contempt test.  *E.g.*, *In re Managed Care*,

## <u>CONCLUSION</u>

For all these reasons, the Court should decline to hold the Attorney General of the State of Florida in contempt or issue any other sanction.


Dated: May 12, 2025                        Respectfully submitted,

                                           <u>s/ *Jesse Panuccio*    </u>
                                           Jesse Panuccio
                                           (Florida Bar No. 31401)
                                           Evan Ezray
                                           (Florida Bar No. 1008228)
                                           Jason Hilborn
                                           (Florida Bar No. 1008829)
                                           **BOIES SCHILLER FLEXNER LLP**
                                           401 East Las Olas Blvd., Suite 1200
                                           Fort Lauderdale, Florida 33301
                                           jpannucio@bsfllp.com

                                           *Counsel for the Attorney General of the State of Florida for the Contempt Proceedings*

---

756 F.3d 1222, 1240 (11th Cir. 2014).  And so, for the same reasons the Court should not hold General Uthmeier in contempt, it also should not sanction him.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 12, 2025, the foregoing was filed with the Clerk of Court using

CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

<u>s/ *Jesse Panuccio*</u>
Jesse Panuccio