# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

|  |  |
|---|---|
| FLORIDA IMMIGRANT COALITION, *et al.*,<br><br>        *Plaintiffs*,<br><br>        v.<br><br>JAMES UTHMEIER, in his official capacity as the Attorney General of the State of Florida, *et al.*,<br><br>        *Defendants*. | Case No. 1:25-cv-21524-KMW |

## PLAINTIFFS' RESPONSE TO DEFENDANT ATTORNEY GENERAL OF FLORIDA'S BRIEF ON ORDER TO SHOW CAUSE

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD.......................................................................................................... 5

ARGUMENT ...................................................................................................................... 7

   I.   CIVIL CONTEMPT IS WARRANTED. ................................................................. 7

     A.   The Attorney General's April 23 Letter Undid His "Actual Notice."............................... 7

     B.   The Attorney General's April 23 Letter Encouraged Law Enforcement to Violate the
             Court's TRO. ...................................................................................................... 15

   II.   CRIMINAL CONTEMPT MAY BE WARRANTED..................................................... 17

   III.  THE ATTORNEY GENERAL ALSO VIOLATED ETHICS RULES............................ 18

   IV. THE COURT SHOULD TAKE APPROPRIATE STEPS TO REINFORCE ITS ORDER
       AND PUNISH THE ATTORNEY GENERAL'S MISCONDUCT. ................................ 20

CONCLUSION.................................................................................................................. 22

## INTRODUCTION

Parties to litigation before this Court, and attorneys admitted to practice before courts more generally, owe important duties to the courts and to the public.  Those duties include complying with court orders, respecting the rule of law and legal process, and behaving responsibly and honestly when it comes to litigation.  For a litigant who is not only a party and a lawyer, but also the "chief legal officer of the State of Florida," DE 81 at 1 ("Br."), those duties are all the more vital.  It is simply not acceptable that, notwithstanding this Court's order and his ethical duties, the Attorney General encouraged arrests that he fully understood were specifically prohibited.

This Court ordered the Attorney General to provide "actual notice" of its temporary restraining order ("TRO") to all law enforcement agencies in Florida, DE 49 at 2, after officers conducted numerous post-TRO arrests—including of a United States citizen.  Initially, the Attorney General complied: He issued a letter to all Florida law enforcement agencies expressing his disagreement with this Court but clearly notifying them that "law enforcement agencies at present must refrain from enforcing" S.B. 4C.  DE 57-2.  That could have been the end of the matter.  Instead, just days later, the Attorney General sent an "update" to those same officials telling them the opposite: that "no judicial order . . . properly restrains you from" enforcing S.B. 4C, and that "no lawful, legitimate order currently impedes your agencies from continuing to enforce [S.B. 4C]."  DE 57-1.  By informing law enforcement that there was no order prohibiting them from enforcing S.B. 4C, the Attorney General effectively undid the notice the Court ordered him to provide and encouraged law enforcement to violate the Court's order—putting Floridians across the state at risk of unconstitutional arrests and detentions.

The Attorney General's responses are notable for what he does not say.  He does not contest that—regardless of his disagreements, legal arguments, or expectations of further review—the law

enforcement officers *were* in fact bound.  Rightly so: "It is well established that" this Court's order "must be obeyed, regardless of the ultimate validity of the order."  *In re Novak*, 932 F.2d 1397, 1400 (11th Cir. 1991).  Nor does he contest that the Court had the authority to order him to provide notice of the injunction to law enforcement.  Nor, finally, does he contest that it would be both contemptuous and unethical conduct either to "undo the notice issued" in his first letter, Br. 17, or to encourage police to make arrests despite this Court's clear injunction to the contrary.

Instead, the Attorney General's response brief effectively reduces to a semantic argument about what the second letter meant.  He argues that he merely expressed disagreement with this Court's order.  Undoubtedly, the Attorney General can hold his own view about this Court's order, and he can express that view to this Court, the Eleventh Circuit, the public, and other Florida state officials, including law enforcement.  But he had *already* expressed his views in the first letter. And, regardless, disagreement with a court order is quite different from telling police—who are not themselves attorneys—that "no judicial order . . . properly restrains you from" enforcing S.B. 4C, and that "no lawful, legitimate order currently impedes" arrests.  DE 57-1.

The Attorney General offers no credible reason for that gratuitous encouragement to violate the Court's order.  And the inference that he intended just such a message is strengthened by his refusal to issue any subsequent clarification, even after this Court specifically invited him to do so.  DE 71 at 42:3-12.  Considered objectively and in the context of the earlier letter, the Attorney General's second letter plainly undermined the notice he was directed to provide, and invited arrests which he knew would be violations of this Court's order.  That is quintessential contempt of court.

For these reasons, this Court should take action to address the April 23 letter.  The Court has various options within its sound discretion, including: directing the Attorney General to issue

clear notice to all law enforcement agencies able to make arrests under S.B. 4C, without any suggestion that compliance with this Court's order is optional; requiring reporting of any arrests conducted in violation of this Court's order; and imposing financial sanctions. The Court may also consider finding probable cause to believe that the Attorney General committed criminal contempt, and referring his conduct to the Florida Bar for disciplinary proceedings.

## BACKGROUND

On April 4, 2025, this Court issued a TRO "prohibiting Defendants and their officers, agents, employees, attorneys, and any person who [is] in active concert or participation with them from enforcing S.B. 4-C." DE 28 at 14. Despite the TRO's issuance, law enforcement officers made several arrests, including of a United States citizen. *See* DE 67 at 27.

