**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-21524-CV-WILLIAMS**

FLORIDA IMMIGRANT COALITION, *et al.*,

      Plaintiffs,

v.

JAMES UTHMEIER, *et al.*,

      Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court following the April 29, 2025 Order requiring Florida Attorney General James Uthmeier ("***Uthmeier***" or "***AG Uthmeier***") to show cause "why he should not be held in contempt or sanctioned for violating this Court's [Temporary Restraining Order ("***TRO***")] (DE 28; DE 49)[.]" (DE 67 at 48–49 ("***Show Cause Order***").) Uthmeier filed a Response to Order to Show Cause (DE 81) ("***Show Cause Response***"), and Plaintiffs filed their own response brief (DE 87). The Court heard further arguments from the Parties at a May 29, 2025 Show Cause Hearing. (DE 89.) For the reasons set forth below, the Court finds that Uthmeier is in civil contempt of the Court's April 18, 2025 Order that Defendants shall "provide actual notice of the TRO" to all "law enforcement officer[s] with power to enforce [S.B.] 4-C." (DE 49.)

## I.   INTRODUCTION

On April 18, 2025, the Court clarified that law enforcement officers within Florida were bound by a TRO enjoining enforcement of the newly enacted criminal immigration

law, Florida Senate Bill 4-C ("**S.B. 4-C**" or the "**Statute**"),[1] and the Court ordered Defendants to "provide actual notice of the TRO" to all "law enforcement officer[s] with power to enforce S.B. 4-C." (DE 49.) Uthmeier initially complied, sending a letter to law enforcement agency heads. (DE 57-2) ("**April 18th Letter**") ("the [C]ourt directed my office to notify your agencies of its clarification that law enforcement officers should take no steps to enforce [S.B. 4-C], including through arrests or detentions . . . . "Please instruct your officers and agents to comply with Judge Williams' directives."). But on April 23, 2025, Uthmeier sent a follow-up letter to the law enforcement community ("**April 23rd Letter**"), telling them, "no judicial order . . . properly restrains you from" enforcing S.B. 4-C and that "no lawful, legitimate order currently impedes your agencies from continuing to enforce" the enjoined statute. (DE 57-1 at 2.)

In his Show Cause Response, Uthmeier posits a series of implausible interpretations of the language he used to argue that his April 23rd Letter does not conflict with or undermine the notice he gave in his April 18th Letter. And while insisting that the meaning the Court should attach to his statements in the April 23rd Letter is that he is fully

---

[1] Broadly, S.B. 4-C creates two new state law offenses: "Illegal entry by adult unauthorized alien into this state" and "Illegal reentry of an adult unauthorized alien." Fla. Stat. §§ 811.102–103. Section 811.102(1) prohibits any "unauthorized alien who is 18 years of age or older" from "knowingly enter[ing] or attempt[ing] to enter" Florida "after entering the United States by eluding or avoiding examination or inspection by immigration officers" ("**illegal entry**"). Under subsection 811.103(1), an adult "unauthorized alien" commits a third-degree felony, if they "enter[], attempt[] to enter, or [are] at any time found in" Florida after "having been denied admission, excluded, deported, or removed or having departed the United States during the time an order of exclusion, deportation, or removal is outstanding" ("**illegal reentry**"). Fla. Stat. § 811.103(1). The Statute has several other provisions governing pre-trial detention, sentencing, affirmative defenses, and required cooperation between the arresting agency and other state and local law enforcement agencies. Fla. Stat. §§ 811.102(2)–(7), 811.103(2)–(6).

compliant with the Court's order, Uthmeier publicly disavowed his compliance on multiple occasions—stating he would not "bow down" to the Court, among other comments. Before analyzing Uthmeier's arguments, the Court will recount a more fulsome factual and procedural history of this case.

## II.   BACKGROUND

### A. *Procedural history leading up to show cause proceedings*

On April 2, 2024, Plaintiffs[2] filed a Class Action Complaint (DE 1), seeking (1) a declaration that S.B. 4-C violates the United States Constitution's Supremacy and Commerce Clauses, and (2) injunctive relief barring enforcement of S.B. 4-C by state and local officials. (DE 1 ¶¶ 2, 5, 40.) The suit names all state prosecutorial authorities—AG Uthmeier, Statewide Prosecutor Nicholas B. Cox, and the State Attorneys for the twenty Florida judicial circuits—as Defendants. (*Id.* ¶¶ 30–32.) That same day, Plaintiffs filed an Expedited Motion for Temporary Restraining Order and Preliminary Injunction (DE 4).[3] On April 4, 2025, the Court entered a TRO "prohibiting Defendants and their officers, agents, employees, attorneys, and any person[s] who are in active concert or participation with them from enforcing" S.B. 4-C for fourteen days. (DE 28 at 14.)

Then, on April 18, 2025, the Court held a hearing to determine whether to convert the TRO into a preliminary injunction. (DE 48.) At the hearing, Plaintiffs informed the Court that law enforcement had made at least thirteen arrests pursuant to S.B. 4-C since the

---

[2] Plaintiffs include individuals V.V. and Y.M., who allege they are at risk of arrest and prosecution under the Statute, and two grassroots membership organizations, Farmworker Association of Florida, Inc. and Florida Immigrant Coalition, which support members who are similarly at risk. (DE 1 ¶¶ 8, 11–24, 26–28.)