At the April 18 preliminary injunction hearing and in a written order issued later that day, the Court expressly stated that its order extended to law enforcement:

> The TRO shall be interpreted to include among those 'who are in active concert or participation with' Defendants or their officers, agents, employees, or attorneys, and thus prohibited from enforcing S.B. 4-C, the following: any officer or other personnel within any municipal or county police department within Florida, the Florida Department of Law Enforcement, or the Florida Highway Patrol, and any other law enforcement officer with power to enforce SB 4-C.

DE 49 at 1. The Court then directed Defendants immediately to "provide actual notice of the TRO to all named Defendants and their officers, agents, employees, attorneys, and any person who is in active participation with them and who has not already received actual notice." *Id.* at 2.

On April 18, Attorney General Uthmeier issued a letter to all Florida law enforcement. The first paragraph explained that: (1) on April 4, this Court had issued a TRO "prohibiting the Attorney General, the statewide prosecutor, the state attorneys, as well as ' . . . any persons who are in active concert or participation with them' from enforcing [S.B. 4C]"; (2) on April 18, the Court extended the TRO and "clarified verbally that her order covers all law enforcement officers

in the State"; and (3) the Court "instructed my office to notify you that all Florida law enforcement agencies at present must refrain from enforcing [S.B. 4C]."  DE 57-2.  The second paragraph "note[d]" the Attorney General's "disagreement" with the Court's order and set forth the Attorney General's arguments on the scope of the injunction.  *Id.*  The final paragraph concluded: "That said, the court directed my office to notify your agencies of its clarification that law enforcement officers should take no steps to enforce [S.B. 4C], including through arrest or detentions . . . . Please instruct your officers and agents to comply with [this Court's] directives."  *Id.*

On April 23, Attorney General Uthmeier issued a second letter to all Florida law enforcement "to provide an update on my Friday, April 18 letter."  DE 57-1.  The first paragraph stated that, in the April 18 letter, the Attorney General had "notified you that [this Court] *believed* all law enforcement agencies in Florida were bound by [the TRO]" and "explained that I believed [the Court's] . . . expansion of her order to nonparties was wrong."  *Id.* (emphasis added).  The letter further stated: "Today, my office filed a brief explaining why [this Court's] order cannot possibly restrain Florida's law enforcement agencies."  *Id.*  The second paragraph explained:

> That said, I want to make clear what I expressed in my April 18 letter.  [The Court] ordered my office to notify you of the evolving scope of her order, and I did so. But I cannot prevent you from enforcing [S.B. 4C], where there remains no judicial order that properly restrains you from doing so.  As set forth in the brief my office filed today, it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce [S.B. 4C].

*Id.*

During the April 26 hearing, the Court noted that the Attorney General's second letter was "inviting" violations of the TRO.  DE 71 at 26:25-28:20.  Counsel for Defendants responded by stating that they understood the April 23 letter to merely "set[] out the attorney general's litigating position."  *Id.* at 24:22-25:14.  This Court explained that "if indeed this is a miscommunication that can be remedied," there might not need to be proceedings to assess possible contempt and

sanctions. *Id.* at 41:19–42:12.  Following a recess, Defendants declined to commit to issuing any clarification to law enforcement to eliminate the apparent invitation of arrests. *Id.* at 43:5–9.  The Court invited Defendants to alert the Court if they "find [their] way to a clarification of what is apparently a miscommunication or a misapprehension." *Id.* at 43:19–25.  No clarification has been issued.

In its preliminary injunction order, the Court ordered the Attorney General to show cause "why he should not be held in contempt or sanctioned for violating this Court's TRO (DE 28; DE 49) through sending his April 23, 2025 letter to law enforcement agencies in Florida advising them, in part, that 'no lawful, legitimate order currently impedes [their] agencies from continuing to enforce' S.B. 4-C."  DE 67 at 48.

## LEGAL STANDARD

"[T]he purpose of contempt proceedings is to uphold the power of the court, and to ensure that the court's vindication of litigants' rights is not merely symbolic." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 952 (9th Cir. 2014) (cleaned up).  To permit state officials to freely "annul the judgments of the courts of the United States" would not just "destroy the rights acquired under those judgments" but also would make a "solemn mockery" of "the constitution itself." *United States v. Peters*, 9 U.S. 115, 136 (1809) (Marshall, C.J.).

There are two paths for contempt: civil and criminal contempt.  "Proceedings by way of criminal contempt are to punish defiance of judicial authority, whereas civil contempt serves to compel obedience of the court order or to compensate the litigant for injuries suffered because of the disobedience." *Lewis v. S.S. Baune*, 534 F.2d 1115, 1119 (5th Cir. 1976).[1]

For civil contempt, a petitioner "must [first] establish by clear and convincing evidence

---

[1] Decisions of the Fifth Circuit from before September 30, 1981, are binding precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

that the alleged contemnor violated [a] court's earlier order." *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998).  At a show cause hearing, the contemnor is "allowed to show either that he did not violate the court order or that he was excused from complying." *Id.* (cleaned up). Contempt is established by "'clear and convincing' proof that the underlying order was violated." *Howard Johnson Co., Inc., v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990).  The Court is afforded "wide discretion in fashioning an equitable remedy in civil contempt." *See FTC v. Leshin*, 618 F.3d 1221, 1237 (11th Cir. 2010).