[3] Plaintiffs also filed a Motion for Class Certification (DE 5). The Court granted provisional class certification on April 29, 2025. (DE 67 at 47.)

entry of the TRO. (DE 50 at 12.) Defendants argued that law enforcement agencies, who were not named parties, were not covered under the TRO, and could lawfully continue making arrests pursuant to a law for which no prosecution could follow. (*Id.* at 12–15.) To clarify that the TRO foreclosed Defendants' position and to ensure the TRO provided Plaintiffs true relief, the Court entered the following Order (DE 49) ("***April 18th Order***") extending the timeline of the TRO and clarifying its scope:

1. The Temporary Restraining Order ("TRO") (DE 28) is EXTENDED and shall remain in effect through April 29, 2025 at 5:00 p.m. or until further order of the Court. The TRO shall be interpreted to include among those "who are in active concert or participation with" Defendants or their officers, agents, employees, or attorneys, and thus prohibited from enforcing SB 4-C, the following: any officer or other personnel within any municipal or county police department within Florida, the Florida Department of Law Enforcement, or the Florida Highway Patrol, and any other law enforcement officer with power to enforce [S.B.] 4-C. (DE 28 at 14; see also Fed. R. Civ. P. 65(d)(2)(C) (including "other persons who are in active concert or participation with" the parties or the parties' officers, agents, servants, employees, and attorneys among those bound by any TRO). The TRO shall also be interpreted to prohibit any person covered by the TRO from filing or maintaining any charge pursuant to Florida Statutes section 811.102 or 811.103.

2. Defendants shall IMMEDIATELY provide actual notice of the TRO to all named Defendants and their officers, agents, employees, attorneys, and any person who is in active concert or participation with them and who has not already received actual notice [("***actual notice requirement***" or "***actual notice mandate***")].

(DE 49 (emphasis omitted).) The April 18th Order also set a briefing schedule and Status Conference for April 29, 2025 to resolve the Parties' disagreement over the proper scope of injunctive relief. (*Id.* at 2.)  Immediately following the April 18th Order, Uthmeier sent his April 18th Letter to the law enforcement community, which complied with the actual notice mandate. In his correspondence—disseminated by email and posted on social media— Uthmeier laid out his disagreement with the Court's legal conclusions, and informed the

recipients of his intent to appeal the scope of the injunction:

> Dear Florida law enforcement community,
>
> On April 4, 2025, U.S. District Judge Kathleen M. Williams issued an *ex parte* temporary restraining order prohibiting the Attorney General, the statewide prosecutor, the state attorneys, as well as "their officers, agents, employees, attorneys, and any persons who are in active concern or participation with them" from enforcing Florida Statutes Sections 811.102 and 811.103. *See* DE 28, *Fla. Immigrant Coal. v. Uthmeier*, No 1:25-cv-21524. On April 18, the court extended her temporary restraining order through April 29 and clarified verbally that her order covers all law enforcement officers in the State of Florida. And the court further instructed my office to notify you that all Florida law enforcement agencies at present must refrain from enforcing Sections 811.102 and 811.103.
>
> I must note my disagreement with this order. For reasons that my office has argued and will further outline in court, this clarification of Judge Williams' prior order is both wrong on the merits and overbroad on its scope. The Federal Rules of Civil Procedure empower the federal courts to enjoin parties, their officers, agents, employees, attorneys, and any persons who are in active concert or participation with those parties from taking certain actions. But independent law enforcement agencies are not parties in this case. At most, a district court may enjoin the law enforcement community when it is acting in concert or participating with the named defendants to enforce these statutes and, as my office will soon explain, the court's current injunction exceeds that equitable limitation. I should also note that while my office represents the current defendants named in this case, it does not represent nonparties like your law enforcement agencies. My office will nevertheless continue to press these scope-of-relief arguments in the district court and, as appropriate, in the U.S. Court of Appeals for the Eleventh Circuit.
>
> That said, the court directed my office to notify your agencies of its clarification that **law enforcement officers should take no steps to enforce Sections 811.102 and 811.103, including through arrests or detentions based on suspected violations of those provisions. Please instruct your officers and agents to comply with Judge Williams' directives**.
>
> A copy of the temporary restraining order is attached below.

(DE 57-2 (emphasis added).) Five days later, Uthmeier sent his follow-up April 23rd Letter,

which is the subject of these show cause proceedings:

Good afternoon,

I write to provide an update on my Friday, April 18 letter. In that communication, I notified you that U.S. District Judge Kathleen M. Williams believed all law enforcement agencies in Florida were bound by an *ex parte* temporary restraining order she issued on April 4, 2025 in *Fla. Immigrant Coal. v. Uthmeier*, No 1:25-cv-21524, a case in which *no law enforcement agencies are parties*. I explained that I believed her after-the-fact expansion of her order to nonparties was wrong, and that my office would be arguing as much in short order. Today, my office filed a brief explaining why her order cannot possibly restrain Florida's law enforcement agencies from enforcing Florida Statutes Sections 811.102 and 811.103. We will continue to argue that position—including on appeal as soon as possible.

That said, I want to make clear what I expressed in my April 18 letter. Judge Williams ordered my office to notify you of the evolving scope of her order, and I did so. But I cannot prevent you from enforcing §§ 811.102 and 811.103, where **there remains no judicial order that properly restrains you from doing so. As set forth in the brief my office filed today, it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce Florida's new illegal entry and reentry laws**.

(DE 57-1 at 2 (first emphasis in the original; second emphasis added).)

**B. *Show cause proceedings***

At the April 29, 2025 Status Conference, the Court expressed its view that language in the April 23rd Letter—particularly Uthmeier's statements, "I cannot prevent you from enforcing §§ 811.102 and 811.103, where there remains no judicial order that properly restrains you from doing so" and "it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce Florida's new illegal entry and reentry laws"—appeared to vitiate the notice to law enforcement that Uthmeier gave in the April 18th Letter and that contempt proceedings may be warranted. (DE 71 at 23–24.) Defendants argued that the April 23rd Letter merely set out AG Uthmeier's litigating position as detailed in Defendants' brief filed that day. (*Id.* at 24–25.) Because Uthmeier's counsel urged the Court to give Uthmeier the benefit

of the doubt as to his intent regarding the April 23rd Letter, and to prevent any violations of the TRO by law enforcement the letter might occasion, the Court gave Uthmeier the opportunity to allay the Court's concern, and, at the request of Uthmeier's counsel, took a brief recess. (*Id.* at 42.)  Uthmeier's counsel returned, declined this opportunity, and asked the Court for a briefing schedule on show cause proceedings. (*Id.* at 43.)