For criminal contempt, there are three elements that must be proven beyond a reasonable doubt: (1) "the court entered a lawful order of reasonable specificity," (2) the party "violated it," and (3) "the violation was willful." *United States v. Turner*, 812 F.2d 1552, 1563 (11th Cir. 1987). The Court may begin by finding probable cause for criminal contempt proceedings.[2]  The Court may then request that the contempt be prosecuted by an attorney for the government or, if the government declines or the interest of justice so requires, another attorney.  *See* Fed. R. Crim. P. 42(a)(2).  In lieu of criminal contempt proceedings, the Court may allow the contumacious party an opportunity to purge its contempt by voluntarily obeying the Court order.  *See J.G.G.*, 2025 WL 1119481, at *20.[3]

---

[2] "It is unclear whether probable cause that a willful violation has occurred is a condition precedent to the commencement of a criminal contempt action."  U.S. Dep't of Just. Criminal Resource Manual § 763, https://perma.cc/Z5DV-RUNU.  And "the vast majority of criminal contempt decisions make no mention of such a requirement."  *Id.*  Some courts, however, have made probable cause findings before initiating criminal contempt proceedings.  *See J.G.G. v. Trump*, No. 25-cv-766, 2025 WL 1119481, at *8 (D.D.C. Apr. 16, 2025) (collecting cases).

[3] Defendants have appealed the Court's decision binding law enforcement officers to the Eleventh Circuit.  They sought expedited consideration, in large part relying on the potential contempt and sanctions proceedings in this Court.  *See* DE 12, No. 25-11469 (May 12, 2025). They argued to the Circuit that this Court may consider only civil contempt because the Court "has complied with none of the due-process requirements for criminal contempt."  *Id.* at 10.  And they therefore argued that a stay or reversal of the injunction would and should "obviate" or "avert" these order-to-show-cause proceedings.  *Id.* at 9-10.  Plaintiffs explained the error in that

## ARGUMENT

The Attorney General's April 23 letter constituted contempt of court for two independent reasons: It effectively undid the notice that the Court ordered him to provide, and it encouraged law enforcement to violate the Court's TRO. The Attorney General's conduct also violated the Rules Regulating the Florida Bar. In addressing this contemptuous and unethical conduct, the Court has a wide range of options available to it, as set forth below.

## I.    CIVIL CONTEMPT IS WARRANTED.

Civil contempt is warranted because clear and convincing evidence establishes a violation of the Court's orders. *See Howard Johnson*, 892 F.2d at 1516. First, the April 23 letter violated the Court's directive that Defendants provide notice, because the letter instead informed law enforcement that no lawful order prevented them from violating S.B. 4C. Second, the April 23 letter undermined the Court's order prohibiting enforcement of S.B. 4C because it encouraged law enforcement to make arrests under S.B. 4C.

### A.  The Attorney General's April 23 Letter Undid His "Actual Notice."

The Attorney General's April 23 letter constituted contempt because it undid the "actual notice" he was ordered to provide to law enforcement. Specifically, at the April 18 preliminary injunction hearing and in a subsequent order issued that day, the Court ordered Defendants to "provide actual notice of the TRO to . . . any person who is in active concert or participation with" Defendants, which the Court explicitly defined to include all Florida law enforcement. DE 49.

---

understanding, including that this Court can consider criminal contempt proceedings that are independent of the question of the validity of its order enjoining law enforcement currently pending at the court of appeals. DE 14 at 8-9, No. 25-11469 (May 14, 2025); *see Lewis*, 534 F.2d at 1119 ("if a person is held in criminal contempt for violating a restraining order, the fact that the order is later set aside as incorrect will not effect the judgment of contempt"). As for the suggestion that this Court has not complied with due process, the order to show cause itself is notice and an opportunity to respond, and, as explained above, this hearing would be only the beginning of potential criminal contempt proceedings.

On April 18, the Attorney General issued a letter to all Florida law enforcement, which directed them to "refrain from enforcing" S.B. 4C.  DE 57-2.  Though the letter explained the Attorney General's "disagreement" with the Court's order, the letter stated, "[t]hat said, . . . law enforcement officers should take no steps to enforce [S.B. 4C]," and asked law enforcement agencies to "instruct your officers and agents to comply with" the Court's order.  *Id.*

On April 23, however, the Attorney General sent a second letter to the same recipients.  DE 57-1.  The letter stated that "I cannot prevent you from enforcing [S.B. 4C], where there remains no judicial order that properly restrains you from doing so."  *Id.*  The letter further stated: "it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce [S.B. 4C]."  *Id.*

This letter effectively undid the "actual notice" that the April 18 letter had provided because the Attorney General told officers that "there remains no judicial order" "restrain[ing] [them]" from enforcing S.B. 4C.  *Id.*  The Attorney General—the chief legal officer in the State of Florida, Fla. Const. art. IV § 4(b)—additionally offered his "view" that "no lawful, legitimate order currently impedes" law enforcement from enforcing S.B. 4C.  *Id.*

The plain language of these statements runs directly contrary to the April 18 letter's statements that there was a court order preventing them from enforcing S.B. 4C.  And viewing these statements in context and under all the circumstances—within a second letter sent by the same signatory, the state's chief legal officer, using notably different language regarding whether enforcement was barred—it is clear that a law enforcement officer reading the letter could reasonably conclude that no court order prevented them from enforcing S.B. 4C.  *See, e.g., Melendres v. Arpaio*, No. 07-cv-2513, 2016 WL 2783715, at *7-8 (D. Ariz. May 13, 2016) (finding civil contempt where, *inter alia*, the sheriff issued press releases promoting violations of the court's

order and continued to instruct officers to violate the order). Indeed, reading the April 23 letter, multiple media outlets concluded that the Attorney General had "greenli[t]" arrests.[4] Law enforcement could have reasonably come to the same conclusion.