As a result, the Court required Uthmeier to show cause why he should not be held in contempt or sanctioned for violating the TRO and scheduled a Show Cause Hearing for May 29, 2025. (DE 67 at 48–49.) Uthmeier filed a Show Cause Response, asserting that he had not violated either of the two mandates contained within the April 18th Order, because: 1) he had not enforced S.B. 4-C, and 2) he provided actual notice of the TRO to the bound law enforcement officers in his April 18th Letter. (DE 81 at 3.) Plaintiffs responded that "[b]y informing law enforcement that there was no order prohibiting them from enforcing S.B. 4-C, the Attorney General effectively undid the notice the Court ordered him to provide and encouraged law enforcement to violate the Court's order[.]" (DE 87 at 3.)

### C. *Uthmeier's public statements*

In the weeks between sending the April 23rd Letter and the May 29, 2025 Show Cause Hearing, Uthmeier posted several videos to his official public social media account—the same account he used to convey the contents of his letters—showing him speaking about this matter in multiple interviews.[4] Several of his statements

---

[4] Federal Rule of Evidence 201 allows the Court to "take judicial notice on its own" of any facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)–(c). Courts nationwide have taken judicial notice of publicly accessible social media posts and other website content based on this rule. *See e.g.*, *Force v.*

addressed his reaction to the Court's April 18th Order:[5]

In a May 6, 2025 interview, Uthmeier made the following statements:

**Interviewer**: So, you're just trying to let cops arrest illegals in your state, you've got another one of these activist judges trying to stop you, and now it sounds like she's threatening to throw you in jail. Do I have it right?

**Uthmeier**: That's right. **This judge is considering whether or not to hold me in contempt. But I am not going to rubber stamp her order, I'm not going to direct law enforcement to stand down on enforcing the Trump agenda and carrying out Florida's law.** Here's the thing, there's not a single law enforcement agency as a party in front of the court in this case. And as a lawyer, the first day of law school, they tell you about separation of powers, they tell you that a judge can't order people around who are not under the jurisdiction of the court. **So I'm not gonna do that, I'm not going to bow down** and withhold my oath.

**Interviewer:** I'm always curious to hear the logic behind a ruling like this. What is her logic for not allowing, for demanding that cops not arrest illegal

_____

*Facebook, Inc.*, 934 F.3d 53, 59 n.5, 61 n.8 (2d Cir. 2019) (finding proper judicial notice of terms and conditions publicly available on Facebook's website and of the fact that publicly available news articles contained certain information); *23-34 94th St. Grocery Corp. v. New York City Bd. Of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012) (taking judicial notice of the pictorial and written contents of a poster published on a publicly accessible website); *Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 867, 869 (N.D. Cal. 2022) (taking judicial notice of the contents of plaintiff's twitter posts and direct messages). While these cases deal with writings and photographs rather than videos, the Court sees no relevant difference between those mediums of communication. Additionally, here, the statements were made by Uthmeier, and he chose to post them on his official social media account, placing the accuracy of the contents even further outside of any reasonable dispute. *See O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224–25 (10th Cir. 2007) (holding trial court's refusal to take judicial notice of information posted on defendant's website was abuse of discretion, in part, because the fact that it was the defendant's "own information[] contribute[d] to its indisputability"). Therefore, the Court finds it appropriate to take judicial notice of Uthmeier's statements posted to his official social media account. But the Court notes that it takes judicial notice of the statements for the fact that Uthmeier made them rather than for the truth of any assertions made therein. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (holding that the transcript of a corporate investor call was subject to judicial notice, but "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth").

[5] For the sake of brevity, the Court includes only the relevant portions of Uthmeier's interviews. However, the full interviews are viewable at the links provided below.

immigrants in the State of Florida. What is she saying?

**Uthmeier:** It's clear that she's got concerns with the law. We will appeal her injunction up at the appellate level. But she wants the law enforcement officers to stop committing arrests, and the problem is the ACLU didn't sue any law enforcement officers. **So if they want to arrest people under the law,** if they want to hand them over to ICE, if they want to help the Trump administration carry out detentions and deportations, **they have the legal authority to do that and I'm not going to stand in their way**.[6]

@AGJamesUthmeier, X (May 6, 2025, 8:57 PM) (emphasis added),

https://x.com/AGJamesUthmeier/status/1919919529699791161.[7]

In a May 8, 2025 interview, Uthmeier said the following:

**Uthmeier: But we do have a judge who is threatening to hold me in contempt because I won't follow an order she has to direct our law enforcement not to enforce a new law we passed earlier this year that says you can't be illegally in the State of Florida.**

**Interviewer**: So, this is a judge, let me get this straight, because I want to make sure I'm clear about this. This is a judge in Florida, who has decided that a law that was passed by the Florida legislature and signed into law by Governor DeSantis, that law enforcement not obeying that . . . she's basically directing them not to obey that law?

**Uthmeier**: [T]he interesting thing here is no law enforcement agency in the state has been sued. They're not a defendant. **So, she's issuing this order and saying you gotta tell them all to stand down. I'm not gonna do that.** First day in law school you learn, that, you know, judges have jurisdiction, and you can't order someone around who's not properly before the court. **So, I've said no. I mean, my argument in court is that I'm not gonna waive my obligation, I took an oath to the constitution, I respect separation of powers, I respect these independent law enforcement bodies and their prerogative to follow the law and they should do that.**

---

[6] Uthmeier conflates arrests pursuant to 8 U.S.C. § 1357(g)(1), which allows state and local officers to enforce federal immigration laws through "287(g) agreements," with arrests under S.B. 4-C made in contravention of this Court's Order. Any arrests made pursuant to a 287(g) agreement are not the subject of this litigation.

[7] In 2023, Twitter rebranded as X.

@AGJamesUthmeier,   X   (May   8,   2025,   1:00   PM)   (emphasis   added),
https://x.com/AGJamesUthmeier/status/1920524094442975631.