The Attorney General asserts that he had already provided notice before April 23. Br. 17. In other words, the Attorney General claims that, once he sent the April 18 letter, he had complied with the Court's order, no matter what else he did. But he does not contest that if, for example, he later sent a letter telling law enforcement that his April 18 letter was mistaken or incorrectly stating that the Eleventh Circuit had overturned this Court's order, that would undo the prior notice he had given. Indeed, that must be the case; the contrary rule "would render [the order to provide notice] meaningless." *See Leshin*, 618 F.3d at 1234 (rejecting contempt defendants' interpretation of a court order on this ground).[5]

He also asserts that the April 23 letter "expressly reiterated the Court's conclusion that the TRO 'bound' the letter's recipients." Br. 9, 14, 17. That is simply not what the letter says. The Attorney General stated, in reference to the original TRO, that his earlier letter had "notified you that U.S. District Judge Kathleen M. Williams *believed* all law enforcement agencies in Florida were bound by an *ex parte* temporary restraining order she issued on April 4 . . . ." DE 57-1 (emphasis added). This sentence does not say the officers *are* bound. It says this Court "believed" them to be bound. Adding yet more confusion, the sentence is in reference to the original *ex parte*

---

[4] *See, e.g.*, Jackie Llanos, *Attorney General Greenlights Arrests Under Suspended Florida Immigration Law*, Florida Phoenix (Apr. 23, 2025), https://perma.cc/3CQC-2UAR; Tim Padgett, *Florida Attorney General Allows Migrant Arrests Despite Federal Judge's Ban*, WLRN (Apr. 24, 2025), https://perma.cc/525B-LTTT.

[5] Indeed, it is well-settled that, even if a party initially complies with a court order, they may later fall out of compliance and be subject to contempt. *See, e.g.*, *Or. Advoc. Ctr. v. Allen*, No. 02-cv-339, 2019 WL 13215534, at *1 (D. Or. Oct. 28, 2019) (setting compliance hearing where defendants initially complied with court order but then "fell out of compliance'); *see also Jensen v. Pratt*, No. 12-cv-601, 2021 WL 3828502, at *12 (D. Ariz. July 16, 2021) (similar).

TRO, not the extended TRO the Court issued after briefing and argument, and which the Court expressly applied to all Florida law enforcement. *See* DE 49. And the Attorney General's use of past tense further suggested that, as of April 23, no order *currently* binds law enforcement. His skeptical statement about the Court's belief as to the effect of an earlier iteration of the injunction does not amount to reiterating the earlier, clear statement that "law enforcement officers should take no steps to enforce" the enjoined statute. DE 57-2. Indeed, the statement that the Court "believed" its order to be binding is all the more striking when contrasted with the second paragraph of the April 23 letter, stating that "no judicial order . . . properly restrains" arrests or "currently impedes" enforcement. DE 57-1.

The Attorney General attempts to escape this conclusion by rewriting his own letter. He asserts that "all the April 23 Letter represents" is "the Attorney General's explanation of his contrary view and notice that he filed a brief expressing that view." Br. 7; *see id*. at 9-10, 17. But as he concedes, the standard here "is 'an objective one.'" *Id*. at 12 (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019)). "[A] party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Taggart*, 587 U.S. at 561. That is the case here.

*First*, no one has contested the Attorney General's ability to publicly disagree with this Court's holdings. But the original April 18 letter already firmly stated his disagreement with this Court's order, so the need to reiterate that disagreement cannot provide an objectively reasonable explanation for the Attorney General's decision to issue the April 23 letter.[6]

*Second,* the Attorney General may of course alert anyone he likes about his court filings—

---

[6] *Southern Pacific Transp. Co. v. Brown*, 651 F.2d 613 (9th Cir. 1980), on which the Attorney General relies, Br. 11, is inapposite. The question there was whether the state Attorney General had sufficient enforcement authority to be a defendant under *Ex Parte Young*. Here, there is no dispute that the Attorney General is a proper defendant.

he could have issued a press release were he so inclined.  But, again, that is not an objectively reasonable explanation for the April 23 letter to law enforcement officers, as the legal arguments in his brief had no effect upon law enforcement officers' ability to conduct arrests under S.B. 4C. As the Defendants conceded in court at the last hearing, the police had to comply with the Court's orders regardless of the Attorney General's legal arguments.  DE 71 at 27:8-17.  Again, this does not mean that the Attorney General could not share his brief with them or anyone else; it just means that in understanding the April 23 letter, the explanations the Attorney General now proffers are illogical and inadequate—and hence not an objectively reasonable way to interpret that letter.

*Third*, and critically, those purported goals also do not adequately explain or excuse the actual *language* the Attorney General used in his letter.  There was no legitimate reason—*none*— to tell police officers that "no judicial order . . . properly restrains you from" enforcing S.B. 4C, and that "no lawful, legitimate order *currently* impedes your agencies from *continuing* to enforce [S.B. 4C]."  DE 57-1 (emphasis added).  Those words are not calculated to express, as the April 18 letter appropriately did, that the Attorney General disagreed with the Court's order, had arguments to make against it, and was appealing it, but that the police remained bound unless and until that order was overturned or stayed.[7]   Instead, that language, viewed objectively by