## III.    LEGAL STANDARD

"Courts have inherent power to enforce compliance with their lawful orders through civil contempt." *S.E.C. v. Greenberg*, 105 F. Supp. 3d 1342, 1352 (S.D. Fla. 2015) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). Courts must be alert to the risks of abuse of contempt powers, for "[u]nlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994). That said, the contempt power is a "necessity: Courts independently must be vested with power to impose . . . submission to their lawful mandates[.]" *Id.* (internal quotations omitted).

Before a civil contempt finding can be made, the Court must establish by clear convincing evidence that the following threshold criteria are met: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order. *F.T.C. v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010). Then, the ultimate "finding of civil contempt must be based on clear and convincing evidence that [the] order was violated." *Jove Engineering, Inc. v. I.R.S.*, 92

F.3d 1539, 1545 (11th Cir. 1996) (internal quotations omitted).[89] Procedurally, once a *prima facie* showing of a violation is made, "the burden then shifts to the alleged contemnor to produce evidence explaining his noncompliance at a show cause hearing." *Leshin,* 618 F.3d at 1232 (internal quotations omitted). The alleged violator may show

---

[8] Clear and convincing proof is "more exacting than the preponderance of the evidence standard but, unlike criminal contempt, does not require proof beyond a reasonable doubt." *Ga. Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007) (internal quotations omitted).

[9] In the Show Cause Response and at the Show Cause Hearing, Uthmeier seemed to argue that layered on top of the clear and convincing standard, the United States Supreme Court has created an additional hurdle which must be overcome before a contempt finding can be made (DE 81 at 7.) Under this "rigorous standard," Uthmeier says, "the Court must find that "there is no objectively reasonable basis for concluding that [Uthmeier's] conduct might be lawful." (*Id.* (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019)).) But Uthmeier misreads *Taggart*.

In *Taggart*, the Court was interpreting two bankruptcy code provisions, which together allowed a bankruptcy court to hold creditors in civil contempt for violating a discharge order. *Id.* at 556. The Court was presented with two suggested standards for analyzing a possible contempt finding, a strict liability standard and a subjective standard. *Id.* Instead, the *Taggart* Court decided that "traditional civil contempt principles apply straightforwardly to the bankruptcy discharge context[,]" and applied an objective standard, which courts have long used to analyze civil contempt. *Id.* at 561. So, the Court was not announcing a new standard for analyzing civil contempt, as Uthmeier argues, but applying well-established civil contempt principles to the bankruptcy context. This is confirmed by the Eleventh Circuit's continued use of the standard described in *Leshin* and *Jove Engineering* in cases after *Taggart*. *E.g. Peery v. City of Miami*, 977 F.3d 1061, 1076–77 (11th Cir. 2020); *O'Neal v. Allstate Indem. Co.*, No. 22-11120, 2023 WL 5624158, at *5 (11th Cir. Aug. 31, 2023); *United States v. Mayer*, No. 20-10231, 2022 WL 203338, at *1 (11th Cir. Jan. 24, 2022); *F.T.C. v. Nat'l Urological Grp.*, 786 F. App'x 947, 954 (11th Cir. 2019).

The language that Uthmeier seizes on, dicta from an 1885 case, was part of the Court's discussion of the principle that "those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id.* (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (holding that the injunction was too vague to provide notice of what conduct is outlawed); then citing *Int'l Longshoreman Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (guiding that civil contempt cannot be "founded upon a decree too vague to understand")). That principle is embodied in the current standard's requirement that an order be clear and unambiguous to form the basis of contempt.

that he did not violate the court order or was excused from complying based on an inability to comply despite making all reasonable efforts. *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998).

Whether conduct violates an order is an objective question. *See Ga. Power Co.*, 484 F.3d at 1291 ("Our focus in a civil contempt proceeding 'is not on the subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue.'") (quoting *Howard Johnson Co. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir.1990)). Therefore, "the absence of wilfulness is not a defense to a charge of civil contempt. *Leshin*, 618 F.3d at 1232 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 1919 (1949)).

## IV.   DISCUSSION

### A. *Contempt*[10]

Uthmeier does not dispute any of the three threshold criteria. First, Defendants

---

[10] Plaintiffs argue that in addition to violating the actual notice requirement, Uthmeier's statements are contemptuous because they encourage or induce violations of the TRO by law enforcement officers. (DE 87 at 17–19 (citing *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 952 (9th Cir. 2014)).) But in *Cetacean Research*, a non-party had carried out acts that violated the terms of the injunction where the party had provided active financial, logistical, and other material support to the non-parties to aid in the violation. *Inst. of Cetacean Rsch.*, 774 F.3d at 945. Indeed, the *Cetacean Research* court was analyzing whether the party was in contempt as an "aider[] and abettor[]" of a non-party's violation. *Id.* at 948. Courts were analyzing similar situations in the other cases Plaintiffs cite. *N.L.R.B. v. Laborer's Intern Union of N.A.*, 882 F.2d 949, 950, 954 (5th Cir. 1989) (finding a party had aided and abetted another party union in evading paying a judgment by approving the restructuring of that union into a new entity); *Roe v. Operation Rescue*, 919 F.2d 857, 860, 871 (3d Cir. 1990) (affirming contempt finding of TRO enjoining protest activity at certain abortion facilities against a party who, while physically standing just off the property, gave instructions to on-site protestors through a headset). As of the date of this Order, there is no record evidence of any violative arrests or prosecutions since April 18, 2025, and Uthmeier's statements would not have risen to the level of providing material support if there had been. Therefore, the Court does not agree, at this time, that Uthmeier has violated the TRO by