---

[7] Nor does that language express, as the Attorney General now suggests, his view that "local law enforcement were bound by the Court's TRO, not by him."  Br. 14; *cf. id*. at 13-14 & n.4.  The letter did not say, for example: 'I cannot prevent you from enforcing [S.B. 4C], because I do not have the power to enforce the Court's TRO—but you should understand that you are bound by it' or even 'I cannot prevent you from enforcing [S.B. 4C], because I do not directly control your agency,' as it might have done if it truly sought to make that point.  Instead, the letter said "I cannot prevent you from enforcing [S.B. 4C], where there remains no judicial order that properly restrains you from doing so."  DE 57-1.  That is, the letter—read objectively—asserts that the Attorney General lacks authority to prevent enforcement *because* there is no valid injunction against such enforcement.  That statement, if anything, suggests the Attorney General would otherwise have authority to control local law enforcement.  Regardless of the control issue, however, what matters for present purposes is that the statement certainly does not amount to merely disclaiming responsibility for law enforcement's duty not to enforce S.B. 4C.

reasonable attorneys and non-attorneys alike, indicates that police were *not* currently bound, and did *not* need to comply (regardless of what the Eleventh Circuit might do).  That inference is all the stronger given that the letter was addressed to police, most of whom are not trained attorneys. *See Turner*, 812 F.2d at 1565 (noting that it may be necessary for orders "directed to laypersons" to be more "specific[]" than those directed "to lawyers").

That is precisely how many understood the Attorney General's letter.  As noted above, press reports indicated that the letter gave the green light to make arrests despite this Court's order, *supra*.  And other Defendants felt the need to react to the letter by providing clear notice—perhaps out of concern that the Attorney General's letter muddied the waters enough that unlawful arrests would follow.  *See, e.g.*, Elena Barrera, *Florida State Attorney Warns Police to Stop Enforcing Immigration Law or Risk Contempt*, Tallahassee Democrat (Apr. 25, 2025), https://perma.cc/4BUU-XQFV.

Subsequent proceedings only reinforced the objective understanding that the letter undid the required notice.  The Court explained at the last hearing that it understood the letter to invite arrests.  DE 71 at 26:25-28:20.  Had that impression been a mistake—an inadvertent drafting error or an unintended ambiguity—one would think that the Attorney General would be eager to correct the error to avoid any misapprehension about his meaning in sending the second letter.  But despite this Court's repeated invitations to issue a clear statement to address the impression left by the April 23 letter, the Attorney General has stood by it.  The objectively reasonable inference from his enduring silence is that he *wants* to leave the impression the Court noted—or at the very least is comfortable with leaving that impression—namely, that the order was not binding upon law enforcement officers and that police may make arrests despite the Court's order.

Perhaps the Attorney General's view is that his letter has enough lawyerly language that

he can both refuse to provide clear notice to police as required and also escape consequences before this Court.  *See* DE 57-1 (providing that no "legitimate" order "properly" restrains police).  But courts routinely reject such gamesmanship.  Here, the Attorney General violated the specific requirement to provide notice.  But even if there were some technical question on that score, courts may "find a breach of the decree in a violation of the spirit of [an order], even though its strict letter may not have been disregarded."  *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d. Cir. 1942); *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972) (rejecting position that an order "can be avoided on merely technical grounds" and explaining that its "language . . . must be read in the light of the circumstances surrounding its entry . . . [including] the mischief that the injunction seeks to prevent"); *Simon v. City & Cnty. of San Francisco*, No. 22-cv-05541, 2024 WL 4314207, at *3 (N.D. Cal. Sept. 26, 2024) ("Arguably, this conduct does not violate the strict terms of the injunction . . . . [However,] there can be no question that the conduct violates the spirit of the injunction."); *Leshin*, 618 F.3d at 1234 (finding defendants in contempt where their interpretation of the court's order would "render [it] meaningless").[8]  Here, the purpose of the Court's order was to ensure that law enforcement knew about the TRO and their obligation not to make arrests in violation of the TRO.  The April 23 letter informing law enforcement that "there remains no judicial order that properly restrains" them from enforcing S.B. 4C is directly contrary to that clear purpose.  DE 57-1.  And if that effect had been merely an unintended consequence, the Attorney General has now had ample opportunity to correct the error.

---

[8] *Leshin* is instructive on this point.  In that case, an injunction barred the defendants from collecting fees from their existing clients.  618 F.3d at 1234.  Some of the clients then cancelled their contracts, and the defendants entered new contracts with them and collected fees on those. *Id.*  The defendants argued that the existing clients had become former clients, and the defendants were technically permitted to enter new contracts with them and collect fees.  *Id.*  But the Eleventh Circuit rejected this sophistry and held the defendants in contempt, finding that their interpretation "would render . . . the injunction meaningless."  *Id.*  The same is true of the Attorney General's position that he could muddy the waters with impunity.

In response, Defendants cite inapposite cases involving unclear court orders—such as those that are vague, ambiguous, or leave room for reasonable disagreement about what conduct is prohibited or who was bound. Br. 5-6.[9] That could not be farther from the case here. The Court's April 18 Order specifically stated that the following people were "'in active concert or participation with' Defendants . . . and thus prohibited from enforcing SB 4-C": "any officer or other personnel within any municipal or county police department within Florida, the Florida Department of Law Enforcement, or the Florida Highway Patrol, and any other law enforcement officer with power to enforce SB 4-C." DE 49 at 1. The April 18 Order then directed Defendants to "provide actual notice of the TRO to all named Defendants . . . and any person who is active concert or participation with them." *Id.* at 2.