have repeatedly acknowledged during hearings that the April 18th Order was binding. (DE 71 at 23 ("Well, to be perfectly clear, Judge, we think that in light of the Court's clarified order . . . on the 18th that law enforcement officers should comply with your directive . . . . So that's our position, that there's a TRO in place, and we're abiding by it, and we've asked the law enforcement officers to also abide by it."); *id.* at 26 ("Well, Judge, our legal position remains today . . . that until overruled, your injunctions are binding on everybody that the Court has said is encompassed by the scope. So that's our view. That's not to say that we won't exercise our appellate options in the event that there is a preliminary injunction issued, but I think that's a different question[.]"); *id.* at 30 ("Judge, I would agree that the named defendants and the law enforcement officers today are bound.").) While Defendants have appealed the Court's grant of injunctive relief, "[i]t is well established that an order duly issued by a court having subject-matter jurisdiction over a case or controversy before it, and personal jurisdiction over the parties to that case or controversy, must be obeyed, regardless of the ultimate validity of the order." *In re Novak*, 932 F.2d 1397, 1400 (11th Cir. 1991) (first citing *Maness v. Meyers*, 419 U.S. 449, 459 (1975); then citing *United States v. United Mine Workers*, 330 U.S. 258, 293 (1947); and then citing *United States v. Dickinson*, 465 F.2d 496, 509 (5th Cir. 1972)); *J.G.G. v. Trump*, 2025 WL 1119481, --F. Supp. 3d--, at *1 (D.D.C. Apr. 16, 2025) ("[I]t is a foundational legal precept that every judicial order 'must be obeyed'—no matter how 'erroneous it 'may be'— until a <u>court</u> reverses it. . . . If a party chooses to disobey the order—rather than wait for it to be reversed through the judicial process—such

---

enforcing or instructing law enforcement to enforce S.B. 4-C, or by aiding and abetting any actual violation. The remainder of the Court's contempt analysis will be limited to the question of whether Uthmeier violated the April 18th Order's actual notice requirement.

disobedience is punishable as contempt, notwithstanding any later-revealed deficiencies in the order.") (emphasis in the original) (quoting *Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967)).

Neither does Uthmeier challenge whether the actual notice requirement was clear and unambiguous. To the contrary, Uthmeier described the order as a "clear command[.]" (DE 81 at 3.) Finally, Uthmeier does not dispute that he had the ability to comply with the order; there is no question of his ability to comply, given that he initially did so in the April 18th Letter.

### 1.  The April 23rd Letter vitiated the actual notice given in the April 18th Letter

The only question is whether Uthmeier's April 23rd Letter negated the notice he gave in the April 18th Letter, violating Defendants' obligation to "provide actual notice of the TRO" to all law enforcement officer[s] with the power to enforce S.B. 4-C." (DE 49.) Answering this question requires some discussion about the purpose and meaning of the April 18th Order. *See United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972) ("The language of an injunction must be read in the light of the circumstances surrounding its entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent.") (citations omitted).

The Court entered the April 18th Order after hearing that law enforcement officers were making arrests pursuant to S.B. 4-C, despite the Court's issuance of a TRO pausing enforcement of the Statute. The clear purpose of the April 18th Order was to prevent any such future arrests; the actual notice requirement was designed to address any law enforcement personnel who might make an arrest pursuant to S.B. 4-C based on the

misapprehension that they were not bound by the TRO.

"'[A]ctual notice' is synonymous with knowledge." *Rosebud LMS Inc. v. Adobe Sys. Inc.*, 812 F.3d 1070, 1074 (Fed. Cir. 2016) (quoting 58 Am.Jur.2d Notice § 4 (2015) (explaining that "[a]ctual notice rests upon personal information or knowledge" and "stems from and means that the party has actual knowledge of [the] fact in question.")); *see also John Wiley & Sons, Inc. v. Kirtsaeng*, No. 08 Civ. 7834, 2009 WL 3817407, at *3 (S.D.N.Y Nov. 9, 2009) ("Notice is regarded as actual where the person charged with notice either knows the particular facts in question or is conscious of having the means to know them[.]"). Consequently, what matters is what law enforcement officers are likely to understand from the information Uthmeier gives them. *See e.g.*, *Brody v. Vill. of Port Chester*, 509 F. Supp. 2d 269, 284 (S.D.N.Y. 2007) (analyzing the possibility that the content of a notice of was insufficient to provide actual notice). A directive that Uthmeier provide actual notice is not satisfied by sending the TRO and initially informing law enforcement officers that they are bound, and then issuing subsequent statements that are likely to mislead law enforcement officers into believing they are *not* bound. This defeats actual notice.

In a variety of ways, Uthmeier's April 23rd Letter conveyed to law enforcement that they could and should disregard the April 18th Letter's message that they were required by court order to cease enforcement of S.B. 4-C. In the opening sentences of the letter, Uthmeier recharacterized the April 18th Order as the Court's "belie[f]," rather than the Court's "order" that law enforcement officers were bound by the TRO. *Compare* (DE 57-1 at 2), *with* (DE 57-2 at 2.) After telling the recipients that Defendants had filed a brief arguing that the Court's "after-the-fact expansion of [its] order" was wrong, Uthmeier

made the remarks in the second paragraph of the letter that are at the heart of this inquiry. (DE 57-1 at 2.)

Initially, the introductory sentence of the second paragraph implied that the paragraph was redefining the April 18th Letter in some way. (*Id.* ("I want to make clear what I expressed in my April 18 letter.")) Uthmeier went on to inform law enforcement, "I cannot prevent you from enforcing [S.B. 4-C], where there remains no judicial order that properly restrains you from doing so. . . .[, and] it is my view that no lawful, legitimate order currently impedes your agencies from continuing to enforce" the law. (*Id.*) This language is a direct contradiction of his prior notice to law enforcement agency heads that they should "instruct [their] officers and agents to comply with Judge Williams' directives" that "law enforcement officers should take no steps to enforce [S.B. 4-C.]" (DE 57-2 at 3.) In fact, it is difficult to imagine language better crafted to reverse officers' understanding of whether they are bound by the TRO short of "I hereby revoke my actual notice of April 18, 2025 and inform you that no court order prohibits your enforcement of S.B. 4-C."[11]