This Order was clear and unequivocal: It catalogued the relevant individuals, outlined that they were prohibited from enforcing S.B. 4C, and directed Defendants to provide actual notice to them. *Id.* at 1-2. And the Attorney General never contends that he was confused about who was prohibited from enforcing S.B. 4C, or to whom he was directed to provide notice. To the contrary, Defendants reaffirmed multiple times, including at court hearings, that they knew law enforcement was prohibited from enforcing S.B. 4C. *See* DE 71 at 30:7-12. And in the April 18 letter, the Attorney General provided the requisite notice to the correct individuals—only underscoring the clarity of the Court's order. *See* DE 57-2. "The lack of ambiguity is also evidenced by the fact that," as noted above, another Defendant "sent a letter" to law enforcement providing notice that

---

[9] *See, e.g.*, *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 71, 76 (1967) (ambiguous order to comply with arbitrator's award, and district court refused to explain what conduct was prohibited or required); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (non-specific injunction not to enforce "the present Wisconsin scheme"); *S.E.C. v. Goble*, 682 F.3d 934, 950-52 (11th Cir. 2012) (comparing impermissible "obey-the-law" orders to permissible specific orders).

all law enforcement are bound. *Drywall Tapers & Pointers of Greater N.Y., Loc. 1974 v. Loc. 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389, 395 (2d Cir. 1989) (cited by Defendants). Because clear and convincing evidence establishes a violation of the Court's order that the Attorney General provide "actual notice," a finding of contempt is warranted. *See Howard Johnson*, 892 F.2d at 1516.

**B. The Attorney General's April 23 Letter Encouraged Law Enforcement to Violate the Court's TRO.**

The April 23 letter was contemptuous for an independent reason: It encouraged law enforcement to violate the Court's TRO by telling officers that there was no order restraining them from enforcing S.B. 4C. Even if the Court had never ordered the Attorney General to provide notice, his conduct—encouraging other bound individuals to violate the Court's directive—would still constitute contempt.

"Every affirmative order in equity carries with it the implicit command to refrain from action designed to defeat it." *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 413 (1960) (Frankfurter, J., concurring). "To fail to accord [an order,] at least the implied effect of a direction not to act solely for the purpose of defeating it, . . . transmutes it into a mockery." *Id.* Indeed, "orders would have little practical force, and would be rendered essentially meaningless, if [courts] were unable to prevent parties bound by them from flagrantly and materially assisting others to do what they themselves are forbidden to do." *Inst. of Cetacean Rsch.*, 774 F.3d at 952.

Based on these principles, courts have found contempt where "a party . . . giv[es] a non-party the means to violate an injunction" if "the party know[s] a violation is highly likely to occur." *See id.* at 950, 952. That is exactly the case here. The Attorney General gave law enforcement the means to violate the injunction by telling them that there was no order restraining them from doing so. *See* DE 57-1. And the Attorney General should have known that a violation was highly

likely to occur; he was, of course, aware of the pattern of enforcement even after this Court's initial TRO, DE 67 at 26-27; that police are not trained attorneys; and that police were likely to look to him for guidance on their duties because he is the State's principal legal officer, Fla. Const. art. IV § 4(b), who is charged with "[g]iv[ing] an official opinion and legal advice in writing on any question of law," Fla. Stat. § 16.01(3).  Thus, because the April 23 letter encouraged law enforcement to enforce S.B. 4C, it constituted contempt.

In an effort to evade accountability for his words, the Attorney General contends that he never enforced S.B. 4C, including through the April 23 letter.  Br. 10-12.  But as explained above, courts have found contempt even where, as here, the party did not themselves undertake the prohibited action but rather gave a nonparty the means to do so.  *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) ("defendants may not nullify [an injunction] by carrying out prohibited acts through aiders and abettors"); *NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 954 (5th Cir. 1989) ("One need not commit an unlawful act in order to be liable for conspiring to evade a judgment of a court: it is contempt to act solely for the purpose of evading a judgment."); *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990) ("The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others.").

The Attorney General asserts that finding contempt here would "deny[] an important Florida government official the right to speak for himself," "implicating serious First and Tenth Amendment concerns."  Br. 16.  But a contempt finding would do no such thing.  Undoubtedly, the Attorney General may speak and may express his disagreement with the Court's orders— including to the Court, the Eleventh Circuit, the public, and law enforcement.  But what the Attorney General may not do is tell law enforcement officers that no order restrains them from

enforcing S.B. 4C, when in fact one does, and when the likely result is arrests and detentions in violation of the Court's order. Indeed, the Attorney General does not suggest that the order to provide notice itself violated either his speech rights or principles of federalism; the same is true of the direction, implicit in every injunction, not to actively work to defeat and undermine the Court's order.[10] Thus, the April 23 letter constitutes contempt.

## II.     CRIMINAL CONTEMPT MAY BE WARRANTED.

The Court may also initiate criminal contempt proceedings by finding probable cause. Criminal contempt requires: (1) "a lawful order of reasonable specificity," (2) that the party "violated it," and (3) that "the violation was willful." *Turner*, 812 F.2d at 1563. For the reasons explained above, the Attorney General violated the Court's order in two ways: by effectively undoing the notice that he was ordered to provide, and by encouraging law enforcement to violate the Court's TRO.

In addition to a violation of the Court's order, the other elements of criminal contempt are also satisfied here. The Court's April 18 Order had the requisite "specificity." *Id.* "The reasonableness of the specificity of an order . . . . must be evaluated in the context in which it is entered and the audience to which it is addressed." *Id.* at 1565. "For example, it may well be necessary that the specificity of orders directed to laypersons be greater than that of orders to lawyers." *Id.* As explained above, the Court's order was clear and unequivocal, and as a trained lawyer the Attorney General doubtless understood them.