---

[11] At the Show Cause Hearing, Uthmeier's counsel contended that the absence of any confirmed arrests in violation of the TRO since the April 18th Order is evidence that the April 23rd Letter was not understood by its recipients as a green light to continue enforcing S.B. 4-C. While the Court is encouraged that arrests have ceased, this does not alter the Court's conclusion on contempt. Even if the Court could be certain that there have been no recent arrests, this may well be in spite of the April 23rd Letter. In any event, while Uthmeier has presented no direct evidence of law enforcement officers' understanding of the April 23rd Letter, the "reaction of the recipients" is but one of many factors Courts "take into consideration" when objectively analyzing a communication. *United States v. Baker*, 514 F. Supp. 3d 1369, 1380 (N.D. Fla. 2021); *see also United States v. Dillard*, 835 F. Supp. 2d 1120, 1123 (D. Kan. 2011) (describing the objective analysis of a communication as asking how "'an ordinary, reasonable person who is familiar with the context of the communication would interpret it'" and being "a fact-intensive inquiry, in which the language, the context in which the statements were made, as well as the recipients' responses are all relevant") (quoting first *Nielander v. Bd. of Cnty. Comm'rs*,

**2. Uthmeier's alternative explanations for the final two sentences of the April 23rd Letter are implausible**

In response, Uthmeier maintains that "reading the letter as a whole and in the context of what preceded it," the letter is properly understood to "keep [law enforcement] informed" of updates in the litigation and "explain . . . the legal views the Attorney General expressed in his brief, and . . . the scope of *his* authority, as opposed to *the Court's* authority." (DE 81 at 9–11 (emphasis in the original).) In fact, Uthmeier states, the April 23rd Letter "expressly reiterated the Court's conclusion that the TRO 'bound' the letter's recipients." (*Id.* at 10 (quoting DE 57-1 at 2).) These explanations are untenable.

First, it may well be true that Uthmeier wanted to keep the non-party law enforcement officers apprised of his recent filings in the case, his litigation plan, and his legal views. However, this explains the first paragraph of the April 23rd Letter, not the problematic second paragraph. In the first paragraph, Uthmeier tells the readers that his "office filed a brief explaining why [the Court's] order cannot possibly restrain Florida's law enforcement agencies from enforcing [S.B. 4-C]" and "will continue to argue that position—including on appeal as soon as possible." (DE 57-1 at 2.) Unfortunately, Uthmeier continued.

Uthmeier argues that the second paragraph—particularly the language "I cannot prevent you from enforcing [S.B. 4-C], where there remains no judicial order that properly restrains from doing so"—clarifies that law enforcement are enjoined pursuant to the Court's authority, not his. (DE 81 at 10–11.) But as Plaintiffs point out, the second clause

---

582 F.3d 1155, 1167–68 (10th Cir. 2009); and then quoting *United States v. Spring*, 305 F.3d 276, 280 (4th Cir. 2002)).

of that sentence undermines Uthmeier's suggested reading. (DE 87 at 13 n.7 ("[T]he letter—read objectively—asserts that the Attorney General lacks authority to prevent enforcement *because* there is no valid injunction against such enforcement. That statement, if anything, suggests the Attorney General would otherwise have authority to control law enforcement."). Had Uthmeier wanted law enforcement to understand his position that he does not control them because he is not a judicial officer or because law enforcement agencies are independent from the Attorney General under Florida's constitutional and statutory framework, he should have said exactly that rather than cast the Court's order as illegitimate. Moreover, this argument cannot explain the subsequent sentence, which expresses Uthmeier's view "that no lawful legitimate order currently impedes" officers from enforcing S.B. 4-C, without anywhere mentioning Uthmeier's control over those officers.[12] (DE 57-1 at 2.)

Uthmeier's final effort to salvage the April 23rd Letter is to quote a portion of the second sentence of the letter and portray it as a reiteration of the notice he provided in the April 18th Letter. (DE 81 at 18 ("[N]othing in the April 23 Letter revoked the Attorney General's prior notice. To the contrary, the April 23 Letter reiterates the April 18 Letter. It says: "all law enforcement agencies in Florida were bound by an *ex parte* temporary restraining order.").) Uthmeier is grasping at semantic straws. The full sentence and the

---

[12] Uthmeier argues that this last sentence merely lays out the arguments made in his brief. (DE 81 at 10.) This interpretation would make the sentence wholly redundant, given the first paragraph of the letter. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) (guiding that interpretation of a legal text should "consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). But more importantly, despite mentioning his brief, Uthmeier does not phrase his view as a legal argument, but as a statement of the law enforcement officers' current legal ability to enforce the Statute. (DE 57-1 at 2.)

full letter do not repeat the message that all law enforcement agencies in Florida continue to be bound by the TRO. The sentence recasts the Court's Order as a matter of the judge's "belie[f]," and the letter concludes by telling law enforcement that "there remains no judicial order that properly restrains" them from enforcing S.B. 4-C. (DE 57-1 at 2.)

In short, the final two sentences of the April 23rd Letter, taken in the context of the preceding paragraph, the April 18th Letter, and the procedural realities of the litigation, would undermine a reasonable law enforcement officer's understanding that they were prohibited by the April 18th Order from enforcing S.B. 4-C. Therefore, they effectively rescind Uthmeier's previous notice and violate the April 18th Order's actual notice requirement.

### 3. Uthmeier's public comments conflict with his argument

Uthmeier's argument that his April 23rd Letter was not designed to rescind the notice given in his April 18th Letter also conflicts with his own public statements. When asked in a May 6, 2025 interview about the pending show cause proceedings, Uthmeier stated that he was, in fact, refusing to comply with the Court's order. He said, "This judge is considering whether or not to hold me in contempt. **But I am not going to rubber stamp her order, I'm not going to direct law enforcement to stand down on** . . . carrying out Florida's law. . . . **So I'm not gonna do that, I'm not going to bow down**[.]"[13] Later in that interview, Uthmeier was asked about the TRO, and he doubled down on the problematic language in his April 23rd Letter: "if [law enforcement officers] want to arrest

---

[13] In this comment, as in others quoted here, Uthmeier mischaracterizes the nature of the Court's actual notice requirement. Defendants were ordered to inform law enforcement officers that the Court had enjoined their enforcement of S.B. 4-C. Uthmeier's mischaracterization does not change his message, which is a clear proclamation of his refusal to comply with the actual notice mandate.

people under the law . . . they have the authority to do that and I'm not going to stand in their way."