Moreover, the Attorney General's violation of the order was willful. Willfulness "means

---

[10] The Attorney General cites *In re Att'y Gen. of U.S.*, 596 F.2d 58 (2d Cir. 1979). Br. 15. That case involved a court order to the federal Attorney General, requiring him to release sensitive files with information about informants to opposing litigants. *Id.* at 60. Requiring the Attorney General here to merely provide unequivocal notice and refrain from actively undermining the Court's order does not present remotely similar "separation of power overtones." *Id.* at 64.

a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order." *United States v. Straub*, 508 F.3d 1003, 1012 (11th Cir. 2007).  Several aspects of the Attorney General's conduct demonstrate that his violation of the Court's order was not "accidental, inadvertent, or negligent." *Id.*; *see also id.* (conduct was willful where it was "not the product of reasonable confusion or misunderstanding").  The Attorney General provided notice to law enforcement in the April 18 letter but then "deliberate[ly]" chose to issue the April 23 letter as well. *Id.*  The medium of his statements—a formal, written letter from the office of the Attorney General for the State of Florida, presumably carefully vetted by the Attorney General's staff, rather than an off-the-cuff statement—also indicates deliberate conduct.  And at the April 29 hearing, after the Court expressed concern that the April 23 letter was "inviting" violations of the TRO, DE 71 at 26:25-28:20, the Attorney General refused to issue a clarification letter to law enforcement officers, nor has he done so since.  Such conduct demonstrates the willfulness of the Attorney General's conduct in issuing the April 23 letter.

## III.   THE ATTORNEY GENERAL ALSO VIOLATED ETHICS RULES.

In addition, the Attorney General's April 23 letter violated the Florida Rules Regulating the Florida Bar ("RRTFB") in multiple ways.  These violations strike at the core duties of candor, honesty, and respect for judicial authority, and are especially grave considering the Attorney General's role as Florida's chief legal officer.  *See* Fla. Const. art. IV § 4(b).

*First*, the Attorney General engaged in conduct involving "dishonesty, fraud, deceit, or misrepresentation," in direct violation of RRTFB 4-8.4(c).  *See also* RRTFB 4-4.1 (stating that a lawyer shall not "make a false statement of material fact or law to a third person" or "fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client").  This Court's order was clear: law enforcement officers are barred

from arresting individuals under S.B. 4C, and Defendants were required to notify all such officers accordingly.  DE 49 at 1-2.  Yet the Attorney General's April 23 letter advising that "no lawful, legitimate order currently impedes" enforcement was not only false, it also was made in the Attorney General's official capacity and distributed to every law enforcement agency in the state.  *See The Florida Bar v. Fredericks*, 731 So. 2d 1249, 1252 (Fla. 1999) (holding that an attorney violated Rule 4-8.4(c) by knowingly misleading a client about the status of a case); *The Florida Bar v. Head*, 27 So. 3d 1, 10 (Fla. 2010) (holding attorney violated *inter alia* Rule 4-8.4(c) for misleading a third party).  The Attorney General's actions were not the product of a mistake or ambiguity.  They were a deliberate misrepresentation of this Court's order intended to create the impression that officers remained free to disregard a federal injunction.  *See, e.g.*, *The Florida Bar v. Marrero*, 157 So. 3d 1020, 1023-24 (Fla. 2015) (finding attorney violated RRTFB 4-8.4(c) by drafting a document "containing the misrepresentation that the borrowers had the legal authority to encumber the property" because attorney "created documents that others would rely upon, and the documents falsely represented that the borrowers could offer the property at issue as collateral").

*Second*, the Attorney General's conduct was "prejudicial to the administration of justice," in violation of RRTFB 4-8.4(d).  Rather than comply with this Court's clear order to notify law enforcement that they were bound, the Attorney General chose to falsely suggest the opposite in his April 23 letter.  DE 57-1.  His letter undermined the judiciary's authority, sowed confusion among arresting agencies, and invited violations of the Court's order by police officers ill-equipped to independently assess their legal force.  Florida law enforcement officers who might have acted on that letter risked engaging in unlawful and unconstitutional arrests—yet the Attorney General not only failed to prevent that result, but he also actively encouraged it.  That conduct

undermines the administration of this case and the legitimacy of the judicial process itself.  *See The Florida Bar v. Machin*, 635 So. 2d 938, 940 (Fla. 1994) ("[C]onduct that prejudices our system of justice as a whole also is encompassed by rule 4-8.4(d).").

*Third*, the Attorney General violated RRTFB 4-8.4(a), which prohibits lawyers from "knowingly assist[ing] or induc[ing] another" to violate the rules of professional conduct.  By affirmatively suggesting that law enforcement agencies could take actions that this Court had explicitly enjoined, the Attorney General knowingly induced violations of the Court's order and the underlying constitutional rights it was issued to protect.  *See, e.g.*, *The Florida Bar v. D'Ambrosio*, 25 So. 3d 1209, 1217 (Fla. 2009) ("An attorney cannot counsel others to do what the attorney is not permitted to do.").

*Fourth*, the Attorney General's conduct was "contrary to honesty and justice" in violation of RRTFB 3-4.3.  That rule exists to capture the kind of serious ethical transgressions that erode trust in the legal system.  No state official—let alone the one tasked with defending the rule of law—may seek to undermine compliance with federal court orders by encouraging others to violate them.  *See The Florida Bar v. Sayler*, 721 So. 2d 1152, 1154 (Fla. 1998) (upholding referee's finding unethical attorney violated Rule 3-4.3 and considering "as aggravating factors that [the unethical attorney] refused to acknowledge the wrongful nature of his conduct and that [the unethical attorney] had substantial experience in the practice of law.").