Two days later, Uthmeier publicly reaffirmed his unwillingness to follow the April 18th Order and then tripled down on his revocation of the April 18th Letter. He said, **"[W]e have a judge who is threatening to hold me in contempt because I won't follow an order she has to direct our law enforcement not to enforce [S.B. 4-C]**. . . . So, she's issuing this order and saying you gotta tell them all to stand down. **I'm not gonna do that**." Moments later, he added, "I respect these independent law enforcement bodies and their prerogative to follow the law and **they should do that**."

The Court analyzes the objective meaning of the April 23rd Letter without considering Uthmeier's subjective intent. *See Ga. Power Co.*, 484 F.3d at 1291. However, the statements are relevant. First, to the extent there is any question about the ambiguity of the April 18th Order, Uthmeier's "record of continuing and persistent violations and persistent contumacy justif[y] placing the burden of any uncertainty in the [Order] on [Uthmeier's] shoulders." *Taggart*, 587 U.S. at 562 (alterations and internal quotations omitted). Additionally, Uthmeier's repeated reinforcement of his message that law enforcement is *not bound*, intentional or not, increases the chance of harm from his continued noncompliance.[14]

---

[14] The Court recognizes Uthmeier may still be acclimating to the new and difficult role of attorney general, which he began two months prior to this case without the benefit of significant experience managing civil or criminal litigations. The Court gives Uthmeier the benefit of the doubt that his words were, as his Counsel said at the Show Cause Hearing, merely "puffery," and that he did not intend to undermine the integrity of the Court or place law enforcement officers at risk of being held liable for committing constitutional violations. Again, however, "absence of willfulness does not relieve from civil contempt" so "it matters not with what intent [Uthmeier] did the prohibited act." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *see also Leshin*, 618 F.3d at 1233 ("We do not focus 'on the

### 4.  Uthmeier's request for special solicitude is misplaced

Finally, Uthmeier asserts that the Court "owe[s] him respect as an official and . . . the most careful and reasoned treatment as party or as litigant[,]" and should therefore refrain from finding him in contempt. (DE 81 at 16–17 (quoting *In re Attorney General of U.S.*, 596 F.2d 58, 64 (2d Cir. 1979)) (arguing contempt proceedings against a state attorney general risk disrupting the sensitive balances of power between the state and federal governments and between the judiciary and executive branches).)  The Court is aware of Uthmeier's status as the state's chief legal officer and appreciates the importance of his relationship with members of Florida's public, the law enforcement community, and other government actors. Fla. Const. art. IV sec. 4(b) (providing that the "attorney general shall be the chief state legal officer"); *State v. Love*, 126 So. 374, 376 (Fla. 1930) ("The Attorney-General is the attorney and legal guardian of the people . . . . [I]t is his duty to use means most effectual to the enforcement of the laws, and the protection of the people.").

Indeed, as the state's chief legal officer, Uthmeier has the weighty responsibility of giving "official opinion[s] and legal advice" to state and local government actors. Fla. Stat. § 16.01(3). So when Uthmeier speaks in his official capacity, his words have power. *See Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 473 (Fla. 2005) (describing the legal opinion of the Attorney General as "entitled to careful consideration" and generally "regarded as highly persuasive"); *United States v. Koubriti*, 305 F. Supp. 2d 723, 759 (E.D. Mich. 2003) (sanctioning the United States Attorney General for

---

subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue.'") (quoting *Ga. Power Co.*, 484 F.3d at 1291).

violating court order by making prejudicial public statements about an ongoing criminal proceeding, and noting that as the "attorney for the body politic" there is "a material difference between a [public statement] issued by the Attorney General and one given out by an attorney for a private client") (quoting ABA Comm. on Prof'l Ethics and Grievances, Formal Op. 199 (1940)). As Attorney General, Uthmeier also has other "important and far-ranging responsibilities, including the power to institute litigation on his own initiative. . . . [o]n behalf of the state[.]" *Fla. Carry, Inc. v. Univ. of N. Fla.*, 133 So. 3d 966, 989 (Fla. Dist. Ct. App. 2013) (Makar, J., concurring) (alterations and internal quotations omitted).

Uthmeier's role endows him with a unique capacity to uphold or undermine the rule of law, and when he does the latter by violating a court order, the integrity of the legal system depends on his conduct being within the Court's remedial reach. *See J.G.G.,* 2025 WL 1119481, at *1 ("The Constitution does not tolerate willful disobedience of judicial orders—especially by officials of a coordinate branch who have sworn an oath to uphold it. To permit such officials to freely 'annul the judgments of the courts of the United States' would not just 'destroy the rights acquired under those judgments'; it would make 'a solemn mockery' of 'the constitution itself. . . . So fatal a result must be deprecated by all.'") (quoting *United States v. Peters*, 9 U.S. (5 Cranch) 115, 136 (1809) (Marshall, C.J.)). The very cases Uthmeier cites to support the notion that his status somehow shields him from a contempt finding bolster this principle. *E.g. Newman v. State of Ala.*, 683 F.2d 1312, 1318 (11th Cir. 1982) ("While a federal court is always reluctant to coerce compliance with its decrees by incarcerating a state official, if that official is in contempt there can be no doubt of the court's authority to do so"); *In re Attorney General*, 596 F.2d

at 64 ("[W[e unequivocally affirm the principle that no person is above the law").[15]

Equally important is the law's commitment to free speech, including that of government officials and anyone whose speech criticizes courts. "Criticism keeps us on our toes and helps us do a better job. . . . Courts . . . speak with the knowledge of their imperfections but also with a sense that they instill a fidelity to law that would be sorely missed in their absence." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025). To be clear, the Court is unconcerned with Uthmeier's criticism and disapproval of the Court and the Court's Order. But respect for the integrity of court orders is of paramount importance. Within the bounds of the local rules and professional rules of conduct,[16] Uthmeier is free to broadcast his continued appeal of the Court's