## IV.   THE COURT SHOULD TAKE APPROPRIATE STEPS TO REINFORCE ITS ORDER AND PUNISH THE ATTORNEY GENERAL'S MISCONDUCT.

The Court has several options available to it to address the impact of the April 23 letter and the Attorney General's misconduct.

*First*, the Court should direct the Attorney General to provide clear and unequivocal notice to law enforcement that arrests and other enforcement actions under S.B. 4C are prohibited by this

Court's order, to resolve any misapprehension caused by the April 23 letter.  The Court and Plaintiffs should have an opportunity to review and approve the language of this guidance to ensure that it accurately reflects the scope and effect of the injunction.  This guidance should be disseminated promptly through multiple channels, including electronic and physical distribution to all law enforcement agencies in the state.  The Attorney General should be ordered to file a sworn certification of compliance within five days, detailing the steps taken to ensure full and accurate distribution of the corrective guidance to all relevant agencies and personnel.

This notice would be appropriate as a remedy for civil contempt, over which this Court has "wide discretion." *See Leshin*, 618 F.3d at 1237.  Additionally, the Court has authority to direct such notice even absent a contempt finding.  Indeed, the Court already ordered notice, and the Attorney General has not contested that order was appropriate.

*Second*, to ensure that the April 23 letter does not lead to prohibited arrests, the Court should require Defendants to file weekly reports with this Court indicating whether any arrests or other enforcement actions under S.B. 4C sections 811.102 and 811.103 have occurred (since the last such report), and, if so, how many and by what agencies.  The Court should further require that, for each such arrest, Defendants promptly provide Plaintiffs with the arrested individual's identifying information, including name, case number(s), and arresting agency.  Again, this order could be an appropriate sanction for contempt, or an exercise of the Court's inherent authority to enforce its order and police the litigants before it.

*Third*, the Court may consider issuing financial sanctions payable either by the State of Florida or by the Attorney General personally, for all attorney's fees and costs, including travel expenses, associated with the April 23 letter, including preparing for the April 29 hearing, preparing this response to the order to show cause, and preparing for and appearing at the May 28

hearing.  Such sanctions are well within the Court's discretion.  *Leshin*, 618 F.3d at 1237.

*Fourth*, the Court should issue an admonition that future similar violations of its orders would result in further sanctions.

*Fifth*, the Court may consider finding probable cause that the Attorney General committed criminal contempt and referring the case to the U.S. Attorney's Office in the first instance for prosecution.  *See J.G.G.* 2025 WL 1119481, at *8 (collecting cases).  Should the U.S. Attorney decline prosecution, the Court may consider appointing an independent prosecutor.  *See id*. at *21.

*Sixth*, the Court may refer the Attorney General to the Florida Bar for disciplinary proceedings.  *See, e.g., Bautista v. Star Cruises*, 696 F. Supp. 2d 1274, 1281 (S.D. Fla. 2010) (referring attorneys to the Florida Bar "to report wrongful conduct"); *see also Stolfat v. Equifax Info. Servs., LLC*, No. 19-cv-80428, 2019 WL 2492076, at *4 (S.D. Fla. June 14, 2019) (collecting cases referring attorney's misconduct to the Florida Bar).

\*      \*      \*

The Attorney General is a litigant and a lawyer and has the associated duties to this Court and the public.  As the Eleventh Circuit explained, in a case on which the Attorney General relies: "State officials are not above the law."  *Newman v. Alabama*, 683 F.2d 1312, 1318 (11th Cir. 1982).[11]

## CONCLUSION

The Attorney General's conduct in his April 23 letter was contemptuous and unethical, and the Court should take appropriate action.

---

[11] The Attorney General mischaracterizes *Newman*.  Br. 15.  The Eleventh Circuit indicated that that courts are reluctant to "incarcerat[e] a state official," not to use their contempt powers more generally.  *Newman*, 683 F.2d at 1318.

Date: May 22, 2025

Cody Wofsy*
Spencer Amdur*
Hannah Steinberg*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
samdur@aclu.org
hsteinberg@aclu.org
osarabia@aclu.org

Omar Jadwat*
Grace Choi*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org
gchoi@aclu.org


*Admitted pro hac vice*

*Counsel for Plaintiffs*

Respectfully submitted,

*/s/ Amien Kacou*
Amien Kacou (FL Bar No. 44302)
Amy Godshall (FL Bar No. 1049803)
Daniel B. Tilley (FL Bar No. 102882)
ACLU FOUNDATION OF FLORIDA,
INC.
4343 West Flagler Street, Suite 400
Miami, FL 33134
T: (786) 363-2700
akacou@aclufl.org
agodshall@aclufl.org
dtilley@aclufl.org

Paul R. Chavez (FL Bar No. 1021395)
Evelyn Wiese (CA Bar No. 338419)*
Christina Isabel LaRocca (FL Bar No.
1025528)
AMERICANS FOR IMMIGRANT
JUSTICE
6355 NW 36 Street, Suite 309
Miami, FL 33166
T: (305) 576-6273
pchavez@aijustice.org
ewiese@aijustice.org
clarocca@aijustice.org

Miriam Haskell (FL Bar No. 69033)
Alana Greer (FL Bar No. 92423)
Will Mann (FL Bar No. 1058086)
COMMUNITY JUSTICE PROJECT, INC.
3000 Biscayne Blvd., Suite 106
Miami, Florida 33137
T: (305) 907-7697
miriam@communityjusticeproject.com
alana@communityjusticeproject.com
will@communityjusticeproject.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been furnished by

electronic service through the CM/ECF Portal on May 22, 2025, to all counsel of record.

<u>/s/ *Amien Kacou*</u>
Amien Kacou