---

[15] *In re Attorney General* featured a court order requiring the United States Attorney General to release to opposing litigants the names of confidential government informants and the Attorney General's assertion "that the [court's] failure to recognize the [government's claim of] privilege would adversely affect the entire law enforcement and intelligence-gathering apparatus of the United States." 596 F.2d at 64. Here, the Court issued a routine order to Defendants to give actual notice to a non-party who was bound by the Court's injunctive relief. This case is devoid of the features that created sensitive separation of powers concerns in *In re Attorney General*. Meanwhile, in *Newman*, the plaintiffs had failed to move the court to initiate contempt proceedings following the state official defendants' violations of an injunction, and the Eleventh Circuit repeatedly guided them that moving for contempt would have been the proper remedy to pursue. 683 F.2d at 1318–20 ("In this case the plaintiffs chose to ignore equity's time-honored contempt procedure in their effort to obtain the State's compliance with the . . . [consent] decree.").

[16] Florida Bar Rule of Professional Conduct 4-8.4(d) provides, in part, that "[a] lawyer shall not . . . engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, jurors, witnesses, court personnel, or other lawyers on any basis." Rule 4-8.2(a) prohibits a lawyer from "mak[ing] a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge[.]" Fla. Bar R. of Pro. Conduct 4-8.2(a). Rule 4-8.4(c) prohibits "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]" Fla. Bar R. of Pro. Conduct 4-8.4(c). And finally, the Florida Bar Rule regulating public pretrial statements provides that "[a] lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will

---

injunction and his view that the Court's rulings are erroneous. However, when instructed to inform law enforcement that they are proscribed from enforcing an enjoined law, he may not tell them otherwise.

## B. *Sanctions*

"District courts have broad discretion in fashioning civil contempt remedies." *Howard Johnson*, 892 F.2d at 1519 (citing *United Mine Workers*, 330 U.S. at 303–04). But civil contempt sanctions must serve "either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *In re McLean*, 794 F.3d 1313, 1323 (11th Cir. 2015) (citations omitted). "A coercive contempt sanction comes with limitations; for instance, once a contemnor's contumacious conduct has ceased or the contempt has been purged, no further sanctions are permissible." *F.T.C. v. Leshin*, 719 F.3d 1227, 1231 (11th Cir. 2013) (citation omitted), *cert. denied*, *Leshin v. F.T.C.*, 571 U.S. 1126 (2014). In contrast, the Court's "discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that they be compensatory." *Id.* (quoting *Howard Johnson*, 892 F.2d at 1521). "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." *Id.* (quoting *McComb*, 336 U.S. at 193).

At the Show Cause Hearing, Plaintiffs stated that their priority is to ensure Uthmeier's statements do not result in harm to provisional class members in the form of arrests and detentions. Since the Court has not been made aware of any arrests or

---

have a substantial likelihood of materially prejudicing an adjudicative proceeding due to its creation of an imminent and substantial detrimental effect on that proceeding." Fla. Bar R. of Pro. Conduct 4-3.6(a). The Southern District of Florida Local Rules incorporate these rules. S.D. Fla. L.R. 11.1(c).

detentions pursuant to S.B. 4-C since the April 18th Order, Plaintiffs have been spared the downstream costs and attorneys' fees, such as those arising from monitoring cases and coordinating release.

The Court agrees the most critical remedial goal is ensuring that the original purpose of the April 18th Order, to prevent enforcement of S.B. 4-C, is fulfilled. Therefore, the Court will require Uthmeier to coordinate with the State Attorney Defendants and their law enforcement partners to file bi-weekly reports detailing whether any arrests, detentions, or law enforcement actions pursuant to S.B. 4-C have occurred, and if so, how many, when, and by which law enforcement agency. Further, if Defendants learn of any arrests pursuant to S.B. 4-C, Defendants must immediately file notice informing the Court. In the event this occurs, the Court will require Defendants to re-notice the arresting law enforcement agency to prevent future violations.[17] These sanctions have both coercive and compensatory elements. The bi-weekly reports are meant to shift the costs of continued monitoring for violative law enforcement activity—made necessary by Uthmeier's contumacious conduct—onto Uthmeier and away from Plaintiffs. The re-noticing requirement is meant to bring Uthmeier into compliance with the April 18th Order, should harm result from his noncompliance. Finally, if Uthmeier does not comply with these remedial sanctions, the Court will consider further sanctions, including fines and fees to compensate Plaintiffs for costs of enforcing the Court's order.

---

[17] The Court will also require that the language in any notice be given to Plaintiffs and the Court for review before being sent to the law enforcement agency.

## V.     CONCLUSION

Over a century ago, author and sometime logician Lewis Carroll guided readers through the looking glass.[18] Among the adventures there, we encounter a character who boasts of his mastery of words:

> "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."
>
> "The question is," said Alice, "whether you *can* make words mean so many different things."[19]

The answer then, as now, is no. Litigants cannot change the plain meaning of words as it suits them, especially when conveying a court's clear and unambiguous order. Fidelity to the rule of law can have no other meaning.

Therefore, it is **ORDERED AND ADJUDGED** as follows:

1. The Court finds Uthmeier in civil contempt of the Court's April 18th Order (DE 49) requiring Defendants to provide actual notice of the TRO to any law enforcement officer with power to enforce S.B. 4-C.

2. Uthmeier shall **FILE BI-WEEKLY REPORTS** detailing whether any arrests, detentions, or law enforcement actions pursuant to S.B. 4-C have occurred, and if so, how many, when, and by which law enforcement agency. The first report shall be filed on or before **July 1, 2025**. Further, If Defendants learn of any arrests pursuant to S.B. 4-C, Uthmeier shall file notice informing the Court of the details of the arrests immediately. Uthmeier may seek modification or

---

[18] Lewis Carroll, Through the Looking-Glass, and What Alice Found There (1871).

[19] *Id.* at 269–70.

termination of this reporting requirement after six months.

      **DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>17th</u> day of June, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE